# **EXHIBIT 5**

Case 2:24-cv-00093-JRG   Document 88-5   Filed 10/16/24   Page 2 of 9 PageID #: 4367

9/10/2024                VirtaMove Corp. v. Amazon.com, Inc., et al.                Donn Rochette

### Page 1

IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TEXAS
MIDLAND/ODESSA DIVISION

_____

VIRTAMOVE, CORP.,                  )
                                   ) CASE NO.
          PLAINTIFF,               ) 7:24-CV-00030
                                   )
     v.                            )
                                   )
AMAZON.COM, INC.; AMAZON.COM       )
SERVICES LLC; AND AMAZON WEB       )
SERVICES, INC.,                    )
                                   )
          DEFENDANTS.              )
_____)

VIDEOTAPED DEPOSITION OF DONN ROCHETTE
TAKEN REMOTELY VIA ZOOM VIDEOCONFERENCE
TUESDAY, SEPTEMBER 10, 2024
11:04 A.M. CDT

REPORTED BY AUDRA E. CRAMER, CSR NO. 9901

DIGITAL EVIDENCE GROUP
1730 M Street, NW, Suite 812
Washington, D.C. 20036
(202) 232-0646

### Page 2

1  VIDEOTAPED DEPOSITION OF DONN ROCHETTE,
2  TAKEN REMOTELY VIA ZOOM ON BEHALF OF THE DEFENDANTS
3  AT 11:04 A.M. CDT, TUESDAY, SEPTEMBER 10, 2024, BEFORE
4  AUDRA E. CRAMER, CSR NO. 9901, PURSUANT TO SUBPOENA.
5
6  APPEARANCES OF COUNSEL
7
8  ON BEHALF OF THE PLAINTIFF:
9
10       RUSS AUGUST & KABAT
11       BY:  PETER TONG, ESQUIRE
12       4925 GREENVILLE AVENUE, SUITE 200
13       DALLAS, TEXAS 75206
         (310) 826-7474
14       ptong@raklaw.com
15
   ON BEHALF OF THE DEFENDANTS:
16
         KNOBBE, MARTENS, OLSON & BEAR LLP
17       BY:  JEREMY ANAPOL, ESQUIRE
         2040 MAIN STREET, 14TH FLOOR
18       IRVINE, CALIFORNIA 92614
         (949) 760-0404
19       jeremy.anapol@knobbe.com
20
   ALSO PRESENT
21
         BILLY FAHNERT, VIDEOGRAPHER
22

### Page 3

1                     I N D E X
2  EXAMINATION                            PAGE
3  BY MR. ANAPOL                          5
4  BY MR. TONG                            95
5  BY MR. ANAPOL                          139
6  BY MR. TONG                            155
7
8             E X H I B I T S
9  NO.      PAGE      DESCRIPTION
10 1010     14        US PATENT 7,519,814
11 1009     18        ARCHIVE VERSION OF THE
12                    HOMEPAGE ONCORE SYSTEMS
13                    CORPORATION
14 1011     24        US PATENT 7,784,058
15 1012     42        AUSTRALIAN UNIX SYSTEMS
16                    USER GROUP NEWSLETTER,
17                    VOLUME 8, NUMBER 5
18    QUESTIONS INSTRUCTED BY COUNSEL NOT TO ANSWER
                        PAGE    LINE
19                      144      7
                        145      2
20    REPORTER'S NOTE: All quotations from exhibits are
   reflected in the manner in which they were read into the
21 record and do not necessarily indicate an exact quote
22 from the document.

