# Exhibit 12

```
 1                UNITED STATES DISTRICT COURT
 2                 WESTERN DISTRICT OF TEXAS
 3                   MIDLAND/ODESSA DIVISION
 4
 5   VIRTAMOVE, CORP.,                  )
                                        )
 6          Plaintiff,                  )
                                        )
 7          vs.                         )Case No.
                                        )7:24-CV-00030-DC-DTG
 8   AMAZON.COM, INC.; AMAZON.COM       )
     SERVICES LLC; and                  )
 9   AMAZON WEB SERVICES, INC.,         )
                                        )
10          Defendants.                 )
     _____)
11
12
13   VIRTUAL VIDEOCONFERENCE VIDEO-RECORDED DEPOSITION OF
14                       PHIL ESTES
15
16               Friday, August 23, 2024
17    Remotely Testifying from Charlottesville, Virginia
18
19
20
21
22
23   Stenographically Reported By:
24   Hanna Kim, CLR, CSR No. 13083
25   Job No. 6879934
```

Page 1

```
 1         UNITED STATES DISTRICT COURT
 2          WESTERN DISTRICT OF TEXAS
 3           MIDLAND/ODESSA DIVISION
 4
 5  VIRTAMOVE, CORP.,      )
                           )
 6       Plaintiff,        )
                           )
 7   vs.            )Case No.
                    )7:24-CV-00030-DC-DTG
 8  AMAZON.COM, INC.; AMAZON.COM   )
    SERVICES LLC; and              )
 9  AMAZON WEB SERVICES, INC.,     )
                                   )
10       Defendants.               )
    _____  )
11
12
13       Virtual videoconference video-recorded
14  deposition of PHIL ESTES, taken on behalf of the
15  Plaintiff, remotely testifying from Charlottesville,
16  Virginia, on Friday, August 23, 2024, before Hanna
17  Kim, CLR, Certified Shorthand Reporter, No. 13083.
18
19
20
21
22
23
24
25
                                                 Page 2
```

```
 1     REMOTE APPEARANCES OF COUNSEL:
 2
 3  FOR PLAINTIFF VIRTAMOVE, CORP.:
 4      RUSS AUGUST & KABAT
 5      BY:  QI (PETER) TONG, ESQ.
 6      4925 Greenville Ave, Suite 200
 7      Dallas, Texas 75206
 8      310.826.7474
 9      ptong@raklaw.com
10
11  FOR DEFENDANTS AMAZON.COM, INC.; AMAZON.COM SERVICES
12  LLC; and AMAZON WEB SERVICES, INC.:
13      KNOBBE, MARTENS, OLSON & BEAR
14      BY:  NATHAN D. REEVES, ESQ.
15      925 4th Avenue, Suite 2500
16      Seattle, Washington 98104
17      206.405.2000
18      nathan.reeves@knobbe.com
19
20  ALSO PRESENT:
21      STEVEN TOGAMI, Videographer
22
23
24
25
                                                 Page 3
```

```
 1              INDEX OF EXAMINATION
 2
 3  WITNESS:  PHIL ESTES
 4  EXAMINATION                               PAGE
 5      BY MR. TONG:                          8
 6
 7
 8
 9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
                                                 Page 4
```

```
 1              INDEX OF EXHIBITS
 2
 3  ESTES DEPOSITION EXHIBITS              PAGE
 4  Exhibit 1   "DECLARATION OF PHIL ESTES IN    10
 5              SUPPORT OF DEFENDANTS' MOTION
 6              TO DISMISS OR TRANSFER"; 5
 7              pages
 8  Exhibit 2   Printout of LinkedIn profile     53
 9              of Phil Estes; 4 pages
10                    --o0o--
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
                                                 Page 5
```

Page 6

```
 1   Remotely Testifying from Charlottesville, Virginia
 2          Friday, August 23, 2024
 3          1:31 p.m., Eastern Daylight Time
 4                 --o0o--
 5          THE VIDEOGRAPHER:  We are on the record at    01:31:23
 6   1:31 p.m., on August 23rd, 2024.
 7          Please note that this deposition is being
 8   conducted virtually.
 9          Quality of recording depends on the
10   quality of camera and internet connection of          01:31:55
11   participants.
12          What is seen from the witness and heard on
13   screen is what will be recorded.
14          Audio and video recording will continue to
15   take place unless all parties agree to go off the     01:32:02
16   record.
17          This is Media Unit Number 1 of the
18   video-recorded deposition of Phil Estes, taken by
19   counsel for the Plaintiff, in the matter of
20   VirtaMove Corporation versus Amazon.com, Inc.,        01:32:20
21   et al., filed in the United States District Court,
22   for the Western District of Texas, Midland/Odessa
23   Division, Case Number 7:24-cv-00030-DC-DTG.
24          My name is Steven Togami, representing
25   Veritext Legal Solutions, and I am the videographer.  01:32:49
```