### Page 4

1        REMOTELY VIA ZOOM VIDEOCONFERENCE
2        TUESDAY, SEPTEMBER 10, 2024, 11:04 A.M. CDT
3
4        THE VIDEOGRAPHER:  We are on the
5  record.  This is the remote video deposition of
6  Donn Rochette in the matter of VirtaMove Corp.
7  versus Amazon.com, Inc., et al., filed in the
8  United States District Court for the Western
9  District of Texas.
10       My name is Billy Fahnert.  I am the
11 video technician today.  The court reporter is
12 Audra Cramer.  We both represent Digital
13 Evidence Group.
14       Today's date is September 10, 2024.
15 The time is 11:04 a.m. Central Standard Time.
16       All parties have stipulated to the
17 witness being sworn in remotely.
18       Will Counsel please identify yourselves
19 for the record, and then the witness will be
20 sworn in.
21       MR. TONG:  This is Peter Tong from Russ
22 August & Kabat on behalf of VirtaMove

Case 2:24-cv-00093-JRG   Document 88-5   Filed 10/16/24   Page 3 of 9 PageID #: 4368

9/10/2024     VirtaMove Corp. v. Amazon.com, Inc., et al.     Donn Rochette

Page 5

1  Corporation?
2      MR. ANAPOL:  Jeremy Anapol of Knobbe
3  Martens Olson & Bear on behalf of Defendants.
4
5      DONN ROCHETTE,
6    having been first duly sworn, was
7    examined and testified as follows:
8
9      MR. ANAPOL:  Thank you.
10
11     EXAMINATION
12 BY MR. ANAPOL:
13   Q.  Mr. Rochette, thank you again for being
14 here today, taking time out of your schedule to
15 help us collect some information that we hope
16 will be helpful in our case.
17     Have you ever been deposed before?
18   A.  No.
19   Q.  Okay.  So I'll cover some general
20 background with you just to help you understand
21 the process.
22     But before that, can we start by having

Page 6

1  you state your full name for the record?
2    A.  My name is Donn Rochette.
3    Q.  And Mr. Rochette, where are you joining
4  us from today?
5    A.  I am calling from my home in northern
6  Iowa.
7    Q.  Okay.  So the deposition is going to
8  follow a question-and-answer format, and Audra,
9  our court reporter, is going to be transcribing
10 the answers.  Because she can only transcribe
11 one person speaking at a time, I'll ask that you
12 wait until I finish my question to start
13 answering, and I will try to wait until you
14 finish answering to ask the next question.
15     Mr. Tong, who's representing the
16 Plaintiffs, may have some objections which he
17 might chime in with, but you can go ahead and
18 answer the question after he finishes his
19 objection.  Those are for the record, so, if
20 necessary, the judge will look at those
21 objections later, but you don't need to concern
22 yourself with those.

Page 7

1    A.  Okay.
2    Q.  If you don't understand one of my
3  questions, please ask for clarification.  I'm
4  happy to provide it.
5      If you need to take a break at any
6  time, please let me know, but if there's a
7  question that's pending, I'll just ask that you
8  give the answer, and then we'll take a break
9  afterward.
10   A.  Okay.
11   Q.  Is there any reason why you cannot
12 provide complete and accurate testimony today
13 such as, you know, being on any medication or
14 anything like that?
15   A.  No.
16   Q.  And, Mr. Rochette, you used to work at
17 a company called Trigence Corp.; is that right?
18   A.  Yes.
19   Q.  And do you remember when you worked for
20 Trigence?
21   A.  Gosh, I couldn't give you the dates off
22 the top of my head, no.  It's been a long time.

Page 8

1    Q.  Was it in the early 2000s?
2    A.  Yes.
3    Q.  And did you understand that Trigence
4  later became AppZero?
5    A.  Yes.
6    Q.  And then there's a company called
7  AppZero Software Corp. which is now called
8  VirtaMove.
9      Do you understand that?
10   A.  I was not aware of that, no.  Not until
11 very recently.
12   Q.  And when did you become aware of that?
13   A.  Oh, about two months ago someone from
14 VirtaMove reached out to me over LinkedIn --
15   Q.  Okay.
16   A.  -- and pointed out the connection.
17   Q.  Do you remember who from VirtaMove
18 reached out to you over LinkedIn?
19   A.  The person identified himself as the
20 CEO of VirtaMove.  I can't remember his name.
21 Sorry.
22   Q.  Was his name Nigel Stokes?