Page 7

```
 1          The court reporter is Hanna Kim, from the
 2   firm Veritext Legal Solutions.
 3          I am not related to any party in this
 4   action, nor am I financially interested in the
 5   outcome.                                              01:32:57
 6          If there are any objections to proceeding,
 7   please state them at the time of your appearance.
 8          At this time, will counsel and all present
 9   please state their appearances and affiliations for
10   the record, starting with the noticing party.         01:33:17
11          MR. TONG:  This is Peter Tong from Russ
12   August & Kabat on behalf of VirtaMove Corporation.
13          MR. REEVES:  Nathan Reeves from Knobbe,
14   Martens, Olson & Bear on behalf of Defendants and
15   the witness.                                          01:33:35
16          THE WITNESS:  Phillip Estes from Amazon
17   Web Services.
18   ///
19   ///
20   ///
21   ///
22   ///
23   ///
24   ///
25   ///
```

Page 8

```
 1                PHIL ESTES,
 2      having been duly administered an oath,
 3      remotely upon the stipulation of counsel,
 4      was examined and testified as follows:
 5
 6                EXAMINATION
 7   BY MR. TONG:
 8      Q.  Thank you.
 9          Have you ever been deposed before,
10   Mr. Estes?                                            01:34:16
11      A.  No, I have not.
12      Q.  Okay.  So I'm going to go over a few rules
13   with you.
14          Is that all right?
15      A.  Yes.                                           01:34:22
16      Q.  So in this proceeding I'm going to ask you
17   some questions, and you must answer them truthfully
18   under oath.
19          Your attorney may object from time to
20   time, but you are still required to answer the       01:34:30
21   question that I ask unless your attorney clearly and
22   directly instructs you not to answer.
23          Do you understand?
24      A.  Yes.
25      Q.  There's no judge here today, but this is a    01:34:41
```