Case 2:24-cv-00093-JRG   Document 88-5   Filed 10/16/24   Page 4 of 9 PageID #: 4369

9/10/2024                    VirtaMove Corp. v. Amazon.com, Inc., et al.              Donn Rochette

Page 37

1  which it did not require internal knowledge --
2  it didn't require knowledge to the internals of
3  Solaris in order to do what we were doing.  And
4  they -- in the end -- it was a rather lengthy
5  discussion.  In the end they recognized what we
6  were doing, and we parted friends.  Everything
7  was fine.
8       Q.  Okay.  So initially Trigence AE was for
9  Linux; right?
10      A.  Correct.
11      Q.  And --
12      A.  Linux and Windows.
13      Q.  Linux and Windows?
14      A.  Yes.
15      Q.  And then Solaris support was added
16 later?
17      A.  Yes.
18      Q.  Okay.  And so the meeting with Sun
19 Microsystems was after you had developed some
20 sort of Solaris capability for Trigence AE?
21      A.  I don't think it was released to the
22 public, but, yes, we had working versions.  Yes.

Page 38

1       Q.  Okay.  So what your understanding of
2  Solaris zones?
3       A.  Oh gosh.  That is a lengthy answer.
4           Zones would provide a separate
5  container, a separate security environment for
6  each app and for our multiple -- and for an
7  application to run it.  So you could define a
8  zone for each application you had running in
9  Solaris.  That zone would allow the application
10 to have its -- potentially its own version of
11 files.  It would -- I don't recall if it had
12 isolated networking, but it would provide a
13 secure environment, and it would provide a
14 separate instance of files and so forth.
15          And, it was -- if you look at it at a
16 very high level, it looked somewhat like what
17 Trigence AE was doing very differently and at
18 different -- very different results but
19 largely -- largely the same -- well -- anyway,
20 at the very, very highest level, objectives were
21 similar.
22      Q.  Okay.

Page 39

1       A.  Does that help?
2       Q.  Sure.
3           So what are some of the differences
4  between what Trigence AE was doing and what
5  Solaris zones was doing?
6       A.  With zones, Solaris would utilize some
7  operating system features to create a separate
8  file area.  They had modified the kernel, the
9  internals of Solaris, to support this.  It
10 relied on kernel internals to provide
11 separations between applications' end zones.  It
12 would provide separate scheduling types of
13 mechanisms and so forth also implemented in the
14 kernel.
15          The Trigence solution made no changes
16 to the kernel -- or didn't require any changes
17 to the kernel.  It was all done with what was
18 called function overlays, where the calls made
19 to shared libraries could be, essentially,
20 redirected to calls in the Trigence library, and
21 we were able to manipulate things in that way.
22 It had nothing to do with separate zones or

Page 40

1  kernel changes or anything.  So...
2       Q.  Okay.  So when you say that Solaris
3  zones was different from what Trigence was
4  doing, you were contrasting Solaris zones with
5  the Trigence product, not the patents; correct?
6       A.  Yes.
7       Q.  So can you explain these function
8  overlays to me a little bit more.
9       A.  Function overlays use an operating
10 system capability called library preload.  In
11 Unix and Linux and Solaris it's called
12 LD_Preload.  In Windows it's called AppInit_DLL.
13 And what happens is you would use LD_Preload or
14 AppInit_DLL to identify a library that you
15 wanted loaded with your -- with an application
16 as it starts.  When that application starts,
17 there's a dynamic loader that would load the
18 application plus other requisite libraries.
19          And LD_Preload/AppInit_DLL would say in
20 addition to the requisite libraries, also load
21 this library, and load it first before any other
22 libraries.  So that has the effect of managing

Case 2:24-cv-00093-JRG   Document 88-5   Filed 10/16/24   Page 5 of 9 PageID #: 4370

9/10/2024                    VirtaMove Corp. v. Amazon.com, Inc., et al.                    Donn Rochette