Page 9

```
 1   legal proceeding just like you're testifying in
 2   court, and you are under the same legal obligation
 3   to tell the truth under the penalty of perjury.
 4          Do you understand that?
 5      A.  Yes, I do.                                     01:34:57
 6      Q.  If you don't understand one of my
 7   questions, you can feel free to say so and ask for
 8   clarification.
 9          What you say today can be used in court,
10   and you will have an opportunity to read over the    01:35:09
11   transcript to correct any transcription mistakes.
12          Do you understand that?
13      A.  Yes.
14      Q.  From time to time we can take a break if
15   you need to.  And you can ask for a break at any     01:35:26
16   time, but we will not take a break while a question
17   is pending.
18          Do you understand that?
19      A.  Yes.
20      Q.  Okay.  Are you on any drugs or medications   01:35:35
21   that may affect your memory or ability to tell the
22   truth today?
23      A.  No, I am not.
24      Q.  Okay.  Is there any other reason why you
25   cannot provide truthful testimony today?             01:35:51
```

```
 1    A.  No.
 2    Q.  Okay.  I would like to at this time
 3 introduce Exhibit 1, which is -- which has been
 4 premarked.  It is the "DECLARATION OF PHIL ESTES."
 5        (Estes Deposition Exhibit 1 was marked for   01:36:13
 6        identification electronically.)
 7 BY MR. TONG:
 8    Q.  Mr. Estes, could you please open up this
 9 document.
10    A.  I have it open.                              01:36:18
11    Q.  Okay.  Do you recognize this as a true and
12 correct copy of the declaration that you had
13 submitted in this case?
14    A.  Yes, I do.  And there is one correction
15 that I'd like to make either at this time or when we  01:36:34
16 are discussing it.
17    Q.  Sure.
18        What is that correction?
19    A.  Paragraph 2 begins "I am also the Chair of
20 the Technical Oversight Board."                     01:36:47
21    Q.  Mm-hmm.
22    A.  And I did not catch that when we first
23 went over this document, that -- I had been the
24 chair for many years, but I've -- I'm still a
25 member, but I'm no longer the actual chair of the   01:37:01
                                                         Page 10
```

```
 1 oversight board.
 2    Q.  Okay.  In what years were you the chair?
 3    A.  I would have to look it up to be exact,
 4 but it was through last January, to the best of my
 5 recollection.                                        01:37:23
 6    Q.  And as the chair of the technical
 7 oversight board, what were your responsibilities?
 8    A.  Yeah, the oversight board for the open
 9 container initiative simply exists to -- to make
10 sure that the operation of that foundation --        01:37:44
11 foundation's technical activities aren't stuck.
12        So it's a board that only meets as
13 necessary.  And so while chair, I -- I chaired the
14 meetings of that board that were required as
15 necessary.                                           01:38:05
16        And I -- as I've mentioned, I'm still a
17 member, so I -- I still attend the meetings, but I'm
18 no longer the chair.
19    Q.  Are those meetings held virtually?
20    A.  Yes, they are.                                01:38:18
21    Q.  Okay.  How long did you spend preparing
22 and drafting this declaration?
23    A.  I -- I -- I -- I don't know an exact time.
24 But, you know, it's obviously quite a simple
25 declaration.  And I reviewed it, made necessary      01:38:39
                                                         Page 11
```

```
 1 corrections, but I have several places where I list
 2 my biography.  And I'm still correcting all the
 3 places that still say I'm the chair of the technical
 4 oversight board.  So this is yet another one that
 5 I -- that I had missed.                              01:38:58
 6    Q.  Sorry.  The question wasn't really about
 7 what you missed.
 8        Do you have an estimate as to the number
 9 of hours that you had worked on this declaration;
10 for example, whether it was one or two or ten or a   01:39:10
11 hundred hours?
12    A.  I would guess one or two hours.
13    Q.  Okay.  Did you write the first draft of
14 this declaration?
15        MR. REEVES:  Objection.  Vague.              01:39:24
16        THE WITNESS:  No, I didn't draft every
17 word of this declaration.
18 BY MR. TONG:
19    Q.  Did you write the first draft of this
20 declaration?                                         01:39:35
21        MR. REEVES:  Objection.  Asked and
22 answered.
23        THE WITNESS:  As I said, I didn't write
24 every word of this document.
25 BY MR. TONG:                                         01:39:45
                                                         Page 12
```

```
 1    Q.  Okay.  Did you review any documents when
 2 you were preparing this declaration?
 3        MR. REEVES:  Objection.  Vague.
 4        THE WITNESS:  Could you restate that in --
 5 in the sense of what documents you would -- I would  01:40:11
 6 review to author this?
 7 BY MR. TONG:
 8    Q.  Sure.
 9        In order to inform your knowledge about
10 the facts stated in this declaration, did you review 01:40:23
11 any documents?
12    A.  No.
13        MR. REEVES:  Objection.  Vague.
14 BY MR. TONG:
15    Q.  Did you do any searching or investigation    01:40:36
16 specifically to inform your knowledge of the facts
17 in this declaration?
18    A.  No.
19        MR. REEVES:  Objection.  Vague.
20 BY MR. TONG:                                         01:40:54
21    Q.  Sorry, could you repeat your answer?
22    A.  No, I did not.
23    Q.  Okay.  Other than attorneys, did you speak
24 to any people in order to inform your knowledge of
25 the facts in this declaration?                       01:41:11
                                                         Page 13
```

**Page 50**

1    THE WITNESS: FOSSY was in Portland,
2 Oregon. FOSDEM is in Brussels, Belgium. State of
3 OpenCon is London, UK. KubeCon last fall was in
4 Chicago, and Open Source Summit was in Seattle.
5 BY MR. TONG:                              02:52:59
6    Q. And your presentations there all related
7 somewhat to containers?
8    A. That --
9    MR. REEVES: Objection. Vague.
10   THE WITNESS: That is correct.       02:53:09
11 BY MR. TONG:
12   Q. Let's see.
13      In Paragraph 4 of your declaration, you
14 say that "Mr. McGowan is also part of the core team
15 that mentions [as read] 'containerd,'"     02:53:44
16 C-O-N-T-A-I-N-E-R-D -- sorry. Let me try and spell
17 that again. C-O-N-T-A-I-N-E-R-D.
18      Do you see that?
19   A. Yes.
20   Q. Could you explain to a judge or jury who  02:54:06
21 doesn't have a software background, what is
22 "containerd"?
23   MR. REEVES: Objection. Vague. Asked and
24 answered.
25   THE WITNESS: Yeah, I answered that in --  02:54:19