Page 53

1  Q. That reminds me. One follow-up
2  question about OnCore: So was OnCore selling
3  the operating system we discussed earlier by
4  2021?
5  A. Yes.
6  Q. By 2002 did software developers in
7  Silicon Valley know that software could run
8  inside of containers?
9      MR. TONG: Objection. Foundation.
10 Calls for speculation.
11     THE WITNESS: Yes. The use of the term
12 "containers" is broad, but if you allow yourself
13 a broad definition of "containers," the answer
14 is yes.
15 BY MR. ANAPOL:
16 Q. Did software developers in Silicon
17 Valley by 2002 know that servers could host more
18 than one container?
19     THE WITNESS: Yes.
20     MR. TONG: Same objection, belated.
21 BY MR. ANAPOL:
22 Q. By 2002 did software developers in

Page 54

1  Silicon Valley know that putting an application
2  in a container could prevent the application
3  from accessing files in another container?
4      MR. TONG: Same objection. Calls for a
5  legal conclusion.
6      I'm also objecting to this whole line
7  of questioning again as getting into fact
8  discovery that Mr. Donn Rochette is not
9  obligated to answer during venue discovery.
10 BY MR. ANAPOL:
11 Q. Do you need me to repeat the question,
12 Mr. Rochette?
13 A. Yes, please.
14 Q. Sure.
15     By 2002 did software developers in
16 Silicon Valley know that putting an application
17 in a container could prevent the application
18 from accessing files in another container?
19     MR. TONG: Same objections.
20     THE WITNESS: Yes. In the context of
21 Solaris zones, that is a true statement.
22

Page 55

1  BY MR. ANAPOL:
2  Q. By 2002 did software developers in
3  Silicon Valley know that putting an application
4  in a container could prevent the application
5  from interfering with applications in another
6  container?
7      MR. TONG: Same objections. Calls for
8  speculation. Foundation. Calls for a legal
9  conclusion. Not venue discovery.
10     THE WITNESS: Again, in the context of
11 Solaris zones, that would be an accurate
12 statement. At least in the context of Solaris
13 zones.
14 BY MR. ANAPOL:
15 Q. What about in the context of OnCore
16 operating system?
17 A. Yes.
18     MR. TONG: Same objections.
19     THE WITNESS: Well, no, not in OnCore.
20 In Trigence. Excuse me.
21 BY MR. ANAPOL:
22 Q. So did the OnCore containers not

Page 56

1  confine the applications in the container?
2      MR. TONG: Objection. Calls for legal
3  conclusions.
4      THE WITNESS: Yeah, it's difficult to
5  answer.
6      The Unix applications running with Unix
7  were not separated and could affect each other.
8  Embedded applications were separated.
9  BY MR. ANAPOL:
10 Q. So, in other words, you could have
11 multiple applications in one container?
12     MR. TONG: Objection. Vague.
13     THE WITNESS: In a Unix context, yes.
14 BY MR. ANAPOL:
15 Q. And the applications running in the
16 Unix context on top of OnCore would be prevented
17 from interfering with the applications running
18 on the real-time portion of the operating
19 system; correct?
20 A. Yes.
21     MR. TONG: Objection. Calls for a
22 legal conclusion.

Case 2:24-cv-00093-JRG   Document 88-5   Filed 10/16/24   Page 6 of 9 PageID #: 4371

9/10/2024                    VirtaMove Corp. v. Amazon.com, Inc., et al.                    Donn Rochette

Page 57

1  BY MR. ANAPOL:
2     Q.  Sorry.  Can you just repeat the answer,
3  Mr. Rochette.
4     A.  The answer is yes.
5     Q.  And is it also true that putting an
6  application in the Unix container in the OnCore
7  operating system would prevent it from
8  interfering with files outside of that
9  container?
10        MR. TONG:  Objection.  Calls for
11 speculation.  Calls for a legal conclusion.
12        THE WITNESS:  That is a true
13 statement -- an accurate statement.
14 BY MR. ANAPOL:
15    Q.  By 2002 did software developers in
16 Silicon Valley know that containers could have
17 their own root file systems?
18        MR. TONG:  Objection.  Calls for
19 speculation.  Leading.
20        THE WITNESS:  That is an accurate
21 statement in the context of zones and
22 Trigence AE [garbled].