**Page 51**

1 in our prior se- -- segment. So I don't know if
2 you're looking for a -- if you thought this was a
3 different project. This is the same project I
4 mentioned.
5 BY MR. TONG:                              02:54:35
6    Q. I want to make sure we have different
7 answers for a container, C-O-N-T-A-I-N-E-R, and this
8 specific thing spelled C-O-N-T-A-I-N-E-R-D.
9       This "containerd" spelling, is that
10 something different from a generic container?  02:55:01
11   MR. REEVES: Objection. Vague.
12   THE WITNESS: Yes. This is the project I
13 mentioned that came out of the Docker engine project
14 into its own open-source project when we talked
15 about its location on GitHub, where I am also one of  02:55:21
16 the core maintainers of this project.
17   MR. REEVES: Hence, I believe it's
18 pronounced "containerd," if that helps.
19   MR. TONG: "Containerd." Okay.
20   THE WITNESS: Yes.                    02:55:42
21 BY MR. TONG:
22   Q. That seems to clean up my confusion.
23   MR. TONG: All right. Could we take a
24 quick five-minute break? I am nearing the end of my
25 outline.                                 02:56:09

**Page 52**

1    MR. REEVES: Sure.
2    THE VIDEOGRAPHER: Going off the record at
3 2:55 p.m.
4    (Short recess taken.)
5    THE VIDEOGRAPHER: Going back on the     03:02:24
6 record at 3:02 p.m.
7    MR. TONG: Thank you.
8 BY MR. TONG:
9    Q. Do you have any knowledge of Sun
10 Microsystems' development of Solaris in 2002?   03:02:48
11   MR. REEVES: Objection. Outside the
12 scope. Vague. Calls for speculation.
13   THE WITNESS: No.
14 BY MR. TONG:
15   Q. Okay. Do you have any knowledge related  03:03:11
16 to Solaris's development of its zones technology
17 in -- around the 2002/2003 time frame?
18   MR. REEVES: Objection. Outside the
19 scope. Vague. Calls for speculation.
20   THE WITNESS: I know about the technology   03:03:31
21 generally, but I have no idea about its development
22 or specifics about the technology.
23 BY MR. TONG:
24   Q. And you certainly were not involved in
25 Sun's development of zones in the 2002/2003 time   03:03:43

**Page 53**

1 frame; correct?
2    MR. REEVES: Objection. Vague. Outside
3 the scope.
4    THE WITNESS: That is correct.
5    MR. TONG: I'm going to introduce the    03:04:02
6 final exhibit today -- what I expect to be our final
7 exhibit.
8       Okay. It should be uploaded to the
9 Exhibit Share site. Please let me know when you are
10 able to access a copy of it.             03:04:56
11   (Estes Deposition Exhibit 2 was marked for
12    identification electronically.)
13   THE WITNESS: Yes, I just opened it.
14 BY MR. TONG:
15   Q. Do you recognize this as a copy of your   03:05:06
16 LinkedIn profile?
17   A. Yes.
18   Q. In the first paragraph it says you're
19 "currently an OSS maintainer for the CNCF containerd
20 project." [As read]                      03:05:29
21      What do those acronyms stand for?
22   A. OSS --
23   MR. REEVES: Objection. Lacks foundation.
24   THE WITNESS: OSS is open-source software.
25 A common just shorthand for open-source software.   03:05:40