Page 58

1        (The reporter requested clarification.)
2        THE WITNESS:  Sorry.
3        That is an accurate statement in the
4  context of Solaris zones, Trigence AE at least.
5  BY MR. ANAPOL:
6     Q.  I want to clarify that because I'm
7  asking about 2002.
8        So does that change your answer?
9     A.  Oh.
10        MR. TONG:  Objection.  Asked and
11 answered.  Same objection as well.
12        THE WITNESS:  In answer to your
13 question, yes.  I shouldn't use examples, but,
14 yes, people knew that that was possible.
15 BY MR. ANAPOL:
16    Q.  And are you familiar with a Unix
17 command called chroot.
18    A.  Yes.
19    Q.  And did that Unix command allow a user
20 to give an application its own root file system?
21    A.  Yes.
22    Q.  And do you know when chroot was

Page 59

1  introduced?
2     A.  It was introduced in the early Unix
3  days before Solaris.  It was introduced by the
4  Bell Labs people when they first did Unix.  It
5  goes way back.
6     Q.  So by the 1980s at least?
7     A.  At least.  Before then, yes.
8     Q.  And are you familiar with something
9  called BSD jails?
10    A.  Yes.  I forgot about those.  Yes, I am.
11    Q.  And what was BSD jails?
12    A.  It was an open source response to the
13 capabilities in Solaris zones.  It was a way of
14 obtaining very similar behavior exemplified by
15 zones in an open source Unix capability that
16 didn't require licensing yet.  They're not
17 exactly the same, but it was close enough.
18    Q.  So is BSD jails another container
19 capability?
20    A.  Yes.
21        MR. TONG:  Objection.  Calls for legal
22 conclusion to the previous question.

Page 60

1  BY MR. ANAPOL:
2     Q.  And do you know one way or the other if
3  "BSD" stands for "Berkeley Software
4  Distribution"?
5     A.  It is my understanding that that is
6  what it stands for, yes.
7     Q.  And that's referring to the University
8  of California, Berkeley, in Northern California?
9     A.  That is my understanding, yes.
10    Q.  By 2002 did software developers in
11 Silicon Valley know that containers could run on
12 top of a kernel that was residing outside of the
13 caper?
14        MR. TONG:  Objection.  Calls for
15 speculation.  Foundation.  Leading.
16        THE WITNESS:  Yes.
17        MR. TONG:  Calls for a legal
18 conclusion.  Sorry.
19        THE WITNESS:  People understood that.
20 BY MR. ANAPOL:
21    Q.  We're almost done with this line of
22 questions, just so you know, Mr. Rochette.  I

Case 2:24-cv-00093-JRG   Document 88-5   Filed 10/16/24   Page 7 of 9 PageID #: 4372

9/10/2024                           VirtaMove Corp. v. Amazon.com, Inc., et al.                        Donn Rochette

Page 61

1  know it's repetitive in some sense.
2       By 2002 did software developers in
3  Silicon Valley know that servers could limit the
4  resources used by a container?
5       MR. TONG: Objection. Calls for
6  speculation. Foundation. Leading.
7       THE WITNESS: Yes.
8  BY MR. ANAPOL:
9   Q. And did the OnCore operating system
10 have the ability to limit resources used by a
11 container?
12      MR. TONG: Same objections.
13      THE WITNESS: That was not the intent
14 of the OnCore system, no. There was no explicit
15 limiting of resources or -- in that -- in that
16 architecture.
17 BY MR. ANAPOL:
18  Q. But the OnCore system would allow a
19 real-time program to preempt an application
20 running in a Unix container; correct?
21  A. That is correct. But not for -- it
22 would not allow -- it would not enforce the

Page 62

1  amount of memory, for example, that a Unix
2  application would use. Nothing of that nature
3  was done.
4       Yes, the really important thing was
5  that an application running in a real-time
6  context could preempt anything running in Unix
7  and be able to respond immediately.
8   Q. And when the real-time application
9  preempts the application in the Unix container,
10 the real-time container is taking processing
11 resources away from the container at that time?
12  A. Absolutely correct, yes.
13      MR. TONG: Same objections.
14      THE WITNESS: Sorry. I should wait for
15 you to object.
16      Yes.
17 BY MR. ANAPOL:
18  Q. By 2002 did software developers in
19 Silicon Valley know that servers could monitor
20 and log a container's resource usage?
21      MR. TONG: Same objections.
22      THE WITNESS: Yes.