14 (Pages 50 - 53)

```
 1        CNCF is the Cloud Native Computing
 2   Foundation.
 3   BY MR. TONG:
 4        Q.  Did you work on container technology at
 5   IBM before you joined Amazon Web Services?        03:06:06
 6        MR. REEVES:  Objection.  Vague.
 7        THE WITNESS:  Yes, I did.
 8   BY MR. TONG:
 9        Q.  Could you generally describe your roles
10   and responsibilities related to container technology   03:06:24
11   at IBM?
12        MR. REEVES:  Objection.  Vague.
13        THE WITNESS:  Yes.
14        I had a -- essentially the same role in
15   open source at both companies.  So I was a        03:06:43
16   maintainer of Docker and then of "containerd" while
17   at IBM and continued to be so here at AWS.
18   BY MR. TONG:
19        Q.  What IBM products did you work on?
20        MR. REEVES:  Objection.  Vague.  Lacks    03:07:12
21   foundation.  Outside the scope.
22        THE WITNESS:  So very similar to my role
23   at Amazon, I'm not directly writing code or leading
24   specific software teams for the services of IBM's
25   cloud, and I also don't do that here.         03:07:38
                                                Page 54
```

```
 1        I work with the open-source technologies
 2   that are used by, at the time IBM and now AWS, to
 3   make cloud software, manage software services.  But
 4   I did not work on -- directly on the teams of any
 5   IBM cloud service.                       03:07:58
 6   BY MR. TONG:
 7        Q.  Were you part of a team at IBM?
 8        A.  Yes.  I was in the office of the CTO.
 9        Q.  Where was that office?
10        A.  It was a title; the -- the office of the   03:08:28
11   CTO was a title.  The team itself was virtual
12   worldwide.
13        Q.  Did you work with any other IBM team
14   members on the East Coast?
15        MR. REEVES:  Objection.  Vague.       03:08:59
16        THE WITNESS:  Yes.  Our IBM research and
17   headquarters are both located in the state of New
18   York.
19   BY MR. TONG:
20        Q.  Were there engineers there who also worked   03:09:18
21   on container-related technology?
22        MR. REEVES:  Objection.  Vague.  Calls for
23   speculation.
24        THE WITNESS:  Yes.  If you mean
25   contributing to the open-source container     03:09:36
                                                Page 55
```

```
 1   technology, there were other employees also
 2   contributing, not from my team, but others were.
 3   BY MR. TONG:
 4        Q.  What's your best estimate of how many
 5   other employees were contributing to container    03:09:56
 6   technology at IBM on the East Coast?
 7        MR. REEVES:  Objection.  Vague.  Calls for
 8   speculation.  Outside the scope.
 9        THE WITNESS:  Yeah, I -- I -- picking a
10   number would be -- especially given it's been many   03:10:19
11   years, I'm -- I would represent it as a handful.
12   Many employees worked directly on the cloud
13   services, so contributing to open source was a -- a
14   much smaller group of people on the order of single
15   digits.                                  03:10:38
16   BY MR. TONG:
17        Q.  Okay.  On your LinkedIn, toward the bottom
18   of page 2, do you see where it says "STSM, IBM Cloud
19   Division"? [As read]
20        A.  Yes, I do.                       03:10:54
21        Q.  What does "STSM" stand for?
22        A.  It stands for senior technical staff
23   member.  Others in the industry call it member of
24   technical staff.
25        Q.  In the last sentence, underneath that   03:11:09
                                                Page 56
```

```
 1   heading, do you see where it says, "Phil currently
 2   works with IBM's Docker partnership, both in direct
 3   Docker community participation as well as cross-IBM
 4   Docker expertise for our clients and internal
 5   product teams"?                          03:11:38
 6        A.  Yes, I do.
 7        Q.  Can you give some of -- some examples of
 8   the clients?
 9        MR. REEVES:  Objection.  Vague.  Outside
10   the scope.                              03:11:55
11        THE WITNESS:  I presented to -- to many
12   IBM customers.  Some of them would come to my talks
13   at a conference, and then note that they were IBM
14   customers and were interested in our activity with
15   Docker.  Verizon, Apple, Cisco.  Yeah, I mean,   03:12:17
16   that's a few -- that's a few.
17   BY MR. TONG:
18        Q.  And what are the names of the internal
19   product teams that are referenced in that paragraph?
20        MR. REEVES:  Objection.  Vague.  Outside   03:12:42
21   the scope.
22        THE WITNESS:  So IBM had a Kubernetes
23   service called IKS.  That would be an internal team
24   that used container technology.  There's another
25   service that's been renamed that was serverless   03:13:00
                                                Page 57
```