Page 63

1  BY MR. ANAPOL:
2   Q. And by 2002 did software developers in
3  Silicon Valley know that containers could have
4  their own IP address separate from a host?
5       MR. TONG: Same objections.
6       THE WITNESS: I'm not 100 percent sure
7  of that. That was very difficult -- that's very
8  difficult to accomplish, the IP address, and I
9  don't -- honestly don't recall if that was
10 considered sort of commonplace.
11 BY MR. ANAPOL:
12  Q. But would it surprise you if someone
13 had that capability before 2002?
14      MR. TONG: Objection --
15      THE WITNESS: It would not surprise
16 me --
17      MR. TONG: -- foundation.
18      THE WITNESS: -- no.
19      Oh, sorry.
20 BY MR. ANAPOL:
21  Q. Can you repeat the answer,
22 Mr. Rochette.

Page 64

1   A. It would not surprise me, no.
2   Q. And by 2002 did software developers in
3  Silicon Valley know how to move software
4  functionality into a shared library?
5       MR. TONG: Objection. Calls for
6  speculation. Foundation. Legal conclusion.
7  Not venue discovery. Leading.
8       THE WITNESS: Yes.
9  BY MR. ANAPOL:
10  Q. And do you know whether Trigence
11 released its container software before or after
12 Solaris zones?
13  A. I don't recall whether anything in
14 Windows or Linux was released before or after
15 zones, no. I don't recall the dates, no.
16  Q. Have you ever heard of Docker?
17  A. Yes.
18  Q. And what is your understanding of
19 Docker?
20  A. Docker is a container technology that
21 is in wide use today.
22  Q. And when did you first hear about

Case 2:24-cv-00093-JRG   Document 88-5   Filed 10/16/24   Page 8 of 9 PageID #: 4373

9/10/2024                           VirtaMove Corp. v. Amazon.com, Inc., et al.                          Donn Rochette

Page 157

1 were very -- very abstract to me. The lawyer
2 did them, and we had conversations about the
3 technology and how it worked. I would --
4 BY MR. TONG:
5    Q. Don't --
6       MR. ANAPOL: Don't --
7 BY MR. TONG:
8    Q. Don't discuss anything --
9       MR. ANAPOL: Peter -- Peter, you have
10 to let him finish his answer.
11      MR. TONG: Well, I'm going to tell him
12 not to reveal anything privileged.
13   Q. So to the extent you're about to say
14 anything about your discussions with a lawyer,
15 don't reveal that. But otherwise, go ahead and
16 finish answering the question.
17   A. Yeah, in a very -- discussions about
18 the claims were always very vague and very
19 legal, and I would -- I don't know. I make
20 no -- I don't know how to -- I don't know how to
21 defend or answer your questions about claims. I
22 just don't. I'm not the right guy to do that.

Page 158

1    Q. Yeah, to clarify my question, it's not
2 whether or not the claims ended up one way or
3 another. My question was about your intent at
4 the time.
5       Would it have been your intent for your
6 patent to capture the technology as you
7 understood and described it today?
8       MR. ANAPOL: Same objections --
9       THE WITNESS: It was my --
10      MR. ANAPOL: -- and relevance.
11      THE WITNESS: It was my intent to get
12 the description of the invention -- to describe
13 it as it worked. That was my intent. It's up
14 to the company and the lawyers and so forth to
15 nail down the claims. That was not my -- I
16 wasn't involved. Not my -- no intent. My
17 intent was to be able to describe how the
18 invention worked.
19      MR. TONG: Okay. Thank you,
20 Mr. Rochette.
21      Pass the witness. And we should be
22 done.