15 (Pages 54 - 57)

```
 1  functions.  Functions is a service that was using
 2  container technology.  So those were internal teams
 3  at IBM cloud.
 4  BY MR. TONG:
 5     Q.  What does "IKS" stand for?         03:13:17
 6     A.  It stands for IBM Kubernetes Service.
 7     Q.  Do you know where the IKS team was
 8  located?
 9         MR. REEVES:  Objection.  Vague.  Outside
10  the scope.                                03:13:34
11         THE WITNESS:  Primarily in Raleigh, North
12  Carolina, at least their leaders that I interacted
13  with were in Raleigh; and also in Rochester,
14  Minnesota.
15  BY MR. TONG:                              03:13:53
16     Q.  And the serverless functions, was that
17  another team?
18     A.  Yes.
19     Q.  And do you know where they were located?
20         MR. REEVES:  Objection.  Vague.  Outside   03:14:09
21  the scope.
22         THE WITNESS:  Mostly in --
23         (Interruption in audio/video.)
24         THE COURT REPORTER:  Could you repeat
25  that, please.                             03:14:16
                                                        Page 58
```

```
 1         THE WITNESS:  Yes.  Mostly in Böblingen,
 2  Germany.
 3  BY MR. TONG:
 4     Q.  Okay.  And I have two more very quick
 5  lines of questions for you.               03:14:37
 6         The first is about Tonis Tiigi -- or
 7  Tiigi.  Do you have any idea of what Tonis Tiigi is
 8  expected to testify about at trial?
 9         MR. REEVES:  Objection.  Vague.  Lacks
10  foundation.  Outside the scope.  Calls for  03:15:07
11  speculation.
12         THE WITNESS:  I -- yeah.
13         So I'm -- I'm going to say no because I'm
14  not quite sure -- I'm -- maybe you should restate
15  the question, but, no.                    03:15:20
16  BY MR. TONG:
17     Q.  Sure.
18         I mean, if Amazon is contending that Tonis
19  Tiigi would be relevant at trial, what might he be
20  relevant to testify about?                03:15:32
21         MR. REEVES:  Objection.  Vague.  Lacks
22  foundation.  Outside the scope.  Calls for
23  speculation.
24         THE WITNESS:  So given the knowledge I
25  have that this relates to container technology, he   03:15:46
                                                        Page 59
```

```
 1  is one of the foremost knowledgeable experts, all
 2  the way back to the beginning of the Docker era.  So
 3  he -- he would be well qualified to speak on any
 4  relevant history or technology choices of Docker,
 5  the project, or Docker the company that he works    03:16:10
 6  for.
 7  BY MR. TONG:
 8     Q.  Docker's code is kept in a [verbatim]
 9  online repository; correct?
10         MR. REEVES:  Objection.  Vague.  Outside   03:16:25
11  the scope.
12         THE WITNESS:  Yes.  Correct.
13  BY MR. TONG:
14     Q.  And that repository tracks the dates as to
15  when code is checked in and updated; correct?      03:16:39
16         MR. REEVES:  Objection.  Asked and
17  answered.  Vague.
18         THE WITNESS:  Yes.
19  BY MR. TONG:
20     Q.  If the development of Docker's code is     03:16:52
21  well-documented with check-in times, do you know
22  what Tonis Tiigi would have to add to this history?
23         MR. REEVES:  Objection.  Vague.  Lacks
24  foundation.  Assumes facts.  Outside the scope.
25  Calls for speculation.                    03:17:17
                                                        Page 60
```

```
 1         THE WITNESS:  Since you mentioned working
 2  on software teams, I think the easiest answer is
 3  that knowing the date and time in which something is
 4  checked in versus knowing the intricate details of
 5  how it works or why it works the way it does or why   03:17:38
 6  a change would be made is best left to people who
 7  regularly interact with that software code.
 8  BY MR. TONG:
 9     Q.  And do you believe that why code changes
10  is relevant to a legal issue in this case?    03:18:04
11         MR. REEVES:  Objection.  Vague.  Lacks
12  foundation.  Outside the scope.  Calls for
13  speculation.  Calls for a legal conclusion.
14         THE WITNESS:  Yeah, since I don't know the
15  stated purposes or claims, then I -- I'm simply   03:18:28
16  stating that any kind of claim would have to be
17  dealt with someone who understands the code to even
18  know, you know, how to -- how to make a statement
19  about Docker's code or its history or -- or any
20  relevant details.                          03:18:55
21  BY MR. TONG:
22     Q.  And you don't have any legal education; do
23  you?
24     A.  No formal le- -- legal education, no.
25     Q.  Would it surprise you to learn that    03:19:08
                                                        Page 61
```

```
 1  normally there are technical experts who explain
 2  topics such as the operation of source code in
 3  patent trials?
 4         MR. REEVES:  Objection.  Vague.  Calls for
 5  speculation.  Lacks foundation.              03:19:26
 6         THE WITNESS:  No.  I -- if -- definitely
 7  not surprised.
 8  BY MR. TONG:
 9     Q.  Is there anything you believe that
10  Mr. Tonis Tiigi would add to the facts beyond what a   03:19:45
11  source code technical expert could explain?
12         MR. REEVES:  Objection.  Vague.  Lacks
13  foundation.  Calls for a legal conclusion.  Asked
14  and answered.  Calls for speculation.
15         THE WITNESS:  Yeah, I -- I don't        03:20:12
16  understand the purpose of the -- the line of
17  questioning.  And, you know, we can talk about
18  Tonis' understanding and capabilities, and that's --
19  that's all I'm representing is his knowledge of this
20  specific code base.                          03:20:30
21  BY MR. TONG:
22     Q.  Okay.
23         But as we sit here today, do you know a
24  particular issue of patent infringement that he has
25  relevant testimony about?                    03:20:53
                                                    Page 62
```

```
 1         MR. REEVES:  Objection.  Asked and
 2  answered.  Vague.  Calls for a legal conclusion.
 3  Calls for speculation.
 4         THE WITNESS:  No, I do not.
 5  BY MR. TONG:                                 03:21:04
 6     Q.  And as we sit here today, do you know a
 7  particular issue of patent invalidity that Mr. Tonis
 8  Tiigi has relevant testimony about at trial?
 9         MR. REEVES:  Same objections.
10         THE WITNESS:  No.                     03:21:17
11  BY MR. TONG:
12     Q.  As we sit here today, do you know a
13  relevant issue of patent damages that Mr. Tonis
14  Tiigi has relevant testimony about at trial?
15         MR. REEVES:  Same objections.         03:21:30
16         THE WITNESS:  No.
17         MR. TONG:  All right.
18         No further questions on direct.
19         MR. REEVES:  All right.  We'll reserve the
20  right to review and sign.                    03:21:50
21         MR. TONG:  Okay.  Thank you for your time,
22  Mr. Estes.
23         We can go off the record.
24         THE WITNESS:  Thank you.
25         THE VIDEOGRAPHER:  Hanna?  Okay.      03:22:00
                                                    Page 63
```

```
 1         We are off the record at 3:21 p.m., and
 2  this concludes today's testimony given by Phil
 3  Estes.  The total number of media used was two and
 4  will be retained by Veritext Legal Solutions.  Thank
 5  you.                                         03:22:17
 6         (Proceedings concluded, 3:21 p.m., EDT, on
 7         August 23, 2024.)
                                                    Page 64
```

```
 1                    JURAT
 2
 3     I, PHIL ESTES, do hereby certify under
 4  penalty of perjury that I have read the foregoing
 5  transcript of my deposition taken remotely via
 6  videoconference on Friday, August 23, 2024; that I
 7  have made such corrections as appear noted herein in
 8  ink, initialed by me; that my testimony as contained
 9  herein, as corrected, is true and correct.
10
11     Dated this _____ day of _____, 2024,
12  at _____.
13
14
15
16
17
18            _____
              PHIL ESTES
19
20
21
22
23
24
25  JOB NO. 6879934
                                                    Page 65
```