Page 159

1       Can you confirm, Jeremy?
2       MR. ANAPOL: Yes.
3       Thanks again for your time,
4 Mr. Rochette.
5       MR. TONG: Thank you so much.
6       THE WITNESS: Am I free to go?
7       MR. ANAPOL: You are free to go.
8       MR. TONG: Mr. Rochette -- we can go
9 off the record.
10      THE VIDEOGRAPHER: Okay. We are going
11 off the record. This deposition is concluded at
12 2:39.
13      (Discussion held off the record.)
14      THE REPORTER: Counsel, do you need a
15 rough draft of this?
16      MR. ANAPOL: Yes, please.
17      THE REPORTER: And, Peter, do you need
18 a rough?
19      MR. TONG: Yes.
20          (Whereupon, at 2:44 P.M. CDT
21      the deposition of DONN ROCHETTE
22      was adjourned.)

Page 160

1 STATE OF CALIFORNIA    )
2 COUNTY OF LOS ANGELES  ) SS.
3
4    I, AUDRA E. CRAMER, CSR No. 9901, in and for the
5 State of California, do hereby certify:
6       That, prior to being examined, the witness named
7 in the foregoing deposition was by me duly sworn to
8 testify the truth, the whole truth and nothing but the
9 truth;
10      That said deposition was taken down by me in
11 shorthand at the time and place therein named, and
12 thereafter reduced to typewriting under my direction,
13 and the same is a true, correct and complete transcript
14 of said proceedings;
15      I further certify that I am not interested in the
16 event of the action.
17      Witness my hand this 18 day of September,
18 2024.
19
20      _____
21      Certified Shorthand
        Reporter for the
22      State of California

Case 2:24-cv-00093-JRG   Document 88-5   Filed 10/16/24   Page 9 of 9 PageID #: 4374

9/10/2024                VirtaMove Corp. v. Amazon.com, Inc., et al.                Donn Rochette

Page 161

```
 1    Donn Rochette, c/o
      Pro se
 2

 3
      Case: VirtaMove Corp. v. Amazon.com, Inc., et al.
 4    Date of deposition: September 10, 2024
      Deponent: Donn Rochette
 5
 6    Please be advised that the transcript in the above
      referenced matter is now complete and ready for signature.
 7    The deponent may come to this office to sign the transcript,
 8    a copy may be purchased for the witness to review and sign,
 9    or the deponent and/or counsel may waive the option of
10    signing. Please advise us of the option selected.
11    Please forward the errata sheet and the original signed
12    signature page to counsel noticing the deposition, noting the
13    applicable time period allowed for such by the governing
14    Rules of Procedure. If you have any questions, please do
15    not hesitate to call our office at (202)-232-0646.
16
17
18    Sincerely,
19    Digital Evidence Group
20    Copyright 2024 Digital Evidence Group
21    Copying is forbidden, including electronically, absent
22    express written consent.
```

Page 162

```
 1    Digital Evidence Group, L.L.C.
      1730 M Street, NW, Suite 812
 2    Washington, D.C. 20036
      (202) 232-0646
 3
 4    SIGNATURE PAGE
      Case: VirtaMove Corp. v. Amazon.com, Inc., et al.
 5    Witness Name: Donn Rochette
      Deposition Date: September 10, 2024
 6
      I do hereby acknowledge that I have read
 7    and examined the foregoing pages
      of the transcript of my deposition and that:
 8
 9    (Check appropriate box):
      ( ) The same is a true, correct and
10    complete transcription of the answers given by
      me to the questions therein recorded.
11    ( ) Except for the changes noted in the
      attached Errata Sheet, the same is a true,
12    correct and complete transcription of the
13    answers given by me to the questions therein
14    recorded.
15
16
17    _____     _____
      DATE             WITNESS SIGNATURE
18
19
20
21    _____     _____
22    DATE             NOTARY
```

Page 163

```
 1    Digital Evidence Group, LLC
 2    1730 M Street, NW, Suite 812
 3    Washington, D.C. 20036
 4    (202)232-0646
 5
 6                    ERRATA SHEET
 7
 8    Case: VirtaMove Corp. v. Amazon.com, Inc., et al.
 9    Witness Name: Donn Rochette
10    Deposition Date: September 10, 2024
11    Page No.   Line No.     Change
12
13
14
15
16
17
18
19
20
21    _____   _____
22    Signature                  Date
```