17 (Pages 62 - 65)

## Page 66

```
 1         CERTIFICATE OF REPORTER
 2         I, Hanna Kim, a Certified Shorthand
 3  Reporter, do hereby certify:
 4         That prior to being examined, the witness
 5  in the foregoing proceedings was by me duly sworn to
 6  testify to the truth, the whole truth, and nothing
 7  but the truth;
 8         That said proceedings were taken before me
 9  at the time and place therein set forth remotely via
10  videoconference and were taken down by me in
11  shorthand and thereafter transcribed into
12  typewriting under my direction and supervision;
13         I further certify that I am neither
14  counsel for, nor related to, any party to said
15  proceedings, not in anywise interested in the
16  outcome thereof.
17         Further, that if the foregoing pertains to
18  the original transcript of a deposition in a federal
19  case, before completion of the proceedings, review
20  of                          was not requested.
21                              have hereunto
22  su
    D
23
24
25  Hanna Kim  CLR, CSR No. 13083
```

## Page 67

```
 1  NATHAN D. REEVES
 2  nathan.reeves@knobbe.com
 3                  September 4, 2024
 4  RE: Virtamove, Corp. v. AMAZON.COM, INC.,
 5  8/23/2024, Phil Estes, (#6879934).
 6  The above-referenced transcript has been
 7  completed by Veritext Legal Solutions and
 8  review of the transcript is being handled as follows:
 9  __ Per CA State Code (CCP 2025.520 (a)-(e)) – Contact Veritext
10     to schedule a time to review the original transcript at
11     a Veritext office.
12  _X_ Per CA State Code (CCP 2025.520 (a)-(e)) – Locked .PDF
13     Transcript - The witness should review the transcript and
14     make any necessary corrections on the errata pages included
15     below, noting the page and line number of the corrections.
16     The witness should then sign and date the errata and penalty
17     of perjury pages and return the completed pages to all
18     appearing counsel within the period of time determined at
19     the deposition or provided by the Code of Civil Procedure.
20     Contact Veritext when the sealed original is required.
21  __ Waiving the CA Code of Civil Procedure per Stipulation of
22     Counsel - Original transcript to be released for signature
23     as determined at the deposition.
24  __ Signature Waived – Reading & Signature was waived at the
25     time of the deposition.
```

## Page 68

```
 1  __ Federal R&S Requested (FRCP 30(e)(1)(B)) – Locked .PDF
 2     Transcript - The witness should review the transcript and
 3     make any necessary corrections on the errata pages included
 4     below, noting the page and line number of the corrections.
 5     The witness should then sign and date the errata and penalty
 6     of perjury pages and return the completed pages to all
 7     appearing counsel within the period of time determined at
 8     the deposition or provided by the Federal Rules.
 9  __ Federal R&S Not Requested - Reading & Signature was not
10     requested before the completion of the deposition.
```

## Page 69

```
 1  Virtamove, Corp. v. AMAZON.COM, INC.,
 2  Phil Estes (#6879934)
 3         E R R A T A  S H E E T
 4  PAGE_____ LINE_____ CHANGE_____
 5  _____
 6  REASON_____
 7  PAGE_____ LINE_____ CHANGE_____
 8  _____
 9  REASON_____
10  PAGE_____ LINE_____ CHANGE_____
11  _____
12  REASON_____
13  PAGE_____ LINE_____ CHANGE_____
14  _____
15  REASON_____
16  PAGE_____ LINE_____ CHANGE_____
17  _____
18  REASON_____
19  PAGE_____ LINE_____ CHANGE_____
20  _____
21  REASON_____
22
23  _____   _____
24     (Phil Estes)              Date
25
```

Federal Rules of Civil Procedure

Rule 30

(e) Review By the Witness; Changes.

(1) Review; Statement of Changes. On request by the deponent or a party before the deposition is completed, the deponent must be allowed 30 days after being notified by the officer that the transcript or recording is available in which:

(A) to review the transcript or recording; and

(B) if there are changes in form or substance, to sign a statement listing the changes and the reasons for making them.

(2) Changes Indicated in the Officer's Certificate. The officer must note in the certificate prescribed by Rule 30(f)(1) whether a review was requested and, if so, must attach any changes the deponent makes during the 30-day period.

DISCLAIMER: THE FOREGOING FEDERAL PROCEDURE RULES ARE PROVIDED FOR INFORMATIONAL PURPOSES ONLY. THE ABOVE RULES ARE CURRENT AS OF APRIL 1, 2019. PLEASE REFER TO THE APPLICABLE FEDERAL RULES OF CIVIL PROCEDURE FOR UP-TO-DATE INFORMATION.

VERITEXT LEGAL SOLUTIONS

COMPANY CERTIFICATE AND DISCLOSURE STATEMENT

Veritext Legal Solutions represents that the foregoing transcript is a true, correct and complete transcript of the colloquies, questions and answers as submitted by the court reporter. Veritext Legal Solutions further represents that the attached exhibits, if any, are true, correct and complete documents as submitted by the court reporter and/or attorneys in relation to this deposition and that the documents were processed in accordance with our litigation support and production standards.

Veritext Legal Solutions is committed to maintaining the confidentiality of client and witness information, in accordance with the regulations promulgated under the Health Insurance Portability and Accountability Act (HIPAA), as amended with respect to protected health information and the Gramm-Leach-Bliley Act, as amended, with respect to Personally Identifiable Information (PII). Physical transcripts and exhibits are managed under strict facility and personnel access controls. Electronic files of documents are stored in encrypted form and are transmitted in an encrypted

fashion to authenticated parties who are permitted to access the material. Our data is hosted in a Tier 4 SSAE 16 certified facility.

Veritext Legal Solutions complies with all federal and State regulations with respect to the provision of court reporting services, and maintains its neutrality and independence regardless of relationship or the financial outcome of any litigation. Veritext requires adherence to the foregoing professional and ethical standards from all of its subcontractors in their independent contractor agreements.

Inquiries about Veritext Legal Solutions' confidentiality and security policies and practices should be directed to Veritext's Client Services Associates indicated on the cover of this document or at www.veritext.com.