# EXHIBIT 17

Case 2:24-cv-00093-JRG    Document 114-17    Filed 12/19/24    Page 2 of 42 PageID #: 8621

9/10/2024                VirtaMove Corp. v. Amazon.com, Inc., et al.                Donn Rochette

## Page 1

IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TEXAS
MIDLAND/ODESSA DIVISION

VIRTAMOVE, CORP.,                )
                                 )  CASE NO.
              PLAINTIFF,         )  7:24-CV-00030
                                 )
         v.                      )
                                 )
AMAZON.COM, INC.; AMAZON.COM     )
SERVICES LLC; AND AMAZON WEB     )
SERVICES, INC.,                  )
                                 )
              DEFENDANTS.        )

VIDEOTAPED DEPOSITION OF DONN ROCHETTE
TAKEN REMOTELY VIA ZOOM VIDEOCONFERENCE
TUESDAY, SEPTEMBER 10, 2024
11:04 A.M. CDT

REPORTED BY AUDRA E. CRAMER, CSR NO. 9901

DIGITAL EVIDENCE GROUP
1730 M Street, NW, Suite 812
Washington, D.C. 20036
(202) 232-0646

## Page 2

```
 1      VIDEOTAPED DEPOSITION OF DONN ROCHETTE,
 2  TAKEN REMOTELY VIA ZOOM ON BEHALF OF THE DEFENDANTS
 3  AT 11:04 A.M. CDT, TUESDAY, SEPTEMBER 10, 2024, BEFORE
 4  AUDRA E. CRAMER, CSR NO. 9901, PURSUANT TO SUBPOENA.
 5
 6  APPEARANCES OF COUNSEL
 7
 8  ON BEHALF OF THE PLAINTIFF:
 9
10      RUSS AUGUST & KABAT
11      BY:  PETER TONG, ESQUIRE
12      4925 GREENVILLE AVENUE, SUITE 200
13      DALLAS, TEXAS 75206
        (310) 826-7474
14      ptong@raklaw.com
15
    ON BEHALF OF THE DEFENDANTS:
16
        KNOBBE, MARTENS, OLSON & BEAR LLP
17      BY:  JEREMY ANAPOL, ESQUIRE
        2040 MAIN STREET, 14TH FLOOR
18      IRVINE, CALIFORNIA 92614
        (949) 760-0404
19      jeremy.anapol@knobbe.com
20
    ALSO PRESENT
21
        BILLY FAHNERT, VIDEOGRAPHER
22
```

## Page 3

```
 1                 I N D E X
 2  EXAMINATION                        PAGE
 3  BY MR. ANAPOL                        5
 4  BY MR. TONG                         95
 5  BY MR. ANAPOL                      139
 6  BY MR. TONG                        155
 7
 8              E X H I B I T S
 9  NO.     PAGE      DESCRIPTION
10  1010     14      US PATENT 7,519,814
11  1009     18      ARCHIVE VERSION OF THE
12                   HOMEPAGE ONCORE SYSTEMS
13                   CORPORATION
14  1011     24      US PATENT 7,784,058
15  1012     42      AUSTRALIAN UNIX SYSTEMS
16                   USER GROUP NEWSLETTER,
17                   VOLUME 8, NUMBER 5
18      QUESTIONS INSTRUCTED BY COUNSEL NOT TO ANSWER
                PAGE    LINE
19              144      7
                145      2
20      REPORTER'S NOTE:  All quotations from exhibits are
    reflected in the manner in which they were read into the
21  record and do not necessarily indicate an exact quote
22  from the document.
```

## Page 4

```
 1      REMOTELY VIA ZOOM VIDEOCONFERENCE
 2      TUESDAY, SEPTEMBER 10, 2024, 11:04 A.M. CDT
 3
 4      THE VIDEOGRAPHER:  We are on the
 5  record.  This is the remote video deposition of
 6  Donn Rochette in the matter of VirtaMove Corp.
 7  versus Amazon.com, Inc., et al., filed in the
 8  United States District Court for the Western
 9  District of Texas.
10      My name is Billy Fahnert.  I am the
11  video technician today.  The court reporter is
12  Audra Cramer.  We both represent Digital
13  Evidence Group.
14      Today's date is September 10, 2024.
15  The time is 11:04 a.m. Central Standard Time.
16      All parties have stipulated to the
17  witness being sworn in remotely.
18      Will Counsel please identify yourselves
19  for the record, and then the witness will be
20  sworn in.
21      MR. TONG:  This is Peter Tong from Russ
22  August & Kabat on behalf of VirtaMove
```

Case 2:24-cv-00093-JRG    Document 114-17    Filed 12/19/24    Page 3 of 42 PageID #: 8622

9/10/2024                VirtaMove Corp. v. Amazon.com, Inc., et al.                Donn Rochette

Page 5

1  Corporation?
2      MR. ANAPOL: Jeremy Anapol of Knobbe
3  Martens Olson & Bear on behalf of Defendants.
4
5          DONN ROCHETTE,
6      having been first duly sworn, was
7      examined and testified as follows:
8
9      MR. ANAPOL: Thank you.
10
11          EXAMINATION
12  BY MR. ANAPOL:
13     Q.  Mr. Rochette, thank you again for being
14  here today, taking time out of your schedule to
15  help us collect some information that we hope
16  will be helpful in our case.
17      Have you ever been deposed before?
18     A.  No.
19     Q.  Okay.  So I'll cover some general
20  background with you just to help you understand
21  the process.
22      But before that, can we start by having

Page 6

1  you state your full name for the record?
2     A.  My name is Donn Rochette.
3     Q.  And Mr. Rochette, where are you joining
4  us from today?
5     A.  I am calling from my home in northern
6  Iowa.
7     Q.  Okay.  So the deposition is going to
8  follow a question-and-answer format, and Audra,
9  our court reporter, is going to be transcribing
10  the answers.  Because she can only transcribe
11  one person speaking at a time, I'll ask that you
12  wait until I finish my question to start
13  answering, and I will try to wait until you
14  finish answering to ask the next question.
15      Mr. Tong, who's representing the
16  Plaintiffs, may have some objections which he
17  might chime in with, but you can go ahead and
18  answer the question after he finishes his
19  objection.  Those are for the record, so, if
20  necessary, the judge will look at those
21  objections later, but you don't need to concern
22  yourself with those.

Page 7

1     A.  Okay.
2     Q.  If you don't understand one of my
3  questions, please ask for clarification.  I'm
4  happy to provide it.
5      If you need to take a break at any
6  time, please let me know, but if there's a
7  question that's pending, I'll just ask that you
8  give the answer, and then we'll take a break
9  afterward.
10     A.  Okay.
11     Q.  Is there any reason why you cannot
12  provide complete and accurate testimony today
13  such as, you know, being on any medication or
14  anything like that?
15     A.  No.
16     Q.  And, Mr. Rochette, you used to work at
17  a company called Trigence Corp.; is that right?
18     A.  Yes.
19     Q.  And do you remember when you worked for
20  Trigence?
21     A.  Gosh, I couldn't give you the dates off
22  the top of my head, no.  It's been a long time.

Page 8

1     Q.  Was it in the early 2000s?
2     A.  Yes.
3     Q.  And did you understand that Trigence
4  later became AppZero?
5     A.  Yes.
6     Q.  And then there's a company called
7  AppZero Software Corp. which is now called
8  VirtaMove.
9      Do you understand that?
10     A.  I was not aware of that, no.  Not until
11  very recently.
12     Q.  And when did you become aware of that?
13     A.  Oh, about two months ago someone from
14  VirtaMove reached out to me over LinkedIn --
15     Q.  Okay.
16     A.  -- and pointed out the connection.
17     Q.  Do you remember who from VirtaMove
18  reached out to you over LinkedIn?
19     A.  The person identified himself as the
20  CEO of VirtaMove.  I can't remember his name.
21  Sorry.
22     Q.  Was his name Nigel Stokes?

2  (Pages 5 to 8)

VM_IBM_0000891

Case 2:24-cv-00093-JRG    Document 114-17    Filed 12/19/24    Page 4 of 42 PageID #: 8623

9/10/2024            VirtaMove Corp. v. Amazon.com, Inc., et al.            Donn Rochette

Page 9

1    A.  That sounds familiar, yes.
2    **Q.  And what did you talk about with**
3  **Mr. Stokes?**
4        MR. TONG:  Objection.  Foundation.
5        MR. ANAPOL:  I'll rephrase the
6  question.
7    **Q.  So occasionally, Mr. Rochette, if Peter**
8  **makes an objection like that, I might rephrase**
9  **the question to help resolve the objection.**
10       **After this person purporting to be**
11 **Mr. Stokes reached out to you via LinkedIn, did**
12 **you speak with him?**
13   A.  Yes, I did.
14   **Q.  And he identified himself as Mr. Stokes**
15 **when you spoke to him?**
16   A.  Yes.
17   **Q.  Okay.  And what did Mr. -- what did you**
18 **talk about with Mr. Stokes?**
19   A.  He identified the fact -- he explained
20 the fact that there was a lawsuit being formed
21 over a couple patents that I had done.
22 Basically asked me if I wanted to get involved.

Page 10

1  I said in no way was I interested in getting
2  involved.  And that was it.
3    **Q.  And did you tell him why you didn't**
4  **want to get involved?**
5    A.  Yes.  I said I'm retired.  I don't want
6  to have anything do with it.  I don't have an
7  opinion one way or the other.  I don't have any
8  involvement in it, and I would prefer to not be
9  involved.
10   **Q.  And when you say you don't have an**
11 **opinion about, what was it that you didn't have**
12 **an opinion about?**
13   A.  The fact that the company called
14 VirtaMove was suing several companies regarding
15 a couple of the patents that I did, and I don't
16 have any -- yeah, I -- what am I trying to say?
17 I don't have any opinion one way or the other
18 about that.
19   **Q.  You mean opinion about the merits of**
20 **the lawsuit?**
21   A.  Well, it seemed like something that was
22 far-reaching, that was not very -- didn't make a

Page 11

1  whole lot of sense, and didn't see where it
2  would go anywhere, didn't understand my
3  involvement, how I could help at all in it.
4        And so that's the reason why I said to
5  him I don't want anything to do with it.  It
6  just seemed rather bizarre and farfetched, and I
7  couldn't appreciate the merit of it at all.
8    **Q.  And did Mr. Stokes suggest a particular**
9  **role for you in the lawsuit?**
10   A.  No.  He only suggested that I -- would
11 I speak with counsel on his part, and I
12 declined.
13   **Q.  Did he offer you any sort of**
14 **compensation?**
15   A.  No.
16   **Q.  So have you spoken with anyone else at**
17 **VirtaMove besides Mr. Stokes?**
18   A.  No.
19   **Q.  And it was just that one conversation**
20 **that you had with him; correct?**
21   A.  That is correct.
22   **Q.  So what was your role when you worked**

Page 12

1  **at Trigence?**
2    A.  I was the chief technology officer and
3  a software developer.
4    **Q.  And can you explain what you were**
5  **responsible for in those roles?**
6    A.  I was responsible for the overall
7  design and implementation of the software we
8  were building, of the architecture of that
9  software and the direction of it.
10   **Q.  And what was the software you were**
11 **building while you were at Trigence?**
12   A.  Trigence was focused on software for
13 the corporate data center, for applications
14 specifically running for corporate purposes in,
15 for the most part, large data centers.
16   **Q.  And what did the software do?**
17   A.  It would allow multiple versions of an
18 application to run on one instance of an
19 operating system.
20   **Q.  And what was the name of that software?**
21   A.  Good question.  I don't remember.  App
22 something, I think.

3  (Pages 9 to 12)

VM_IBM_0000892

Case 2:24-cv-00093-JRG    Document 114-17    Filed 12/19/24    Page 5 of 42 PageID #: 8624

9/10/2024                    VirtaMove Corp. v. Amazon.com, Inc., et al.                    Donn Rochette

Page 13

1    Q.  Was it Trigence AE?
2    A.  Oh, yeah.  That's it.  Yes.  Thank you.
3    Q.  And --
4    A.  Yeah.  Yes.
5    Q.  And did the "AE" stand for "application
6  environment"?
7    A.  Yes, I did.
8    Q.  And you worked on several patents while
9  you were at Trigence; correct?
10    A.  Yes.
11    Q.  And do you understand that two of those
12  patents are asserted in this case?
13    A.  Yes.
14    Q.  And I'm just going to show you some
15  documents to help with this discussion.
16    A.  Okay.
17        MR. ANAPOL:  And so I'm going to ask
18  Billy to mark them, but first I have to put them
19  where Billy can see them.
20        So, Billy, could you go ahead and mark
21  Document A as Exhibit 1010, please.  1010.
22        THE VIDEOGRAPHER:  Okay.  Give me one

Page 14

1  moment to pull it down.
2        (Whereupon, Exhibit 1010 was
3        marked for identification.)
4  BY MR. ANAPOL:
5    Q.  And, Mr. Rochette, do you recognize
6  Exhibit 1010?
7    A.  Yes.
8    Q.  And this is a copy of US Patent
9  No. 7,519,814.
10        Do you see that --
11    A.  Yes.
12    Q.  -- in the upper right?
13    A.  Yeah.
14    Q.  And you are listed as the first named
15  inventor on this patent.
16        Do you see that?
17    A.  Yes.
18    Q.  So where it says "Donn Rochette,
19  Fenton, Iowa, United States," that's you;
20  correct?
21    A.  That is me, correct.
22    Q.  And does the '814 patent generally

Page 15

1  relate to containers?
2    A.  Yes.
3    Q.  When did you first become aware of
4  containers?
5    A.  Early 2000s.  Would have been about a
6  year -- it would have been about two years
7  before this patent was published.  So, yeah, we
8  were discussing the concepts and examining ways
9  of creating an environment where applications
10  can run -- disparate applications could run,
11  yes.
12    Q.  And I just want to clarify one thing
13  you said.  You said "about two years before this
14  patent was published."
15        Did you mean published or filed?
16    A.  Filed.  Thank you for the
17  clarification.  Yes.
18    Q.  So you can see on this page here, on
19  the bottom left corner of the portion that Billy
20  was showing -- Billy, if you scroll up.
21        Under "Related US Application Data," it
22  refers to two provisional applications that were

Page 16

1  filed in September 2003.
2    A.  Uh-huh.  Right.
3    Q.  So those are the initial disclosures
4  that this is based on.
5        Is that the filing date that you were
6  referring to --
7    A.  Yes.
8    Q.  -- when you were saying two years
9  earlier?
10    A.  Yes.  We would have been discussing and
11  talking about and envisioning things, yes,
12  before this was -- before the provisional was
13  filed.
14    Q.  And how did you first learn about
15  containers?
16        MR. TONG:  Objection.  Foundation.
17  BY MR. ANAPOL:
18    Q.  You can go ahead and answer,
19  Mr. Rochette.
20    A.  Oh, okay.
21        I first learned about containers in
22  discussions with corporate -- with people

4  (Pages 13 to 16)

VM_IBM_0000893

Page 17

1   running corporate data centers and their
2   description of how difficult it was to get
3   applications to run, to migrate older
4   applications to newer platforms, the number of
5   servers and hardware instances that were
6   required for each application, things like that.
7        And so we began envisioning an
8   environment where multiple applications could
9   run and trying to determine if we could solve
10  the problem where an application that was run on
11  one version of the operating system could run on
12  a newer version of a very similar operating
13  system was what -- some of the first things that
14  caused us to think to arrive at what is now
15  described here as containers.
16       **Q.   Okay.  But you worked on containers at**
17  **your prior employer before Trigence; right?**
18       MR. TONG:  Objection.  Foundation.
19       THE WITNESS:  Yes, they would very
20  loosely be called containers in a prior job.
21       The work I did prior to Trigence was
22  focused on embedded systems.  So these were --

Page 18

1   this is software that would run on a computer
2   platform that in itself is a part of a larger
3   product, so the engine controller in your car
4   or, you know, some sort of controller for a
5   larger purpose, the controlling software that
6   would be a part of that embedded computer is
7   what we were working on.
8        So we didn't at the time think of them
9   as containers, but you could loosely define them
10  as containers in some respect because they are
11  certain applications running, albeit for a
12  lightly different purpose.
13       MR. ANAPOL:  Billy, could you mark
14  Document C as Exhibit 1009.
15            (Whereupon, Exhibit 1009 was
16            marked for identification.)
17  BY MR. ANAPOL:
18       **Q.   So, Mr. Rochette, Exhibit 1009 is what**
19  **appears to be an archive version of the homepage**
20  **for OnCore Systems Corporation.**
21       **Does that -- do you recognize this?**
22       A.  Yes.  That is a blast from the past.

Page 19

1        **Q.   And is OnCore Systems Corporation where**
2   **you worked before Trigence?**
3        A.  Yes.
4        **Q.   And do you see in the second black**
5   **paragraph on this page what's written in bold?**
6        A.  Yeah, you're right.  They were called
7   virtual computing containers, yeah.
8        **Q.   So OnCore, where you worked before**
9   **Trigence, had a capability that they called**
10  **virtual computing containers; right?**
11       A.  That is correct.
12       **Q.   And the OnCore operating system allowed**
13  **users to run Linux applications; correct?**
14       A.  Yes.
15       MR. TONG:  Hold on.  Before your next
16  question, I want to object to this whole line of
17  questioning as exceeding the scope of venue
18  discovery that you're entitled to ask
19  Mr. Rochette about.  Venue discovery should be
20  limited to the locations of witnesses, the
21  relevance of evidence and the inconvenience cost
22  of trial, and we're getting into fact discovery.

Page 20

1   BY MR. ANAPOL:
2        **Q.   Mr. Rochette OnCore Systems Corporation**
3   **was located in California; correct?**
4        A.  Yes.  The corporate headquarters were
5   located in California, yes.
6        **Q.   And so OnCore Systems Corporation was**
7   **developing containers in California; right?**
8        A.  Yes.
9        **Q.   In Northern California specifically;**
10  **correct?**
11       A.  Yes.  In the Bay Area.
12       **Q.   Thank you.**
13       **And the OnCore operating system, which**
14  **you helped develop before you went to Trigence,**
15  **allowed users to run Linux operations; correct?**
16       A.  Correct.
17       **Q.   And OnCore called its system for**
18  **walling off applications virtual computing**
19  **containers; correct?**
20       A.  Yes.
21       **Q.   And OnCore had those virtual computing**
22  **containers before Trigence developed its**

5 (Pages 17 to 20)

VM_IBM_0000894

Case 2:24-cv-00093-JRG    Document 114-17    Filed 12/19/24    Page 7 of 42 PageID #: 8626

9/10/2024                  VirtaMove Corp. v. Amazon.com, Inc., et al.                  Donn Rochette

Page 21

1  container product; correct?
2     A.  Correct.  Yes.
3     Q.  And when you worked for OnCore, were
4  you physically in Northern California?
5     A.  No.  I worked out of Iowa, near Fenton.
6     Q.  Did you visit Northern California for
7  work?
8     A.  I did, yes.
9     Q.  How often did you visit Northern
10  California?
11     A.  Probably three or four times a year.
12     Q.  And how long would you stay when you
13  visited?
14     A.  Most often not more than a week at a
15  time.
16     Q.  And did you have contact during your
17  time at OnCore with software developers who were
18  physically in Northern California?
19     A.  Yes.
20     Q.  Did OnCore have any employees who were
21  employed by OnCore that were physically based in
22  Northern California?

Page 22

1     A.  Yes.
2     Q.  And did you speak with those people
3  when you would visit Northern California?
4     A.  Yes.
5     Q.  And what was your title at OnCore?
6     A.  The chief technology officer.
7     Q.  So were you well acquainted with how
8  OnCore's operating system worked?
9     A.  Yes.
10     Q.  And were you well acquainted with how
11  OnCore's containers worked?
12     A.  Yes.
13     Q.  And before Encore, did you work for a
14  different company in Northern California?
15     A.  Yes.  I worked for Microtec -- well,
16  wait.  Microtec was bought by another company
17  out of Oregon.  I can't remember the name of it.
18         Yes, we lived and worked in Northern
19  California before OnCore.
20     Q.  So when did you live in Northern
21  California?
22     A.  Early 2000s.

Page 23

1     Q.  Okay.  And when did you stop living in
2  Northern California?
3     A.  Oh, I think -- I don't know.  2001,
4  2002, something like that, we moved to Iowa.
5  I'd have to go back and check the exact dates.
6     Q.  Is that around the same time that you
7  started working at Trigence?
8     A.  It's around the same time that I
9  started working at OnCore.  I moved to Iowa,
10  working remotely for the company based in
11  California, and then shortly thereafter I
12  started working for OnCore in Iowa.
13     Q.  Okay.  And then after OnCore you
14  started working at Trigence; correct?
15     A.  Correct.  Yes.
16     Q.  And did you remain in Iowa when you
17  worked for Trigence?
18     A.  Yes.
19     Q.  And then briefly, what did you do at
20  Microtec, the company you worked at before
21  OnCore?
22     A.  I was a software developer working on

Page 24

1  real-time operating systems.
2     Q.  So before Trigence, how long would you
3  say you worked in the operating system field?
4     A.  I think it was around 1998 or 1999 I
5  started focusing specifically on real-time
6  operating systems.
7     Q.  Okay.  So several years before you
8  filed the application for the '814 patent, you
9  were a software developer in Northern California
10  working on operating systems before you moved to
11  Iowa; correct?
12     A.  That is correct.
13         MR. ANAPOL:  Billy, can we mark
14  Exhibit B as Exhibit 1011.
15             (Whereupon, Exhibit 1011 was
16             marked for identification.)
17  BY MR. ANAPOL:
18     Q.  Mr. Rochette, do you recognize
19  Exhibit 1011?
20     A.  Yes.
21     Q.  This is a copy of US Patent
22  No. 7,784,058.

6 (Pages 21 to 24)

VM_IBM_0000895

9/10/2024                VirtaMove Corp. v. Amazon.com, Inc., et al.                Donn Rochette

Page 25

1       Do you see that?
2    A.  Yes.
3    Q.  And you are listed as the first named
4  inventor on this patent; correct?
5    A.  Yes.
6    Q.  And just for the record, I will refer
7  to this as the '058 patent.  Okay?
8    A.  Okay.
9    Q.  And Exhibit 1010, which we looked at
10  before, I will refer to as the '814 patent.
11  Okay?
12    A.  Okay.
13    Q.  And the '058 patent generally relates
14  to shared libraries; correct?
15    A.  Yes.
16    Q.  What is a shared library?
17    A.  It is a grouping of code that is
18  assembled into an archive that gets linked into
19  an application that would be called a binary or
20  an executable.
21       So almost any executable in any of the
22  operating systems that you would be familiar

Page 26

1  with would have several shared libraries linked
2  to it.  In Unix they're called shared libraries.
3  In the Windows world they're called DLLs, or
4  dynamic link libraries.
5    Q.  So the Windows equivalent of a Unix
6  shared library is a dynamic link library?
7    A.  Correct.
8    Q.  And when did you first become aware of
9  shared libraries?
10    A.  Very early on in my career.  They have
11  been a part of Unix and Linux and Windows for --
12  since the beginning, so I would have been aware
13  of them very early in my career.
14    Q.  By the 1980s would you have been aware
15  of shared libraries?
16    A.  Yes, definitely.
17    Q.  And do you understand that -- let me
18  withdraw the question and rephrase.
19       Are you familiar with a company called
20  sun Mike systems?
21    A.  Yes.
22    Q.  And Sun Microsystems was based in

Page 27

1  Northern California; correct?
2    A.  Yes.
3    Q.  And you were aware of an operating
4  system from Sun Microsystems called Solaris?
5    A.  Yes.
6    Q.  And Solaris predated the two patents
7  that we're looking at; correct?
8    A.  That's correct.
9       MR. TONG:  Objection.  Vague.
10       THE WITNESS:  Sorry.
11       That is correct.
12  BY MR. ANAPOL:
13    Q.  Okay.  And before -- long before you
14  filed these patent applications, Solaris had
15  support for shared libraries; correct?
16    A.  Yes.
17    Q.  And you were aware of Solaris's support
18  for shared libraries before you filed the
19  applications that led to these two patents;
20  correct?
21    A.  That is correct.
22    Q.  And many other operating systems also

Page 28

1  had shared libraries; correct?
2    A.  Correct.
3    Q.  And are you aware of any examples, from
4  your personal experience, of developers moving
5  the functionality from an operating system's
6  kernel to a shared library?
7    A.  There is -- there are some examples.
8  You have to -- you have to -- it's not as
9  clear-cut as move code literally from the kernel
10  into a shared library, but functionality that
11  you would normally expect to find in the kernel
12  was -- has been -- had been implemented in
13  libraries.
14    Q.  Can you give me an example of that?
15    A.  [Garbled] zones was a really big
16  example of it.
17       (The reporter requested clarification.)
18       THE WITNESS:  A feature in the Sun
19  Microsystems operating system called Solaris,
20  the feature is callid zones, z-o-n-e-s.
21  BY MR. ANAPOL:
22    Q.  And do you know where the people

7 (Pages 25 to 28)

VM_IBM_0000896

9/10/2024          VirtaMove Corp. v. Amazon.com, Inc., et al.          Donn Rochette

Page 29

1  responsible for Solaris zones would be located?
2      A.  The Bay Area --
3          MR. TONG:  Objection.  Vague.
4          THE WITNESS:  Oh, sorry.
5  BY MR. ANAPOL:
6      Q.  Go ahead, Mr. Rochette.  Sorry for the
7  interruption.
8      A.  Yeah, they're located in the Bay Area
9  of California, yes.
10         There's also examples where Apple has
11 done the same kind of thing, and it's not -- I'm
12 sorry.  I'm answering questions you didn't ask.
13 Sorry.
14     Q.  Well, I did ask for examples.
15         So it sounds like you were going to
16 mention Apple as another example; is that right?
17     A.  Yeah, Apple is another example with
18 the -- with the diversion of macOS that we
19 currently know, there's cases where Apple has
20 moved things that would be expected to be in
21 other operating systems.  Like, for example,
22 Linux would be in the kernel or not in the

Page 30

1  kernel in the macOS example.
2      Q.  And are you referring to the macOS
3  version that is based on Unix?
4      A.  Yes.
5      Q.  And that is OS X?
6      A.  Correct.
7      Q.  And do you know where Apple is
8  headquartered?
9      A.  Cupertino, California, in the Bay Area.
10         I met with groups of both of these
11 developers.
12     Q.  When did you meet with these groups of
13 developers?
14     A.  Early on in the Trigence days.
15         I'm sorry.  No.  Wait.  Excuse me.  I
16 met with Apple at the end of the OnCore days.  I
17 met with the Sunday's Solaris people early on in
18 the Trigence days.  So it's split between the
19 two companies.
20     Q.  All right.  So you met with the Apple
21 folks before you started working at Trigence?
22     A.  That is correct.

Page 31

1      Q.  And what was that discussion with the
2  Apple folks about?
3      A.  I met with the chief technology of
4  Apple at the time.  His name is Avie Tevanian.
5  And Avie was deep into doing very similar things
6  that we were doing at OnCore with a microkernel
7  and multiple-user-mode operating system elements
8  running, including shared libraries.
9          And we were working with a
10 microprocessor architecture called the PowerPC.
11 Avie and his teams were working with the
12 microprocessor architecture with -- I think they
13 moved to Intel at the time.  But anyway, they
14 were not -- and so they were interested in our
15 experience with that hardware architecture, and
16 we were discussing lots of deep software things
17 related to CPU architecture and this mode of
18 operation.
19     Q.  Can you repeat the last name of this
20 Avie.
21     A.  Avie Tevanian.  I can't remember how to
22 spell it.

Page 32

1      Q.  That's fine.  We can look it up.  Thank
2  you.
3          So did Mr. Tevanian reach out to you,
4  or did you reach out to him?  Do you recall?
5      A.  My recollection is that one of the
6  salespeople that worked for OnCore in Northern
7  California had a conversation that led to an
8  interaction with Avie Tevanian, which led to an
9  invitation for me to come out and meet with him.
10     Q.  And where did you meet with him?
11     A.  In Cupertino in his office.
12     Q.  And at the time you met with him, had
13 Apple started incorporating this functionality
14 that would normally be in the kernel into a
15 shared library --
16     A.  Yes.
17     Q.  -- or was that a new feature?
18     A.  Yes.  No, they were well underway with
19 that, yes.
20     Q.  And do you remember anything else about
21 what you discussed with Mr. Tevanian?
22     A.  No, nothing -- he wanted us to do some

8  (Pages 29 to 32)

VM_IBM_0000897

9/10/2024                    VirtaMove Corp. v. Amazon.com, Inc., et al.                    Donn Rochette

---

Page 33

1   work for them, and we -- and that was about --
2   that's all I can recall.  Lots of low-level
3   technical detail.
4       **Q.  Low-level technical detail related to**
5   **operating system implementations?**
6       A.  Yes.
7       **Q.  And how long did you spend talking with**
8   **Mr. Tevanian?  Do you remember?**
9       A.  My recollection would be a couple of
10  hours.
11      **Q.  Was it just, like, one session, or were**
12  **there multiple sessions?**
13      A.  There was only one session
14  face-to-face.
15      **Q.  Were there some phone calls or --**
16      A.  Email exchanges.  There were email
17  exchanges.
18      **Q.  All right.  And then what about your**
19  **interactions with Solaris folks?  Do you**
20  **remember who you spoke to at Sun Microsystems?**
21      A.  No, I don't remember names.  I remember
22  we met with that entire software group

---

Page 34

1   responsible for Solaris, and I don't remember --
2   I don't remember the -- which -- the name of the
3   group.  It was quite a few software developers
4   at their headquarters and -- yeah.
5       **Q.  Do you remember if this was before or**
6   **after 2003?**
7       A.  No.  I only remember it being early in
8   the Trigence days.  I don't remember a date.
9       **Q.  Do you remember if it was before or**
10  **after you filed these patent applications?**
11      A.  I don't remember for sure, no.  I only
12  have a feeling.
13      **Q.  What is your feeling?**
14      A.  I think that the provisionals had been
15  filed, but I can't say for sure.
16      **Q.  Okay.  Can you tell me if you recognize**
17  **any of these names:  Andrew Tucker, John Beck,**
18  **David Comay, Andrew Gabriel, Ozgur Leonard or**
19  **Daniel Price?**
20      A.  I do recognize two of them.
21      **Q.  Which two?**
22      A.  John Beck and -- can you read the list

---

Page 35

1   again, please.
2       **Q.  Sure.**
3           **Andrew Tucker, David Comay, Andrew**
4   **Gabriel, Ozgur Leonard, Daniel Price.**
5       A.  I recognize David's name, David Comay,
6   and John Beck.
7       **Q.  Do you know if these were among the**
8   **people you spoke to at Sun Microsystems?**
9       A.  I can't remember, no.
10      **Q.  How do you know Mr. Beck?**
11      A.  We met with him.  I had conversations
12  with him.  I remember -- I just remember the
13  name, because I -- when I worked with NASA in
14  Florida, there was -- I worked with a guy by the
15  name of John Beck, and I remember, you know,
16  hey, another John Beck.  You know, that just --
17  just a memory trigger is all.
18      **Q.  Okay.  But the John Beck -- let me**
19  **clarify.**
20          **Do you remember a John Beck who was**
21  **affiliated with Sun Microsystems?**
22      A.  Yes.

---

Page 36

1       **Q.  And what do you remember about David**
2   **Comay?**
3       A.  The name is familiar.  I think it was
4   in the meetings we had with Sun.  That's -- I
5   don't remember.  I can't -- I don't remember why
6   his name is familiar, but I recognize it.
7       **Q.  Okay.  And what did you discuss in your**
8   **meetings with the Sun Microsystems folks?**
9       A.  We discussed the differences between
10  Solaris zones and what we were doing at
11  Trigence.
12      **Q.  And what was the difference?**
13      A.  Well, there's a lot of differences.
14  The guys at Solaris were concerned that -- it
15  was their feeling that we could not have
16  implemented what we were doing in Solaris
17  without having access to Solaris source code,
18  and we not had any -- Solaris is closed source
19  and was -- we didn't have any access to it.
20          And it was somewhat confrontational,
21  and we had to sit down and explain to them how
22  we were doing what we were doing and the way in

---

www.DigitalEvidenceGroup.com Digital Evidence Group C'rt 2024                    202-232-0646

VM_IBM_0000898

Page 37

1  which it did not require internal knowledge --
2  it didn't require knowledge to the internals of
3  Solaris in order to do what we were doing.  And
4  they -- in the end -- it was a rather lengthy
5  discussion.  In the end they recognized what we
6  were doing, and we parted friends.  Everything
7  was fine.
8      Q.  Okay.  So initially Trigence AE was for
9  Linux; right?
10     A.  Correct.
11     Q.  And --
12     A.  Linux and Windows.
13     Q.  Linux and Windows?
14     A.  Yes.
15     Q.  And then Solaris support was added
16  later?
17     A.  Yes.
18     Q.  Okay.  And so the meeting with Sun
19  Microsystems was after you had developed some
20  sort of Solaris capability for Trigence AE?
21     A.  I don't think it was released to the
22  public, but, yes, we had working versions.  Yes.

Page 38

1      Q.  Okay.  So what your understanding of
2  Solaris zones?
3      A.  Oh gosh.  That is a lengthy answer.
4         Zones would provide a separate
5  container, a separate security environment for
6  each app and for our multiple -- and for an
7  application to run it.  So you could define a
8  zone for each application you had running in
9  Solaris.  That zone would allow the application
10  to have its -- potentially its own version of
11  files.  It would -- I don't recall if it had
12  isolated networking, but it would provide a
13  secure environment, and it would provide a
14  separate instance of files and so forth.
15         And, it was -- if you look at it at a
16  very high level, it looked somewhat like what
17  Trigence AE was doing very differently and at
18  different -- very different results but
19  largely -- largely the same -- well -- anyway,
20  at the very, very highest level, objectives were
21  similar.
22     Q.  Okay.

Page 39

1      A.  Does that help?
2      Q.  Sure.
3         So what are some of the differences
4  between what Trigence AE was doing and what
5  Solaris zones was doing?
6      A.  With zones, Solaris would utilize some
7  operating system features to create a separate
8  file area.  They had modified the kernel, the
9  internals of Solaris, to support this.  It
10  relied on kernel internals to provide
11  separations between applications' end zones.  It
12  would provide separate scheduling types of
13  mechanisms and so forth also implemented in the
14  kernel.
15         The Trigence solution made no changes
16  to the kernel -- or didn't require any changes
17  to the kernel.  It was all done with what was
18  called function overlays, where the calls made
19  to shared libraries could be, essentially,
20  redirected to calls in the Trigence library, and
21  we were able to manipulate things in that way.
22  It had nothing to do with separate zones or

Page 40

1  kernel changes or anything.  So...
2      Q.  Okay.  So when you say that Solaris
3  zones was different from what Trigence was
4  doing, you were contrasting Solaris zones with
5  the Trigence product, not the patents; correct?
6      A.  Yes.
7      Q.  So can you explain these function
8  overlays to me a little bit more.
9      A.  Function overlays use an operating
10  system capability called library preload.  In
11  Unix and Linux and Solaris it's called
12  LD_Preload.  In Windows it's called AppInit_DLL.
13  And what happens is you would use LD_Preload or
14  AppInit_DLL to identify a library that you
15  wanted loaded with your -- with an application
16  as it starts.  When that application starts,
17  there's a dynamic loader that would load the
18  application plus other requisite libraries.
19         And LD_Preload/AppInit_DLL would say in
20  addition to the requisite libraries, also load
21  this library, and load it first before any other
22  libraries.  So that has the effect of managing

10  (Pages 37 to 40)

VM_IBM_0000899

Case 2:24-cv-00093-JRG    Document 114-17    Filed 12/19/24    Page 12 of 42 PageID #: 8631

9/10/2024                VirtaMove Corp. v. Amazon.com, Inc., et al.                Donn Rochette

Page 41

1  the -- what's called the namespace that the
2  loader used.
3        So if the application called a function
4  called fu, let's say, for example, if fu were
5  existent in a system library and also in a
6  Trigence library, because of the preload, the
7  loader would resolve fu to the Trigence library
8  instead of the system library because the
9  Trigence library was loaded first due to
10 LD_Preload/AppInit_DLL.
11     **Q.  Okay.  So you mentioned that this**
12 **function overlay capability that Trigence was**
13 **using was called LD_Preload in Solaris; is that**
14 **right?**
15     A.  Correct.
16     **Q.  Okay.  So Solaris had this LD_Preload**
17 **capability that could be used to provide the**
18 **function overlay capability?**
19     A.  Correct.
20     **Q.  And do you know when Solaris gained**
21 **that function overlay capability that Trigence**
22 **was using?**

Page 42

1  A.  That capability has been present in
2  Solaris since its first release of its origin.
3     **Q.  Does the 1987 sound like approximately**
4  **the right timeframe?**
5  A.  Yeah, that would be -- that would be in
6  the range, yes.
7     **Q.  I'm going to show you a document and**
8  **see if it's referring to the same thing you're**
9  **talking about when you say function overlay.**
10 A.  Okay.
11     MR. ANAPOL:  So, Billy, can you mark
12 Document E as Exhibit 1012.
13        (Whereupon, Exhibit 1012 was
14        marked for identification.)
15        (Discussion held off the record.)
16 BY MR. ANAPOL:
17     **Q.  So, Mr. Rochette, Exhibit 1015 the**
18 **cover page says "Australia Unix Systems User**
19 **Group Newsletter, Volume 8, No. 5."**
20        **Do you see that?**
21 A.  Yes.
22     MR. ANAPOL:  And, Billy, can you go to

Page 43

1  page 3 of the PDF?
2     **Q.  Mr. Rochette, do you see that this is**
3  **the table of contents?**
4  A.  Yes.
5     **Q.  And do you see that it's dated October**
6  **1987?**
7  A.  Yes.
8     **Q.  And towards the bottom, corresponding**
9  **with page 112, there's an entry for "Shared**
10 **Libraries in SunOS."**
11        **Do you see that?**
12 A.  Yes.
13        MR. ANAPOL:  So, Billy, could you go to
14 page 114 of the PDF?
15     **Q.  And, Mr. Rochette, you see that this**
16 **page shows the cover of an article entitled**
17 **"Shared Libraries in SunOS"?**
18 A.  Yes.
19     **Q.  And you see that there's four authors**
20 **from Sun Microsystems.**
21        **Do you see that?**
22 A.  I do, yes.

Page 44

1     **Q.  And you see that they give an address**
2  **in Mountain View, California; correct?**
3  A.  Yes.
4     **Q.  And that's Northern California; right?**
5  A.  That is correct.
6        MR. ANAPOL:  And, Billy, could you
7  please go to page 127 of the PDF.
8     **Q.  So, Mr. Rochette, do you see the**
9  **heading for Section 7.2 of this article?**
10 A.  Interposition, yeah, uh-huh.
11     **Q.  And could you just read this to**
12 **yourself and let me know when you're done.**
13 A.  Yeah, I'm done.
14     **Q.  So is the interposition being described**
15 **in this 1987 article the same as the function**
16 **overlay capability that you were referring to in**
17 **your earlier testimony?**
18 A.  It is functionally the same, yes.
19     **Q.  And did you learn about this capability**
20 **in the '80s, or did you learn about it later?**
21 A.  Oh, probably did learn about it in the
22 late '80s, yeah.

11  (Pages 41 to 44)

9/10/2024                    VirtaMove Corp. v. Amazon.com, Inc., et al.                    Donn Rochette

---

Page 45

1    Q.  Do you remember how you learned about
2  it?
3    A.  I don't remember the first time I used
4  it, no.  I don't recall the scenario, no.
5        MR. ANAPOL:  Okay.  Billy, you can
6  close this.
7    Q.  So I want to briefly go back to OnCore,
8  and then we'll take a break because we've been
9  going for about an hour.
10       Did OnCore's operating system have a
11  networking stack during the time you worked
12  there?
13   A.  Yes.
14   Q.  And let me just clarify that when I'm
15  asking about OnCore, I'm only ask about the time
16  you worked there, not anything that happened
17  after.  Okay?
18   A.  Okay.
19   Q.  So was the networking stack for the
20  OnCore operating system implemented inside or
21  outside of the kernel?
22   A.  Outside of the kernel.

---

Page 46

1    Q.  Do you remember how it was implemented?
2    A.  It was implemented as a separate --
3  what's called a process as a part of -- because
4  all of Unix was implemented as a separate
5  process.  So it was a part of the Unix instance,
6  which -- where all of Unix ran outside of the
7  kernel in user mode.
8    Q.  So you had all of Unix running in user
9  mode on top of the OnCore operating system;
10  correct?
11   A.  Yes.
12   Q.  And so all of that was outside of the
13  OnCore operating system's kernel; correct?
14       MR. TONG:  Objection --
15       THE WITNESS:  Outside of the kernel,
16  correct.
17       MR. TONG:  And I'm going to object to
18  this line of questioning again as getting back
19  into deep fact discovery, outside the scope of
20  venue discovery, and I don't think Mr. Donn
21  Rochette needs to answer any of these questions.
22       MR. ANAPOL:  Well, your objection is

---

Page 47

1  noted.
2    Q.  But you still have to answer the
3  question, Mr. Rochette.  And, again, I'll
4  just -- let me just repeat the question here.
5        So Unix was running outside of the
6  kernel in the OnCore operating system; correct?
7    A.  Yes.
8    Q.  And that includes the Unix networking
9  stack; correct?
10   A.  Yes.
11   Q.  And was any part of that in a shared
12  library?
13   A.  Yes, shared libraries were utilized for
14  portions of it.  Yes.
15   Q.  And did OnCore's operating system have
16  a file system?
17   A.  Yes.
18   Q.  And was the file system implemented
19  inside or outside of the operating system
20  kernel?
21   A.  Outside of the kernel.
22   Q.  Was any of it in a shared library?

---

Page 48

1    A.  Yes, portions of it would have been
2  implemented in a shared library -- one or more
3  shared libraries, yes.
4    Q.  And are there anybody -- let me
5  rephrase.
6        Are there anybody -- I can't get my
7  tenses to line up.
8        Are there any people in Northern
9  California who know about that functionality
10  that OnCore implemented in shared libraries?
11   A.  That OnCore implemented?  Well, there
12  are numerous people in Northern California that
13  would be familiar with the way in which it was
14  done or the way in which it is done, yes.
15  Specifically OnCore, I don't -- I doubt it.  I
16  don't know.
17   Q.  Who aside from you would know, from
18  working at OnCore, how those file system
19  functionalities were implemented?
20   A.  Well, just about any software developer
21  at Apple.
22   Q.  Okay.

12  (Pages 45 to 48)

VM_IBM_0000901

Case 2:24-cv-00093-JRG     Document 114-17     Filed 12/19/24     Page 14 of 42 PageID #: 8633

9/10/2024                VirtaMove Corp. v. Amazon.com, Inc., et al.                Donn Rochette

Page 49

1    A.  Because Apple's architecture runs in
2  the same way, uses the same kernel we were
3  using.
4    **Q.  And who aside from you would know, from**
5  **working at OnCore, how the networking stack was**
6  **implemented?**
7    A.  Same thing.  Lots of people would
8  understand how it works, maybe not specifically
9  what OnCore was doing, but the architecture, the
10  concept, the techniques would all be well known
11  by anybody at Apple.
12    **Q.  And do you know if any software**
13  **developers who worked with you at OnCore are**
14  **still in Northern California?**
15    A.  There's a gentleman called George
16  Marrow that's still in Northern California.
17  That's the only one that I know of that I can
18  think of anyway right now.
19        MR. ANAPOL:  Mr. Rochette, would you
20  like to take a five-minute break?  We've been
21  going for about an hour.
22        THE WITNESS:  I would.  Thank you.

Page 50

1        MR. ANAPOL:  Back in five minutes
2  everybody?
3        MR. TONG:  That's fine with us.
4        THE VIDEOGRAPHER:  Going off the
5  record.  The time is 11:59.
6        (Recess taken.)
7        THE VIDEOGRAPHER:  We are back on the
8  record.  The time is 12:09.
9  BY MR. ANAPOL:
10    **Q.  Mr. Rochette, before the break you**
11  **mentioned an individual named George Marrow.**
12    A.  Uh-huh.
13    **Q.  Could you give us the spelling of that**
14  **if you know it.**
15    A.  M-a-r-r-o-w.
16    **Q.  And --**
17    A.  I haven't spoken to George in a long
18  time.  You asked if there might be anybody, and
19  that's the only one I could think of who might
20  be around.
21    **Q.  Okay.  We can check.  Thank you.**
22        **At the time that you had it these**

Page 51

1  **discussions with Sun Microsystems that you**
2  **testified about earlier, do you know if they had**
3  **created zones yet at the time.**
4    A.  Yes, they had.  It was very new, but
5  they were out and released in the product.
6    **Q.  I just want to at this point get an**
7  **overview based on your experience working in**
8  **Silicon Valley and with people in Silicon Valley**
9  **about what they knew during the time you worked**
10  **for OnCore.  Okay?**
11    A.  Okay.
12    **Q.  Okay.  So -- and I understand you left**
13  **OnCore in 2002; is that right?**
14    A.  I don't remember the exact date, but
15  that sounds -- that sounds like the right range,
16  yes.
17    **Q.  Or maybe earlier, but by 2002?**
18    A.  Yeah.
19    **Q.  Okay.  So by 2002 did software**
20  **developers in Silicon Valley know that large**
21  **numbers of computers running different operating**
22  **systems could be connected in a network?**

Page 52

1        MR. TONG:  Objection.  Foundation.
2  Calls for speculation.
3        THE WITNESS:  Yes, there were many
4  examples of that scenario you just described by
5  that timeframe.
6  BY MR. ANAPOL:
7    **Q.  And by 2002 did software developers in**
8  **Silicon Valley know that servers running**
9  **different operating systems could work together**
10  **to provide a service?**
11        MR. TONG:  Objection.  Foundation.
12  Calls for speculation.
13        THE WITNESS:  Yes, there are also
14  examples of that by that date.
15  BY MR. ANAPOL:
16    **Q.  Can you give an example?**
17    A.  We discussed things with Chase Bank in
18  New York, and they were using Solaris and
19  Windows together to form various applications,
20  Windows being the front end, Solaris being the
21  data management in the back end, together
22  forming a service.

13  (Pages 49 to 52)

VM_IBM_0000902

Case 2:24-cv-00093-JRG    Document 114-17    Filed 12/19/24    Page 15 of 42 PageID #: 8634

9/10/2024                    VirtaMove Corp. v. Amazon.com, Inc., et al.                    Donn Rochette

Page 53

1    Q.  That reminds me.  One follow-up
2  question about OnCore:  So was OnCore selling
3  the operating system we discussed earlier by
4  2021?
5    A.  Yes.
6    Q.  By 2002 did software developers in
7  Silicon Valley know that software could run
8  inside of containers?
9        MR. TONG:  Objection.  Foundation.
10  Calls for speculation.
11       THE WITNESS:  Yes.  The use of the term
12  "containers" is broad, but if you allow yourself
13  a broad definition of "containers," the answer
14  is yes.
15  BY MR. ANAPOL:
16    Q.  Did software developers in Silicon
17  Valley by 2002 know that servers could host more
18  than one container?
19       THE WITNESS:  Yes.
20       MR. TONG:  Same objection, belated.
21  BY MR. ANAPOL:
22    Q.  By 2002 did software developers in

Page 54

1  Silicon Valley know that putting an application
2  in a container could prevent the application
3  from accessing files in another container?
4        MR. TONG:  Same objection.  Calls for a
5  legal conclusion.
6        I'm also objecting to this whole line
7  of questioning again as getting into fact
8  discovery that Mr. Donn Rochette is not
9  obligated to answer during venue discovery.
10  BY MR. ANAPOL:
11    Q.  Do you need me to repeat the question,
12  Mr. Rochette?
13    A.  Yes, please.
14    Q.  Sure.
15        By 2002 did software developers in
16  Silicon Valley know that putting an application
17  in a container could prevent the application
18  from accessing files in another container?
19       THE WITNESS:  Same objections.
20       THE WITNESS:  Yes.  In the context of
21  Solaris zones, that is a true statement.
22

Page 55

1  BY MR. ANAPOL:
2    Q.  By 2002 did software developers in
3  Silicon Valley know that putting an application
4  in a container could prevent the application
5  from interfering with applications in another
6  container?
7        MR. TONG:  Same objections.  Calls for
8  speculation.  Foundation.  Calls for a legal
9  conclusion.  Not venue discovery.
10       THE WITNESS:  Again, in the context of
11  Solaris zones, that would be an accurate
12  statement.  At least in the context of Solaris
13  zones.
14  BY MR. ANAPOL:
15    Q.  What about in the context of OnCore
16  operating system?
17    A.  Yes.
18       MR. TONG:  Same objections.
19       THE WITNESS:  Well, no, not in OnCore.
20  In Trigence.  Excuse me.
21  BY MR. ANAPOL:
22    Q.  So did the OnCore containers not

Page 56

1  confine the applications in the container?
2        MR. TONG:  Objection.  Calls for legal
3  conclusions.
4        THE WITNESS:  Yeah, it's difficult to
5  answer.
6        The Unix applications running with Unix
7  were not separated and could affect each other.
8  Embedded applications were separated.
9  BY MR. ANAPOL:
10    Q.  So, in other words, you could have
11  multiple applications in one container?
12       MR. TONG:  Objection.  Vague.
13       THE WITNESS:  In a Unix context, yes.
14  BY MR. ANAPOL:
15    Q.  And the applications running in the
16  Unix context on top of OnCore would be prevented
17  from interfering with the applications running
18  on the real-time portion of the operating
19  system; correct?
20    A.  Yes.
21       MR. TONG:  Objection.  Calls for a
22  legal conclusion.

14  (Pages 53 to 56)

VM_IBM_0000903

9/10/2024                VirtaMove Corp. v. Amazon.com, Inc., et al.                Donn Rochette

---

Page 57

1  BY MR. ANAPOL:
2      **Q.  Sorry.  Can you just repeat the answer,**
3  **Mr. Rochette.**
4      A.  The answer is yes.
5      **Q.  And is it also true that putting an**
6  **application in the Unix container in the OnCore**
7  **operating system would prevent it from**
8  **interfering with files outside of that**
9  **container?**
10      MR. TONG:  Objection.  Calls for
11  speculation.  Calls for a legal conclusion.
12      THE WITNESS:  That is a true
13  statement -- an accurate statement.
14  BY MR. ANAPOL:
15      **Q.  By 2002 did software developers in**
16  **Silicon Valley know that containers could have**
17  **their own root file systems?**
18      MR. TONG:  Objection.  Calls for
19  speculation.  Leading.
20      THE WITNESS:  That is an accurate
21  statement in the context of zones and
22  Trigence AE [garbled].

---

Page 58

1      (The reporter requested clarification.)
2      THE WITNESS:  Sorry.
3      That is an accurate statement in the
4  context of Solaris zones, Trigence AE at least.
5  BY MR. ANAPOL:
6      **Q.  I want to clarify that because I'm**
7  **asking about 2002.**
8      **So does that change your answer?**
9      A.  Oh.
10      MR. TONG:  Objection.  Asked and
11  answered.  Same objection as well.
12      THE WITNESS:  In answer to your
13  question, yes.  I shouldn't use examples, but,
14  yes, people knew that that was possible.
15  BY MR. ANAPOL:
16      **Q.  And are you familiar with a Unix**
17  **command called chroot.**
18      A.  Yes.
19      **Q.  And did that Unix command allow a user**
20  **to give an application its own root file system?**
21      A.  Yes.
22      **Q.  And do you know when chroot was**

---

Page 59

1  **introduced?**
2      A.  It was introduced in the early Unix
3  days before Solaris.  It was introduced by the
4  Bell Labs people when they first did Unix.  It
5  goes way back.
6      **Q.  So by the 1980s at least?**
7      A.  At least.  Before then, yes.
8      **Q.  And are you familiar with something**
9  **called BSD jails?**
10      A.  Yes.  I forgot about those.  Yes, I am.
11      **Q.  And what was BSD jails?**
12      A.  It was an open source response to the
13  capabilities in Solaris zones.  It was a way of
14  obtaining very similar behavior exemplified by
15  zones in an open source Unix capability that
16  didn't require licensing yet.  They're not
17  exactly the same, but it was close enough.
18      **Q.  So is BSD jails another container**
19  **capability?**
20      A.  Yes.
21      MR. TONG:  Objection.  Calls for legal
22  conclusion to the previous question.

---

Page 60

1  BY MR. ANAPOL:
2      **Q.  And do you know one way or the other if**
3  **"BSD" stands for "Berkeley Software**
4  **Distribution"?**
5      A.  It is my understanding that that is
6  what it stands for, yes.
7      **Q.  And that's referring to the University**
8  **of California, Berkeley, in Northern California?**
9      A.  That is my understanding, yes.
10      **Q.  By 2002 did software developers in**
11  **Silicon Valley know that containers could run on**
12  **top of a kernel that was residing outside of the**
13  **caper?**
14      MR. TONG:  Objection.  Calls for
15  speculation.  Foundation.  Leading.
16      THE WITNESS:  Yes.
17      MR. TONG:  Calls for a legal
18  conclusion.  Sorry.
19      THE WITNESS:  People understood that.
20  BY MR. ANAPOL:
21      **Q.  We're almost done with this line of**
22  **questions, just so you know, Mr. Rochette.  I**

---

15  (Pages 57 to 60)

VM_IBM_0000904

Case 2:24-cv-00093-JRG    Document 114-17    Filed 12/19/24    Page 17 of 42 PageID #: 8636

9/10/2024                VirtaMove Corp. v. Amazon.com, Inc., et al.                Donn Rochette

Page 61

1  know it's repetitive in some sense.
2      By 2002 did software developers in
3  Silicon Valley know that servers could limit the
4  resources used by a container?
5      MR. TONG:  Objection.  Calls for
6  speculation.  Foundation.  Leading.
7      THE WITNESS:  Yes.
8  BY MR. ANAPOL:
9      Q.  And did the OnCore operating system
10  have the ability to limit resources used by a
11  container?
12      MR. TONG:  Same objections.
13      THE WITNESS:  That was not the intent
14  of the OnCore system, no.  There was no explicit
15  limiting of resources or -- in that -- in that
16  architecture.
17  BY MR. ANAPOL:
18      Q.  But the OnCore system would allow a
19  real-time program to preempt an application
20  running in a Unix container; correct?
21      A.  That is correct.  But not for -- it
22  would not allow -- it would not enforce the

Page 62

1  amount of memory, for example, that a Unix
2  application would use.  Nothing of that nature
3  was done.
4      Yes, the really important thing was
5  that an application running in a real-time
6  context could preempt anything running in Unix
7  and be able to respond immediately.
8      Q.  And when the real-time application
9  preempts the application in the Unix container,
10  the real-time container is taking processing
11  resources away from the container at that time?
12      A.  Absolutely correct, yes.
13      MR. TONG:  Same objections.
14      THE WITNESS:  Sorry.  I should wait for
15  you to object.
16      Yes.
17  BY MR. ANAPOL:
18      Q.  By 2002 did software developers in
19  Silicon Valley know that servers could monitor
20  and log a container's resource usage?
21      MR. TONG:  Same objections.
22      THE WITNESS:  Yes.

Page 63

1  BY MR. ANAPOL:
2      Q.  And by 2002 did software developers in
3  Silicon Valley know that containers could have
4  their own IP address separate from a host?
5      MR. TONG:  Same objections.
6      THE WITNESS:  I'm not 100 percent sure
7  of that.  That was very difficult -- that's very
8  difficult to accomplish, the IP address, and I
9  don't -- honestly don't recall if that was
10  considered sort of commonplace.
11  BY MR. ANAPOL:
12      Q.  But would it surprise you if someone
13  had that capability before 2002?
14      MR. TONG:  Objection --
15      THE WITNESS:  It would not surprise
16  me --
17      MR. TONG:  -- foundation.
18      THE WITNESS:  -- no.
19      Oh, sorry.
20  BY MR. ANAPOL:
21      Q.  Can you repeat the answer,
22  Mr. Rochette.

Page 64

1      A.  It would not surprise me, no.
2      Q.  And by 2002 did software developers in
3  Silicon Valley know how to move software
4  functionality into a shared library?
5      MR. TONG:  Objection.  Calls for
6  speculation.  Foundation.  Legal conclusion.
7  Not venue discovery.  Leading.
8      THE WITNESS:  Yes.
9  BY MR. ANAPOL:
10      Q.  And do you know whether Trigence
11  released its container software before or after
12  Solaris zones?
13      A.  I don't recall whether anything in
14  Windows or Linux was released before or after
15  zones, no.  I don't recall the dates, no.
16      Q.  Have you ever heard of Docker?
17      A.  Yes.
18      Q.  And what is your understanding of
19  Docker?
20      A.  Docker is a container technology that
21  is in wide use today.
22      Q.  And when did you first hear about

16 (Pages 61 to 64)

9/10/2024                VirtaMove Corp. v. Amazon.com, Inc., et al.                Donn Rochette

---

Page 65

1  **Docker?**
2      A.  Maybe after the Trigence days, at the
3  end of Trigence -- my time at Trigence.  I don't
4  recall a date.
5      **Q.  Have you personally used Docker?**
6      A.  Yes.
7      **Q.  In what context?**
8      A.  Creating containers.  Allowing -- for
9  development purposes.  For production purposes.
10 For monitoring purposes.  We use Docker quite a
11 bit.
12     **Q.  When you say, "We have used Docker,"**
13 **who are you referring to?**
14     A.  Oh, I'm sorry.  Multiple development
15 teams that I've been a part of.  We have all
16 used Docker.
17     **Q.  Which companies that you've worked at**
18 **have used Docker?**
19     A.  AppFirst.  ScienceLogic.  I worked as a
20 contractor for the US Air Force for a while.
21 And Cribl most recently.
22     **Q.  Okay.  So all four of those**

---

Page 66

1  **organizations used Docker?**
2      A.  Correct.
3      **Q.  And, Mr. Rochette, have you ever heard**
4  **of containerd?**
5      A.  Yes.
6      **Q.  What's your understanding of**
7  **containerd?**
8      A.  Containerd is a process that runs in
9  the background as a part of Docker and is --
10 implements a large portion of the Docker
11 functionality.
12     **Q.  And do you have an understanding of**
13 **where Docker originated?**
14         MR. TONG:  Objection.  Calls for
15 speculation.
16         THE WITNESS:  I don't, actually.  I
17 know it's open source, but I don't know where or
18 what group originated it, no.
19 BY MR. ANAPOL:
20     **Q.  You mentioned Cribl in one of your**
21 **earlier answers.**
22         **Where is Cribl located?**

---

Page 67

1      A.  Cribl is located in San Francisco.
2      **Q.  And do you know if Cribl is using**
3  **Docker in San Francisco?**
4      A.  Yes.
5      **Q.  And did you visit San Francisco when**
6  **you worked for Cribl?**
7      A.  Yes.
8      **Q.  How often?**
9      A.  Not very often.  Once a year.
10     **Q.  And are there a lot of people in**
11 **Northern California who know about Docker?**
12     A.  Yes.
13         MR. TONG:  Objection.  Calls for
14 speculation.
15 BY MR. ANAPOL:
16     **Q.  And Cribl is the most recent company**
17 **that you worked at?**
18     A.  That is correct.
19     **Q.  Do you still work there?**
20     A.  No.  I am retired.
21     **Q.  Oh, right.  You mentioned that earlier.**
22         **When did you retire from Cribl?**

---

Page 68

1      A.  1st of September two years ago.
2      **Q.  2022?**
3      A.  Yes.
4      **Q.  And how does Docker compare to the**
5  **technology developed at Trigence?**
6         MR. TONG:  Objection.  Calls for legal
7  conclusions.  And Daubert.
8         THE WITNESS:  It is very similar.
9  Docker containers are quite similar to what is
10 described in the Trigence patent.  There are --
11 there are a lot of differences.  You know, any
12 software developer can describe those
13 differences to you.  But overall the ability to
14 create multiple containers with, you know,
15 multiple disparate applications running in them
16 is consistent.
17 BY MR. ANAPOL:
18     **Q.  And what do you mean by "disparate**
19 **applications"?**
20     A.  Primarily referring to applications
21 that would require a specific version of an
22 operating system.  So something that would run

---

17  (Pages 65 to 68)

VM_IBM_0000906

Case 2:24-cv-00093-JRG    Document 114-17    Filed 12/19/24    Page 19 of 42 PageID #: 8638

9/10/2024                VirtaMove Corp. v. Amazon.com, Inc., et al.                Donn Rochette

Page 69

1  on -- something that was originally running in a
2  Windows 10 environment that would be placed in a
3  container and could run in a Windows 12
4  environment.  That's what I mean by "disparate,"
5  meaning --
6      Q.  So the environments are disparate,
7  meaning different versions of the same operating
8  system?
9      A.  Different versions of the same
10  operating system, correct.
11      Q.  Okay.  So did you make the decision to
12  use Docker at the four companies you mentioned,
13  or did somebody else make that decision?
14      A.  Oh, no, somebody else made the
15  decision.  It was -- yeah.
16      Q.  Did you ever suggest to any of those
17  four companies that they use Trigence AE instead
18  of Docker?
19      A.  No.
20      Q.  Why not?
21      A.  Because -- the primary reason is
22  because of the difference in the way the

Page 70

1  Trigence AE is implemented, which requires
2  function overlays and shared libraries and so
3  forth.  It's difficult for larger companies'
4  environments to adopt that kind of approach.
5      Q.  Why?
6      A.  Because it modifies the way -- there
7  are modifications in the way in which an
8  application would run that are reliant on
9  private, non-open-sourced libraries and so forth
10  that make it very difficult for someone to be
11  able to validate -- and you need support and
12  things like that.
13      So it's much more difficult to adopt
14  that kind of an approach.  And I think one of
15  the reasons -- it's one of the reasons why
16  Docker is very typically chosen over an approach
17  like Trigence AE.
18      Q.  And did you ever think that the
19  companies you were working for that use Docker
20  needed a license to the '814 or '058 patents?
21      A.  No.  Never crossed my mind.  It never
22  crossed my mind that they were similar.

Page 71

1      Q.  And do you have an understanding of
2  whether any of the four companies you worked at
3  that use Docker were also using containerd?
4      A.  If you were using Docker, you were
5  using containerd.
6      Q.  So all four of those companies were
7  also using containerd?
8      A.  Yes.
9      Q.  Okay.  I want to talk a little bit more
10  about the disparate computing environments that
11  you mentioned.
12      A.  Okay.
13      MR. ANAPOL:  And, Billy, could you
14  please pull up Exhibit 1010 for us, and scroll
15  down to Column 2, please.  And around lines 17
16  to 19, can you blow that up for us.
17      Q.  So in the '814 patent, Mr. Rochette, do
18  you see that there's this definition of
19  "disparate computing environments"?
20      A.  Yes.
21      Q.  Do you know what this means?
22      A.  Yeah.  It's -- it's worded like a

Page 72

1  lawyer would word it.  Sorry.
2      It is -- it's meant to speak to the
3  ability for applications that are unrelated to
4  each other to run in a common compute platform.
5      Q.  So it says, "Environments where
6  computers are stand-alone or where there are
7  plural computers and where they are unrelated."
8      So does "unrelated" refer to the
9  computers or to the applications running on
10  them?
11      A.  In this statement it refers --
12      MR. TONG:  Objection.  Calls for a
13  legal conclusion.
14      THE WITNESS:  Oh, sorry.
15  BY MR. ANAPOL:
16      Q.  Go ahead, Mr. Rochette?
17      A.  In this statement it refers to the
18  computer platform -- the computer platforms.
19      Q.  And what does it mean for computer
20  platforms to be unrelated?
21      MR. TONG:  Objection.  Calls for a
22  legal conclusion.

18  (Pages 69 to 72)

VM_IBM_0000907

9/10/2024                VirtaMove Corp. v. Amazon.com, Inc., et al.                Donn Rochette

---

Page 73

1    THE WITNESS:  It would be having a --
2  there would be stand-alone, having -- presumably
3  having a network connection where information
4  could be exchanged, but they are not necessarily
5  related to each other.
6    If you go back to the example of a
7  corporate business application where it's using
8  Windows as a front end and some Unix or Solaris
9  background for data would be an example of that.
10  They are unrelated to each other, Windows is
11  Windows, Unix is Unix, and they are stand-alone,
12  but -- and [unintelligible] of things unrelated
13  that can be made to be related by applications
14  that talk to each other.
15    Does that help?  I'm not sure I'm
16  answering the question.
17  BY MR. ANAPOL:
18    **Q.  Yeah, I'm just trying to understand how**
19  **you tell whether two computers are stand-alone**
20  **or unrelated.**
21    **Do they have to be running different**
22  **operating systems?**

---

Page 74

1    A.  No.  They would just be separate
2  instances.
3    If you look at a rack of computers,
4  each hardware platform is a separate stand-alone
5  device.  Even if they're already all running the
6  same hardware and all running the same operating
7  system, they are different from each other.
8    **Q.  Okay.  So they're considered unrelated**
9  **even if they're all in the same place, they're**
10  **all connected to the same network and they're**
11  **all running the same operating system?**
12    A.  Yes.
13    MR. TONG:  Objection.  Calls for a
14  legal conclusion.
15    THE WITNESS:  Oh, sorry.
16    One way to differentiate that is that
17  they would all have a different network address
18  would make them standalone and separate.
19  BY MR. ANAPOL:
20    **Q.  Okay.  You reside in Iowa; correct?**
21    A.  Yes.
22    **Q.  And you're retired now; right?**

---

Page 75

1    A.  Yes.
2    **Q.  So you're not employed in any state**
3  **outside of Iowa; is that right?**
4    A.  That is right.
5    **Q.  And are there any states outside of**
6  **Iowa that you regularly travel to for business?**
7    A.  Not for business.  Only for personal.
8    **Q.  And before you retired, you worked for**
9  **Cribl; right?**
10    A.  That is correct.
11    **Q.  Which was based in San Francisco?**
12    A.  Yes.
13    **Q.  And sorry if you already answered this.**
14  **I can't recall.**
15    How often did you visit San Francisco
16  **when you worked for Cribl?**
17    A.  About once a year.  Not frequently.
18    The company was remote.  So we had
19  people in Europe and all across the United
20  States, and we all worked remotely.
21    **Q.  Okay.  I just want to get back to**
22  **Docker --**

---

Page 76

1    A.  Okay.
2    **Q.  -- and then hopefully we'll be able to**
3  **wrap up here.**
4    So Docker, based on your experience --
5  **I'm sorry.  I didn't mean Docker.  I meant**
6  **Solaris zones.**
7    A.  Okay.
8    **Q.  So Solaris zones, based on your**
9  **experience, can operate in disparate computing**
10  **environments?**
11    A.  Yes.
12    MR. TONG:  Objection.  Calls for a
13  legal conclusion.  Daubert.
14  BY MR. ANAPOL:
15    **Q.  And Solaris zones was capable on**
16  **running of on a plurality of servers, meaning**
17  **multiple servers?**
18    A.  Yes.
19    **Q.  And those servers would include a**
20  **processor; right?**
21    A.  Yes.
22    **Q.  And an operating system; right?**

19  (Pages 73 to 76)

VM_IBM_0000908

Page 77

1    A.  Yes.
2    Q.  And a kernel; right?
3    A.  Yes.
4    Q.  And local system files compatible with
5  the processor?
6    A.  Yes.
7    Q.  And the server could provide executable
8  applications related to a service?
9        MR. TONG:  Objection.  Calls for legal
10  conclusions.  Daubert.
11       THE WITNESS:  Yes.
12  BY MR. ANAPOL:
13   Q.  And Solaris zones allowed applications
14  to be executed in a secure environment?
15   A.  Correct.
16       MR. TONG:  Same objections.  And
17  leading.
18       THE WITNESS:  Yes.
19  BY MR. ANAPOL:
20   Q.  I will rephrase the last question.
21       Could a server running Solaris zones
22  provide executable applications relating to a

Page 78

1  service?
2        MR. TONG:  Same objections.
3        THE WITNESS:  Yes.
4  BY MR. ANAPOL:
5    Q.  And could a server running Solaris
6  zones execute applications in a secure
7  environment?
8        MR. TONG:  Same objections.
9        THE WITNESS:  Yes.
10  BY MR. ANAPOL:
11   Q.  And could a server running Solaris
12  zones store multiple secure containers in
13  memory?
14       MR. TONG:  Same objections.
15       THE WITNESS:  Yes.
16  BY MR. ANAPOL:
17   Q.  And could those multiple containers
18  have applications and system files in them?
19       MR. TONG:  Same objections.
20       THE WITNESS:  Yes.
21  BY MR. ANAPOL:
22   Q.  And would those containers use the

Page 79

1  kernel from the operating system hosted on the
2  server?
3        MR. TONG:  Same objections.
4        THE WITNESS:  Yes.
5  BY MR. ANAPOL:
6    Q.  And that kernel would be on the server
7  regardless of whether it was running any
8  containers; right?
9        MR. TONG:  Same objections.
10       THE WITNESS:  Yes.
11  BY MR. ANAPOL:
12   Q.  Would the kernel be running on the
13  operating system regardless of whether the
14  server was running any containers?
15       MR. TONG:  Same objections.
16       THE WITNESS:  Yes.  The kernel would
17  run first and foremost, yes, in all instances.
18  BY MR. ANAPOL:
19   Q.  And would the system files in the
20  containers be compatible with the kernel?
21       MR. TONG:  Same objections.
22       THE WITNESS:  That is a major

Page 80

1  difference.  In zones they would have to be
2  compatible with the kernel and the version of
3  the kernel being used, yes.
4  BY MR. ANAPOL:
5    Q.  And did each container have its own
6  kernel or did they share a kernel?
7    A.  No --
8        MR. TONG:  Same objections.
9        THE WITNESS:  -- one kernel shared
10  by -- oh, I'm sorry.
11       One kernel shared by all applications.
12  BY MR. ANAPOL:
13   Q.  And could a container contain system
14  files that were also present outside of the
15  container?
16       MR. TONG:  Same objections.
17       THE WITNESS:  I'm sorry.  Could you
18  clarify that.
19  BY MR. ANAPOL:
20   Q.  Yeah.  So imagine you have a service
21  running outside of the container, like, you
22  know, you have an instance of Apache, for

20  (Pages  77 to 80)

VM_IBM_0000909

Case 2:24-cv-00093-JRG   Document 114-17   Filed 12/19/24   Page 22 of 42 PageID #: 8641

9/10/2024          VirtaMove Corp. v. Amazon.com, Inc., et al.          Donn Rochette

Page 81

1  example.
2      A.  Okay.
3      Q.  And then you also have an instance of
4  Apache running inside the container.
5      A.  Uh-huh.
6      Q.  Could you have system files, like, the
7  configuration file for Apache, one inside the
8  container and one outside the container?
9      A.  Yes.
10      MR. TONG: Objection. Incomplete
11  hypothetical. Leading. Daubert. Calls for a
12  legal conclusion. Foundation.
13      THE WITNESS: Yes. That's actually a
14  common scenario.
15  BY MR. ANAPOL:
16      Q.  And --
17      A.  A configuration file is a very common
18  scenario.
19      Q.  And would the instance of Apache inside
20  the container use the configuration file inside
21  of the container instead of the one outside of
22  the container?

Page 82

1      MR. TONG: Same objections.
2      THE WITNESS: Yes.
3  BY MR. ANAPOL:
4      Q.  And would the applications inside of a
5  container on Solaris zones be able to access
6  software in another container?
7      MR. TONG: Same objections.
8      THE WITNESS: No.
9  BY MR. ANAPOL:
10      Q.  And would each of those containers be
11  able to have its own root file system?
12      MR. TONG: Same objections.
13      THE WITNESS: Yes.
14  BY MR. ANAPOL:
15      Q.  And do you know if Solaris zones
16  allowed resource limits to be placed on a
17  container?
18      A.  Yes, it is.
19      MR. TONG: Same objection.
20  BY MR. ANAPOL:
21      Q.  Mr. Rochette?
22      A.  Yes.

Page 83

1      Q.  And would applications inside of a
2  container be prevented from accessing system
3  files outside of the container?
4      MR. TONG: Same objections.
5      THE WITNESS: Yes, that is correct.
6  BY MR. ANAPOL:
7      Q.  And do you know how a container would
8  be created in Solaris zones, in other words, how
9  you would get the necessary files into the
10  container?
11      A.  There were very specific command line
12  options that you used with Solaris zones. A
13  zone_create command and a zone command for
14  specifying resources, a zone command for
15  specifying files that were used in the zone, and
16  things like that. So you would -- you would
17  configure these things using a command line.
18      Q.  So did Solaris zones have the ability
19  to create a container -- basically take an
20  application that's already running outside of a
21  container and then make a copy of it inside of a
22  container?

Page 84

1      MR. TONG: Same objections.
2      THE WITNESS: You would make a copy --
3  oh, sorry. Excuse me. Sorry.
4      Yes, you would make a copy of it. You
5  would create the zone, then you would copy files
6  as needed, very likely you'd have to modify the
7  configuration of something, and then you could
8  start your application.
9  BY MR. ANAPOL:
10      Q.  And when you would copy files into the
11  container, it would be applications and system
12  files, or no?
13      A.  Application files for sure. System
14  files would be optional, depending on what you
15  were doing. You might need some system files,
16  you might not, depending on what the application
17  was and what you were trying to accomplish.
18      Q.  And when you made that copy, you would
19  still have the original version outside of the
20  container; right?
21      A.  You would -- it would be possible, yes.
22      Q.  I think you mentioned earlier that

21 (Pages 81 to 84)

Case 2:24-cv-00093-JRG    Document 114-17    Filed 12/19/24    Page 23 of 42 PageID #: 8642

9/10/2024                VirtaMove Corp. v. Amazon.com, Inc., et al.                Donn Rochette

Page 85

1  **Solaris zones had the capability of moving**
2  **certain functionality that would normally be in**
3  **an operating system kernel into a shared**
4  **library; is that right?**
5       MR. TONG:  Objection.
6  Mischaracterizes.  Leading.
7       THE WITNESS:  Yes, there were some
8  capabilities that were represented outside of
9  the kernel in user mode, correct.
10  BY MR. ANAPOL:
11     Q.  What capabilities were those?
12     A.  File system separation.  The use of
13  something like the chroot command, or the chroot
14  command you referred to earlier.  The -- oh, I
15  can't think of other examples.  I mean, there
16  were several examples of it.
17     Q.  And how did you learn that Solaris
18  **zones had that capability?**
19     A.  Sitting down in front of a Solaris
20  operating system and using it.  Reading the
21  documentations and using the capabilities and
22  testing it.

Page 86

1     Q.  And how did you determine that those
2  **capabilities were implemented in shared**
3  **libraries rather than the kernel?**
4     A.  If you go to an application and -- you
5  would execute the command called LDD.  LDD shows
6  you what libraries are required by a certain
7  executable, and it would -- it's very clear --
8  clearly shown what libraries are referenced, and
9  you could then look at the libraries and very
10  clearly see what is implemented in those
11  libraries.
12     Q.  So do you know if there was any shared
13  **library functionality in Solaris that was also**
14  **in the kernel, in other words, the shared**
15  **library functionality was a duplicate or**
16  **performing a similar function to what was in the**
17  **kernel?**
18       MR. TONG:  Objection.  Foundation.
19  Leading.  Calls for a legal conclusion.
20       THE WITNESS:  There were some
21  networking capabilities and shared libraries and
22  some -- for example, that would define what IP

Page 87

1  address is used, define what routing is used for
2  a container separate from the kernel and was --
3  would be accessed by applications before going
4  to the kernel.
5       So you would have had very similar
6  capability in that zone that was accessed by
7  applications in these zones before going to the
8  kernel.
9  BY MR. ANAPOL:
10     Q.  So just for the sake of a concrete
11  **discussion, can you think of an example of a**
12  **shared library that we could talk about that had**
13  **this operating system functionality?**
14     A.  I can't recall the names of them in
15  Solaris.  They would have been a libnetwork.so
16  or lib -- something with the name "network" in
17  it or "net."  It would have the network --
18  the things that would otherwise -- the things
19  that were also present in a kernel, like
20  defining an IP address, like defining routes,
21  like defining -- not TCP protocol, but these
22  would have been used by zones to configure the

Page 88

1  network capabilities present in that zone or
2  container for use by the application.
3       I don't remember exactly the names.
4  It's a long time ago, but there were shared
5  libraries used by Solaris that did those things.
6     Q.  So for the networking shared library,
7  **if there were two applications using that shared**
8  **library, would they each have their own instance**
9  **in the sense of, you know, internal data used by**
10  **the shared library having two different copies**
11  **of that data?**
12       MR. TONG:  Objection.  Foundation.
13  Leading.  Calls for a legal conclusion.
14  Daubert.
15       THE WITNESS:  The way it works is the
16  code for that library in question, once loaded
17  into memory, is shared by all applications.
18  That's the -- hence, the term "shared library."
19  And -- so multiple zones could make use of the
20  same networking library.
21       The difference is that the data that
22  they use is distinct.  So the actual code that

22  (Pages 85 to 88)

VM_IBM_0000911

Case 2:24-cv-00093-JRG   Document 114-17   Filed 12/19/24   Page 24 of 42 PageID #: 8643

9/10/2024          VirtaMove Corp. v. Amazon.com, Inc., et al.          Donn Rochette

Page 89

1  gets executed is common across zones; the data
2  that they use is separate for each zone.
3          And any writes that would happen into
4  memory -- oh, gosh, at the risk of going into
5  detail would be -- would implement an operating
6  feature called copy-on-write, which would create
7  a different instance of a page in memory, but
8  it's specific to that zone.
9          Sorry.  I think I went too deep.
10  BY MR. ANAPOL:
11      Q.  And did the Trigence AE approach to
12  shared libraries work the same way?
13      A.  Yes.
14      Q.  So are you aware of any differences
15  between how your '058 patent uses shared
16  libraries versus how the Solaris zones used
17  shared libraries?
18      A.  There are fundamental differences, yes.
19      Q.  Okay.  What are the differences?
20      A.  I'm pausing to think about how to make
21  it very simple.
22          The most -- the biggest difference or

Page 90

1  the most salient difference is the use of the
2  library preload.  I referred to it earlier,
3  LD_Preload and AppInit_DLL.  The Trigence patent
4  defines the use of these capabilities by and
5  from an operating system so that a
6  Trigence-specific library gets loaded
7  independent of the application or in addition to
8  the libraries required by the application.  And
9  these function overlays I referred to earlier
10  are used a lot.  It's the foundation to the way
11  that technology is defined.
12          This is not used in zones.  Zones did
13  not do any of that.  Where they required, for
14  example, different -- where they required, for
15  example, specific behavior for one zone versus
16  another zone, they were able to rely on kernel
17  internals in Solaris do that.  Trigence AE is
18  not able to do that and therefore would rely on
19  preload and function overlays in order to
20  accomplish those kinds of things.
21      Q.  Okay.
22      A.  Really big difference.  There are

Page 91

1  others, but that's the biggest.
2      Q.  And do you know if the claims of the
3  '058 patent reflect that difference?
4          MR. TONG:  Objection.  Daubert.  Calls
5  for a legal conclusion.
6          THE WITNESS:  When I reviewed the
7  patents in preparation for this discussion, I
8  did not look at the claims.  I don't -- I
9  couldn't answer that effectively right now.
10          MR. ANAPOL:  All right.  So I'm almost
11  done.  I probably have a couple more questions,
12  but I want to give you an opportunity to take a
13  lunch break if you want one.
14          THE WITNESS:  If it's okay with
15  everybody else, I'd rather just finish.
16          MR. ANAPOL:  Okay.  All right.
17          THE WITNESS:  If everybody else is
18  okay.
19          MR. ANAPOL:  We've been going about an
20  hour.  So, Audra, do you want to do five minutes
21  or ten minutes for a break?
22          We'll do a ten-minute break.  I'll have

Page 92

1  a few questions to wrap up.  Mr. Tong might have
2  some questions after that, but hopefully we can
3  just wrap this up before you need to eat lunch.
4          THE WITNESS:  Thank you.
5          THE VIDEOGRAPHER:  Okay.  Going off the
6  record.  The time is 12:59.
7          (Recess taken.)
8          THE VIDEOGRAPHER:  We are back on the
9  record.  The time is 1:10.
10  BY MR. ANAPOL:
11      Q.  Okay.  So before the break, we were
12  talking about Solaris zones.
13          Do you remember that?
14      A.  Yes.
15      Q.  And so, as you sit here today, are you
16  able to identify any difference between the
17  claims of the '058 patent and what was in
18  Solaris zones?
19          MR. TONG:  Objection.  Calls for a
20  legal conclusion.  Daubert.
21          THE WITNESS:  I would have a difficult
22  time being specific about claims because, as I

23  (Pages 89 to 92)

9/10/2024    VirtaMove Corp. v. Amazon.com, Inc., et al.    Donn Rochette

Page 93

1  said, I didn't review the claims.  I can -- I am
2  comfortable with differences in technology or
3  differences in implementation, but the specific
4  claims I would have to -- I couldn't answer
5  right now.
6  BY MR. ANAPOL:
7      Q.  So when we go back to the court, just
8  so you understand, there's going to be some
9  briefing where we explain, you know, our
10  position and the other side's position, and when
11  we are describing to the court what happened
12  here, I want to be able to tell the court
13  whether you're what we call a willing witness or
14  an unwilling witness.
15      So an unwilling witness would be
16  someone who is only going to come if they're
17  subject to subpoena that requires them to come
18  to the trial, and a willing witness is someone
19  who would come willingly even if they're not
20  compelled to come.
21      And so would you put yourself in the
22  willing or unwilling category?

Page 94

1      A.  In all honesty, I would put myself in
2  the unwilling category.
3      Q.  Okay.  And then I just wanted to back
4  briefly to the Docker issue.
5      A.  Okay.
6      Q.  So you used Docker and containerd at
7  four different companies; right?
8      A.  Correct.
9      Q.  And you are the named inventor on both
10  the '814 patent and the '058 patent; correct?
11      A.  Yes.
12      Q.  The first named inventor.
13      A.  Yes.
14      Q.  And it never occurred to you at any of
15  those four companies that your company needed a
16  license from Trigence or VirtaMove to use Docker
17  or containerd?
18      MR. TONG:  Objection --
19      THE WITNESS:  It never occurred to me.
20      MR. TONG:  -- leading.
21      THE WITNESS:  It never occurred to me,
22  no.

Page 95

1  BY MR. ANAPOL:
2      Q.  Do you think now that Cribl needs a
3  license to the '814 or '058 patent to use Docker
4  and containerd.
5      MR. TONG:  Objection --
6      THE WITNESS:  Absolutely not.
7      MR. TONG:  -- leading.  Calls for a
8  legal conclusion.
9      THE WITNESS:  I'm sorry.  I keep doing
10  that.
11      Absolutely not, no.
12      MR. ANAPOL:  No further questions.
13
14      EXAMINATION
15  BY MR. TONG:
16      Q.  Mr. Rochette, it'll be my turn to ask a
17  few more questions.
18      A.  Okay.
19      Q.  First of all, I want to thank you for
20  your time here today.
21      In preparation for this deposition,
22  have you been in communication with Amazon or

Page 96

1  its counsel?
2      A.  I spoke with Mr. Anapol very briefly to
3  clarify whether or not -- to clarify what I
4  needed to be prepared -- what I needed to bring
5  in; if there was any response that was required
6  that was -- yep.
7      So I had one conversation on the phone
8  just to make sure I was doing what I was
9  supposed to be doing.
10      Q.  Did you speak with anyone else other
11  than Mr. Jeremy Anapol?
12      A.  No.
13      Q.  About how long did you speak with
14  Mr. Anapol?
15      A.  Oh, I think the conversation might have
16  lasted ten, fifteen minutes is all.
17      Q.  Did you speak with any other lawyers
18  from other firms?
19      A.  No.
20      Q.  Okay.  And did you try and retain your
21  own attorney to defend you in this deposition?
22      A.  No.

24  (Pages 93 to 96)

VM_IBM_0000913

Case 2:24-cv-00093-JRG    Document 114-17    Filed 12/19/24    Page 26 of 42 PageID #: 8645

9/10/2024                VirtaMove Corp. v. Amazon.com, Inc., et al.                Donn Rochette

Page 97

1    Q.  Did Amazon offer you any type of
2  compensation or paid role as a consultant?
3    A.  No.
4    Q.  Did you have any email exchanges either
5  with Amazon or its attorneys or other
6  representatives?
7    A.  The only email I've had is a
8  clarification of which Zoom I could use.
9    Q.  Did -- on your -- when you had that
10  discussion with Mr. Anapol, what topics did he
11  tell you to be prepared about?
12    A.  He explained that there was a -- I
13  think he described it as a motion before the
14  court about change of venue, and he explained
15  why they were doing that.
16      He explained that this was in reference
17  to the two patents, making sure that I was
18  comfortable with what those patents were.
19      And, yeah, that's about it.
20    Q.  Did he discuss any lines of questioning
21  with you?
22    A.  No.

Page 98

1    Q.  Did he talk about how you should answer
2  any of the questions that he was going to ask
3  today?
4    A.  No.  He was very careful to say just be
5  honest and answer to the best of your ability.
6  That was my recollection.
7    Q.  Did you have any communications with
8  Amazon today during the breaks in this
9  deposition, either Amazon or its
10  representatives, like Mr. Jeremy Anapol?
11    A.  No.
12    Q.  Did you read the patents in preparation
13  for this deposition?
14    A.  Yes.  Like I said, I did not read over
15  the claims, but I did read over the patents,
16  yes.
17    Q.  If you didn't want to be involved with
18  this lawsuit, why did you prepare for this
19  deposition and agree to, you know, so willingly
20  join us today?
21      MR. ANAPOL:  Objection.  Argumentative.
22  And mischaracterizes testimony.

Page 99

1      And as you know, Peter, he was subject
2  to subpoena, so he was required by law to
3  attend.
4      MR. TONG:  Okay.  No speaking
5  objections, please.
6      MR. ANAPOL:  You can answer,
7  Mr. Rochette.
8      THE WITNESS:  I was required by law to
9  attend based on federal subpoena, yeah.
10  BY MR. TONG:
11    Q.  So you recall what you said was you
12  speaking with Mr. Nigel Stokes?
13    A.  Yeah.
14    Q.  That was through LinkedIn; right?
15    A.  Correct.
16    Q.  Okay.  It wasn't actual speaking, like,
17  by telephone, was it?
18    A.  Yes, we had a phone conversation.  He
19  contacted me over LinkedIn, he asked for
20  permission to call me, and we had a -- we had a
21  telephone conversation, a brief telephone
22  conversation.

Page 100

1    Q.  Okay.  And during that conversation,
2  you generally expressed that you did not want to
3  be involved with this case; correct?
4    A.  That is correct.
5      MR. ANAPOL:  Objection.  Leading.
6  BY MR. TONG:
7    Q.  And so today you heard me object
8  several times that this deposition is supposed
9  to be limited to venue facts.
10      Do you remember that?
11    A.  I do recall you saying that, yes.
12    Q.  Why did you keep answering questions
13  after that objection?
14    A.  Because I was told -- informed by other
15  counsel that I was required to answer it.
16    Q.  And was that Mr. Anapol --
17    A.  Yes.
18    Q.  -- who informed you of that?
19    A.  Yes.
20    Q.  Did he tell you that you had to
21  cooperate with him other than by showing up at
22  this deposition today?

25  (Pages 97 to 100)

VM_IBM_0000914

Case 2:24-cv-00093-JRG    Document 114-17    Filed 12/19/24    Page 27 of 42 PageID #: 8646

9/10/2024                VirtaMove Corp. v. Amazon.com, Inc., et al.                Donn Rochette

Page 101

1    A.  I don't understand that question.
2    Q.  Did he tell you that the subpoena
3    required you to cooperate with him in any other
4    way outside of this deposition?
5    A.  No.
6    Q.  Does Amazon represent you in any
7    capacity?
8    A.  No.
9    Q.  Does Mr. Jeremy Anapol represent you --
10   or any other member of his law firm, Knobbe
11   Martens, represent you in any capacity?
12   A.  No.
13   Q.  If you recall, earlier today we looked
14   at the '814 patent, and --
15   A.  Yes.
16   Q.  -- you said it was generally related to
17   containers.
18   A.  Yes.
19   Q.  At a high level, what was it about the
20   use of containers that you thought was inventive
21   and worth filing a patent on?
22   A.  The ability to create separate

Page 102

1    application environments or environments for
2    applications to run in Windows and Linux.
3    Q.  And you thought that was inventive at
4    the time you came up with it; right?
5    A.  Yes.
6    Q.  Did OnCore do that already by the time
7    that you had filed the application for the
8    '814 patent?
9    A.  Not -- they're not the same.  OnCore
10   created -- they used the term "container."  You
11   saw what was displayed earlier.  They used the
12   term "virtual containers," and they are; they're
13   virtual containers.  But they're very different.
14        They are -- the intent of what OnCore
15   did was to create priority preemptable, embedded
16   applications running side by side with Linux.
17   What this patent describes is very different
18   from that.
19   Q.  Could you elaborate a little bit more
20   on what this patent describes that is very
21   different from the virtual containers of OnCore.
22   A.  The '814 patent describes an ability to

Page 103

1    utilize library preloads, function overlays in
2    order to support a environment in which
3    applications with run in secure containers, in
4    separate containers that the OnCore technology
5    did not use library preload or function overlays
6    at all.
7    Q.  Thanks.
8        By the time you had filed the
9    '814 patent, do you think the technology was --
10   of the '814 patent -- was that different from
11   what Solaris zones was doing at the time?
12   A.  Yes, it was different.  And the way in
13   which it was implemented was different, and
14   the -- much of the features were different.
15   But, yeah, there were differences.
16        The primary difference is the
17   technology defined in the '814 patent could be
18   used outside of Solaris.  Zones is specific to
19   Solaris.
20   Q.  Other than that the technology of
21   Solaris zones was specific to Solaris, were
22   there any other ways that zones and the

Page 104

1    technology of the '814 patent were different?
2    A.  Well, the fundamental design was vastly
3    different.  The architecture was vastly
4    different.
5        I feel like I'm repeating myself, but
6    zones relied on specific Unix commands and
7    modifications to the kernel in Solaris in order
8    to implement those containers.  What's defined
9    in the '814 patent does not rely on changes to
10   the kernel and does not rely on specific Unix
11   commands to implement these -- the containers
12   that are described.
13   Q.  And that would have been -- modifying
14   the kernel in something like Solaris, that would
15   be very difficult to do for an average
16   programmer if that programmer did not have
17   access to the Solaris kernel source code;
18   correct?
19        MR. ANAPOL:  Leading.
20        THE WITNESS:  It would be very
21   difficult.  Virtually impossible.
22

26  (Pages 101 to 104)

VM_IBM_0000915

Case 2:24-cv-00093-JRG    Document 114-17    Filed 12/19/24    Page 28 of 42 PageID #: 8647

9/10/2024    VirtaMove Corp. v. Amazon.com, Inc., et al.    Donn Rochette

Page 105

1  BY MR. TONG:
2      **Q.  My previous question asked you about**
3  **the difference between the '814 patent and the**
4  **virtual containers of OnCore.**
5          **Did those differences exist at the time**
6  **that you had filed the provisional applications**
7  **that the '814 patent claims priority to?**
8      A.  I'm sorry.  Make sure I understand your
9  question.
10         Did the differences between what the
11 OnCore technology defined and what's defined in
12 the '814 patent exist at the time the
13 provisional was submitted?
14         Yes, those differences did exist at
15 that timing.
16     **Q.  And similar question for Solaris zones:**
17 **Did the differences between Solaris zones and**
18 **the technology of the '814 patent exist at the**
19 **time that you filed the provisional applications**
20 **that led to the '814 patent?**
21     A.  As I stated earlier, I don't recall the
22 timing when zones were announced and released

Page 106

1  relative to the provisional patent application.
2  I don't recall the timing of that.  It was
3  close.
4      **Q.  So earlier you had discussed a meeting**
5  **with the folks at Solaris zones.**
6          **Do you remember discussing that**
7  **meeting?**
8      A.  Yes.
9      **Q.  And initially they thought that you or**
10 **someone else had gained access to the zone**
11 **source code?**
12     A.  That was their impression when we went
13 into the meeting, correct.
14     **Q.  Okay.  And then you explained to them**
15 **that you had, in fact -- well, what did you**
16 **explain to them in response to that accusation?**
17     A.  We explained in a lot detail how
18 Trigence AE worked, why it worked, what we did,
19 how to make it work, and they were able to see
20 in that discussion and whiteboarding that what
21 we were doing was able to be accomplished
22 without access to Solaris internals.

Page 107

1      **Q.  Initially were they skeptical when you**
2  **denied accessing Solaris source code?**
3      A.  I suppose they were.
4      **Q.  And you had to more or less convince**
5  **them and dissolve that skepticism through lots**
6  **of details and discussions of how Trigence AE**
7  **worked; correct?**
8      A.  Yes.
9          MR. ANAPOL:  Objection.  Leading.
10 BY MR. TONG:
11     **Q.  So when you were talking with**
12 **Mr. Anapol, you had said that at your previous**
13 **job at OnCore you only very loosely worked on**
14 **containers.**
15         **Do you remember using the words "very**
16 **loosely" in an answer?**
17     A.  Yes.
18     **Q.  What did you mean by you only very**
19 **loosely worked on containers?**
20     A.  The use of the term "containers" has
21 taken on today -- in today's understanding of
22 the technology has taken on a fairly specific

Page 108

1  and well-understood understanding of what that
2  means.
3          When the OnCore work was done, there
4  was not such an understanding of what
5  "containers" mean.  It was a new kind of topic,
6  and there was not a common understanding of it,
7  and so we could -- the website and marketing
8  people and salespeople could use the term
9  "containers," and it was acceptable.
10         And so that's what I mean by a loose --
11 use of the word "containers," you would not be
12 able to do that.  It would -- you would not be
13 able to use that term today for what OnCore is
14 doing or had -- did do.  That's what I was
15 trying to imply.
16     **Q.  Okay.  How was OnCore using the term**
17 **"containers" back then?**
18     A.  OnCore would take a microkernel, would
19 deploy embedded real-time applications using
20 that microkernel and, in parallel with that,
21 would employ Unix or Linux in an application.
22 So a real-time application would be running as a

27 (Pages 105 to 108)

VM_IBM_0000916

Case 2:24-cv-00093-JRG    Document 114-17    Filed 12/19/24    Page 29 of 42 PageID #: 8648

9/10/2024          VirtaMove Corp. v. Amazon.com, Inc., et al.          Donn Rochette

Page 109

1  peer to all of Unix.
2      And so the term "container" would be
3  used to describe the real-time application
4  running as well as Unix as an application, and
5  all of the applications on top of Unix would
6  be -- that's how they -- the term "container" --
7  "virtual container" was used in the OnCore
8  context.
9      **Q.  When you were at OnCore, did you ever**
10 **use the word "docking" or "docker"?**
11     A.  I don't recall the use of that term in
12 the OnCore context.
13     **Q.  Before you filed either of the '058 or**
14 **'814 patents at issue in this case, did you hear**
15 **anyone else use the word "docking" or "docker"?**
16     MR. ANAPOL:  Objection.  Vague.
17     THE WITNESS:  I don't recall whether or
18 not "docker" was a commonly used -- at the time
19 that was used.  I don't recall.
20     MR. TONG:  Let's turn to the
21 '058 patent for a little bit.
22     Could we please put Mr. Rochette back

Page 110

1  in the main window?
2      THE VIDEOGRAPHER:  Do you not want me
3  to share?
4      MR. TONG:  No, it's not necessary.
5      **Q.  So earlier do you remember discussing**
6  **how this patent related to shared libraries?**
7      A.  Yes.
8      **Q.  Now, you're not claiming to be the**
9  **inventor of shared libraries; correct?**
10     A.  That is correct.
11     **Q.  The '058 patent covers and discloses**
12 **more than just the use of a shared library by**
13 **itself; correct?**
14     A.  That is correct.
15     **Q.  Okay.  So what did you think was**
16 **inventive about the use of shared libraries in**
17 **the '058 patent?**
18     A.  A number of things.  The biggest thing
19 was the ability to implement things that were at
20 the time only implemented in the kernel.  So you
21 could, for example, provide an application that
22 required an older version of Windows.  Say

Page 111

1  something ran on Windows 8; you could run it on
2  Windows 10.
3      The -- it would be required that that
4  application get specific files and libraries
5  used only by Windows 8 that not are not
6  available on Windows 10.  So you had to ensure,
7  when a file was opened, that you were able to
8  use these shared library techniques in order to
9  open the file related to that application --
10 required by that application, not the file
11 provided by the operating system.
12     Another example of that would be an
13 ability to have an application use an IP address
14 specific to that application or container which
15 is separate from other IP addresses.  So you had
16 to again use code in these shared libraries in
17 order to basically ensure that the application
18 thought it had one IP address.
19     And that's where that whole use of the
20 term "critical system elements" in the
21 '058 patent comes into play.  And you were
22 taking functionality that would otherwise only

Page 112

1  be available in a kernel and putting that into
2  libraries that you caused that application to
3  use.
4      **Q.  So you said that that was the biggest**
5  **thing.**
6      **Were there any other inventive concepts**
7  **related to the '058 patent that you felt like**
8  **you had invented?**
9      A.  Well, the ability to do --
10     MR. ANAPOL:  Objection.  Calls for --
11 sorry.  Sorry, Mr. Rochette.
12     Calls for a legal conclusion.
13     Go ahead.
14     THE WITNESS:  The ability to do any of
15 these things we've been discussing in a Windows
16 context at the time was very inventive.  There
17 was no way to do any of this in Windows without
18 what was described at the time in these
19 technologies.
20 BY MR. TONG:
21     **Q.  Let's talk for a minute about possibly**
22 **conflicting libraries.**

28  (Pages 109 to 112)

9/10/2024          VirtaMove Corp. v. Amazon.com, Inc., et al.          Donn Rochette

Page 113

1      If I had an application running in an
2  old operating system that needed to use a
3  particular library file called, let's say, ABC,
4  and I moved that application to a newer
5  operating system:  What was the solution to
6  allow the moved application to still use the
7  library file ABC from the old operating system
8  rather than having it look at ABC from the new
9  operating system?
10      MR. ANAPOL:  Okay.  Mr. Rochette,
11  before you start, I have a couple objections, so
12  I don't want to interrupt you.
13      Calls for opinion.  Outside the scope.
14  Lacks foundation.  Incomplete hypothetical.
15      Go ahead.
16      THE WITNESS:  The way it works is you
17  would use AppInit_DLL or LD_Preload to load a
18  library that -- again, as I described earlier,
19  that would have an effect on the namespace.
20      So when the application opened ABC
21  library, the function overlay would cause the
22  open to actually be implemented in one of these

Page 114

1  critical system libraries or the Trigence
2  library.  The Trigence library would go and look
3  for a file by that name in container-specific
4  sources, and if it found it, it would use that.
5  Even -- and if it didn't find it, then it would
6  fall back to use the one in the operating
7  system.
8      So if ABC -- if the library ABC existed
9  in the container, it would use that instead of
10  the operating system one, and that's how
11  versions of the older operating system code and
12  configuration data would be utilized by the
13  application.
14      MR. TONG:  Could we turn back, please,
15  to page -- Exhibit 1012.
16      THE VIDEOGRAPHER:  Do you want me to
17  share this time?
18      MR. TONG:  Yes, please do.
19      THE VIDEOGRAPHER:  Okay.  I'm sorry
20  which page?
21      MR. TONG:  Exhibit 1012.  I think this
22  was the --

Page 115

1      THE VIDEOGRAPHER:  Oh, 1012.  My bad.
2      MR. TONG:  Yeah.
3      Q.  If I recall, we had looked at page 114
4  together.
5      Mr. Rochette, do you remember looking
6  at this?
7      A.  Yes.
8      Q.  Okay.  Do you think that what you had
9  described in the '058 patent is different from
10  what is being described in this paper titled
11  "Shared Libraries in SunOS"?
12      MR. ANAPOL:  Objection.  Vague as to
13  "what you had described in the '058 patent."
14      THE WITNESS:  Yeah, it's a very broad
15  question.
16      This is -- this paper is describing
17  what your libraries are and the use of shared
18  libraries and examples of how to use them.  As
19  you previously pointed out, the '058 patent is
20  not claiming, you know, the invention of shared
21  libraries.
22      It is using shared libraries and the

Page 116

1  way in which shared libraries are utilized and
2  the dynamic loader in order to accomplish
3  these -- you know, in order to accomplish
4  certain things, but it's not changing what
5  shared libraries are or how they're loaded or
6  anything like that.  So it's making use of what
7  your libraries are and how they are used.
8      I'm not -- am I answering the question?
9  Is that -- I don't --
10  BY MR. TONG:
11      Q.  You are.  Thank you very much.
12      A.  Okay.
13      Q.  And what was the command to -- that you
14  had mentioned earlier, I think you said to
15  preload a library?
16      A.  To preload a library, you used a
17  function in the operating -- in Unix operating
18  systems you used a command called LD_Preload.
19  In Windows you used a feature called
20  AppInit_DLL.
21      Q.  And in the '058 patent you're not
22  claiming to invent a preload command; correct?

29  (Pages 113 to 116)

VM_IBM_0000918

Case 2:24-cv-00093-JRG    Document 114-17    Filed 12/19/24    Page 31 of 42 PageID #: 8650

9/10/2024                  VirtaMove Corp. v. Amazon.com, Inc., et al.                  Donn Rochette

---

Page 117

1    A.  That is correct.  We're utilizing a
2  preload command to accomplish what's described.
3    Q.  Thank you.
4        By the time you had filed the
5  provisional applications that led to the
6  '058 patent, was OnCore doing -- or performing
7  the technology that was described in the
8  '058 patent?
9        MR. ANAPOL:  Objection.  Vague as to
10  "the technology described in the '058 patent."
11  Vague as to time.  And lacks foundation.
12       THE WITNESS:  Yeah, it's my
13  understanding that OnCore was no longer a
14  company.  It was out of business by the time the
15  provisionals were submitted for the '058 and
16  '814.  There was no OnCore.  It was gone.
17  BY MR. TONG:
18    Q.  At any time before the filing of the
19  provisional patent that led to the '058 patent,
20  did OnCore perform the technology that you had
21  described as being disclosed in the '058 patent?
22       MR. ANAPOL:  Foundation.

---

Page 118

1        THE WITNESS:  Again, in the broadest
2  use of the term "containers," it can be
3  conceived that they were using containers.  But
4  there was nothing -- did not specifically, no.
5  The specifics defined in both the '814 and '085
6  patents are very different from what OnCore was
7  doing, but in the broadest use of the term
8  "containers," they both had containers.
9  BY MR. TONG:
10    Q.  And similar question for Solaris zones:
11  At any time before the filing of the provisional
12  patent that led to the '058 patent, did Solaris
13  zones perform the technology that you had
14  described as being disclosed in the '058 patent?
15    A.  Again, there's two parts to that
16  answer, if I understand the question correctly.
17  No. 1, I don't recall the timing.  As
18  I've said, I don't -- I just don't recall when
19  zones were announced and published relative to
20  when the patents were -- when the provisionals
21  were submitted.  I just don't recall, No. 1.
22  No. 2, there are -- there's similar --

---

Page 119

1  both zones and the '814 patent define
2  "containers."  There are very fundamental
3  differences in how that's accomplished.
4    Q.  Do you remember identifying two people
5  that you had -- sorry.  Strike that.
6        So you had mentioned talking to several
7  people who worked for Solaris zones at a
8  meeting.
9        Do you know where those people live
10  today?
11    A.  No.  Not today, no.
12    Q.  Not even generally in terms of a city
13  or state?
14    A.  No.  I'm not aware.
15    Q.  And I think you had mentioned talking
16  to John Beck and David Comay, or at least that
17  you recognized their names.
18    A.  Yes.
19    Q.  Do you know what city or state they
20  live in today?
21    A.  No, I do not.
22    Q.  We had talked about interposition

---

Page 120

1  earlier.
2    A.  Yes.
3    Q.  Do you remember that?
4    A.  Yes.
5    Q.  And you described interposition as
6  "functionally the same as a function overlay."
7        What did you mean by "functionally the
8  same"?
9    A.  It's my personal understanding; right?
10       So, I mean, other people can have their
11  own view of it, but they are accomplishing the
12  same thing.  There are a couple different ways
13  in which it can be accomplished, but they are
14  doing the same thing.
15    Q.  So what's different?
16    A.  Well, again, they're doing the same
17  thing.  You can -- you can cause that behavior
18  to be accomplished in a couple different ways.
19  The paper from Australia showed one way.
20  LD_Preload is another example of doing that.
21       The end result is the same where --
22  when an application is running and it makes a

30  (Pages 117 to 120)

VM_IBM_0000919

Case 2:24-cv-00093-JRG    Document 114-17    Filed 12/19/24    Page 32 of 42 PageID #: 8651

9/10/2024          VirtaMove Corp. v. Amazon.com, Inc., et al.          Donn Rochette

Page 121

1  call to a function, you are causing that call to
2  be resolved by -- in a library that you have
3  caused to be loaded instead of the system
4  library; right?
5       So in the example of Read, you load a
6  library that implements Read, and you cause the
7  loader to load that library either by linking
8  directly to it or using LD_Preload when that --
9  there's also a function called Read in the
10  system library called libc. And without the
11  function overlay, without the interposition,
12  when the application calls Read, it will call a
13  function in libc.
14       However, with interposition/function
15  overlay what you've done is you've caused that
16  application to call a function called Read in
17  the library that you've specified and not in
18  libc.
19    **Q.  What was the primary use case for**
20  **preload at the time of, say, 2002?**
21    A.  One --
22       MR. ANAPOL:  Foundation --

Page 122

1       THE WITNESS:  Oh, sorry.  Go ahead.
2       MR. ANAPOL:  Foundation and vague.
3       THE WITNESS:  There are multiple.
4       No. 1, you are using preload to cause a
5  library to be loaded that wouldn't otherwise be
6  loaded.
7       No. 2, you are causing -- you are
8  enabling, by the act of loading that library,
9  interposition/function overlay.  You are then
10  using function overlay to accomplish direction
11  of files to the container, specific IP addresses
12  and things of that nature that are described in
13  the invention.
14  BY MR. TONG:
15    **Q.  To be clear, in 2002 are you aware of**
16  **others who used function overlay in the context**
17  **of containers and things of that nature as**
18  **described in the invention, or was that -- or**
19  **were you just -- sorry.  Let me rephrase that.**
20       **My question was what was the primary**
21  **use case for preload in the time of, say, 2002.**
22  **The part of your answer, which was, you're then**

Page 123

1  **using function overlay to accomplish direction**
2  **of files to the container-specific IP addresses**
3  **and things of that nature.**
4       **Was that part of your answer to**
5  **something that was a primary use case for**
6  **preload in 2002?**
7    A.  To the best of my understanding, there
8  were examples of preload being used in 2002.
9  You could -- you could find a number of
10  examples.
11       To the best of my understanding, there
12  were not examples of preload being used to
13  redirect files and accomplish the networking
14  things.  It wasn't used in that nature or in
15  that scope, to the best of my recollection.
16    **Q.  Okay.**
17    A.  You see the difference I'm trying to
18  say?
19       LD_Preload -- preload was being used,
20  and there are -- there were examples of it, but
21  not in the context of creating a container-type
22  environment --

Page 124

1    **Q.  Got it.**
2    A.  -- is my recollection.
3    **Q.  Okay.  Thank you for clarifying.**
4       **So do you remember talking about how**
5  **Unix applications were separated and could not**
6  **affect each other in the context of containers?**
7    A.  Yes, generally.
8    **Q.  What did you mean by the part of your**
9  **answer that applications running Unix were not**
10  **separated and could affect each other?**
11    A.  Without any containers, applications
12  running in Unix can affect other applications by
13  the -- well, one of the simplest examples is
14  Application A comes up and uses the system IP
15  address and binds Port No. 1000 to that.
16  Application B comes up, wants to do the same
17  thing and is not able to -- it will receive an
18  error and will crash because that IP number is
19  port number is already in use.
20       So you've got Unix Application A
21  causing application Unix Application B not to be
22  able to proceed because of the way it uses

31 (Pages 121 to 124)

VM_IBM_0000920

Case 2:24-cv-00093-JRG    Document 114-17    Filed 12/19/24    Page 33 of 42 PageID #: 8652

9/10/2024                    VirtaMove Corp. v. Amazon.com, Inc., et al.                    Donn Rochette

Page 125

1  networking. It's a very simple example.
2  **Q. And --**
3  A. That would be one Unix behavior, you
4  know.
5  **Q. And is that conflict of port number**
6  **something that was solved by the technology in**
7  **either the '814 patent or the '058 patent?**
8  A. Yes.
9  MR. ANAPOL: Objection. Vague as to
10  the patent and vague as to the technology.
11  THE WITNESS: Sorry.
12  BY MR. TONG:
13  **Q. Which of those patents solved this type**
14  **of port conflict number?**
15  A. It's described in the '814 patent.
16  **Q. When you spoke with Mr. Anapol, did he**
17  **inform you that Amazon was a defendant in this**
18  **case, accused of patent infringement?**
19  A. Actually, I don't recall there being a
20  discussion of that.
21  It was very clear to me from the
22  summons I received that that was the case. I

Page 126

1  don't recall talking with Mr. Anapol about
2  anything like that.
3  **Q. Did Mr. Anapol tell you that Amazon**
4  **intends to pursue a defense in this case that**
5  **your patents are, in fact, invalid?**
6  A. No, that was not described to me.
7  **Q. Do you think that either of your '814**
8  **or '058 patent are invalid?**
9  A. That would not be for me to comment.
10  I'm not a -- I'm -- I'm not -- I have nothing to
11  do with the patent, you know, organization. I'm
12  not a reviewer. I...
13  **Q. You are an inventor, though; right?**
14  A. I am an inventor, yes.
15  **Q. And at the time that you filed for your**
16  **patent applications, for both of those, you**
17  **thought that they were, in fact, true inventions**
18  **in the sense of the -- in the common of the word**
19  **"invention"; correct?**
20  MR. ANAPOL: Objection. Leading.
21  Objection. Vague. Objection to the extent it
22  calls for a legal conclusion.

Page 127

1  THE WITNESS: Obviously we -- when we
2  submitted the patent, we thought that it was
3  inventive, or we wouldn't have submitted it.
4  BY MR. TONG:
5  **Q. And has your opinion changed since the**
6  **day you had filed the application?**
7  MR. ANAPOL: Objection. Legal
8  conclusion. Lacks foundation.
9  THE WITNESS: Well --
10  MR. ANAPOL: And to the extent it calls
11  for expert opinion.
12  THE WITNESS: Yeah, I mean, it -- I'd
13  have to -- I can only give you an opinion.
14  I mean, there are -- at the time the
15  biggest advantage was use of this kind of
16  containerization in Windows and open source
17  Linux kinds of things because it wasn't
18  available at the time. Today there are lots of
19  better solutions.
20  BY MR. TONG:
21  **Q. If Amazon were to attempt to invalidate**
22  **your patents at trial and to argue that what you**

Page 128

1  **filed for is not really an invention, would you**
2  **be willing to show up and testify on the stand**
3  **and defend the validity and the integrity of**
4  **your status as an inventor?**
5  A. Does it change the status of my -- no.
6  The answer is no. I don't have -- I do not feel
7  the need to defend the work we did or defend
8  this patent. I don't feel the need to do that,
9  and I would not do that unless I wasn't given
10  any option.
11  **Q. Okay. And is that because you're**
12  **comfortable knowing that you are, in fact, an**
13  **inventor and there's no one you need to prove**
14  **that to?**
15  MR. ANAPOL: Objection. Leading.
16  THE WITNESS: Yeah, I don't need to
17  prove myself to anybody. I'm very comfortable
18  with what I've accomplished and what these
19  things -- they are what they are, and...
20  MR. TONG: And could we -- we've been
21  going for a little bit could we take a short
22  maybe five- or ten-minute break, and then I'll

32 (Pages 125 to 128)

VM_IBM_0000921

Case 2:24-cv-00093-JRG    Document 114-17    Filed 12/19/24    Page 34 of 42 PageID #: 8653

9/10/2024              VirtaMove Corp. v. Amazon.com, Inc., et al.              Donn Rochette

Page 129

1  wrap up?
2          THE WITNESS: Yeah, fine by me.
3          MR. TONG: Okay. Thanks.
4          MR. ANAPOL: Let's go off the record,
5  and then I want to talk about the break.
6          THE VIDEOGRAPHER: Going off the
7  record. The time is 1:58.
8              (Recess taken.)
9          THE VIDEOGRAPHER: We are back on the
10  record. The time is 2:06.
11  BY MR. TONG:
12    Q. Thank you, Mr. Rochette. I have just
13  five more lines of questioning. They should
14  hopefully all be short.
15        The first one, again, relates to your
16  willingness to attend trial. It's possible that
17  Amazon may raise a defense and say that you had,
18  in fact, committed fraud upon the patent office
19  because you should have told the patent office
20  about your work at OnCore or your knowledge of
21  Solaris zones.
22        If Amazon tried to accuse you of fraud

Page 130

1  at this trial, would you in that case be willing
2  to show up and defend yourself?
3          MR. ANAPOL: Objection. Lacks
4  foundation. Amazon hasn't done that. Calls for
5  speculation.
6          THE WITNESS: No. I have no -- they
7  can -- once again, I don't feel the need to
8  defend myself. It is what it is. I -- and...
9  BY MR. TONG:
10    Q. Thanks.
11        Are you proud of being an inventor on
12  these patents?
13    A. I feel like we did good work, yeah,
14  that was needed at the time.
15    Q. For --
16          MR. ANAPOL: Outside the -- sorry.
17  Outside the scope.
18  BY MR. TONG:
19    Q. Are you a lawyer or do you have any
20  type of law degree?
21    A. No.
22    Q. Are you aware of any orders from the

Page 131

1  court designating you as an expert in this case?
2    A. No.
3    Q. Can you confirm that you have not
4  received any claim constructions for either the
5  '814 or '058 patent from the court?
6    A. What did you describe it as? Claim
7  what?
8    Q. Claim constructions.
9        I take it from your question that you
10  haven't received any from the court; is that
11  correct?
12    A. No. I don't even know what it is.
13    Q. From the '814 patent, which is titled
14  "System for Containerization of Application
15  Sets," could you please look into the camera,
16  and -- assuming that this may get shown to the
17  judge or jury if we're unable to call you at
18  trial because you're not willing to attend, and
19  if this is the only thing that the jury hears
20  from you about the '814 patent, what would you
21  say to the jury about why the '814 patent was a
22  new and inventive technology at the time that

Page 132

1  you had filed it?
2          MR. ANAPOL: Objection. Outside the
3  scope. Lacks foundation. Assumes facts not in
4  evidence and calls for speculation.
5          THE WITNESS: At the time that this
6  was -- these applications were submitted, there
7  was no generally accepted definition of what
8  containers are. You have to put yourself back
9  in the -- back in time. Today containers are
10  well understood and are everywhere, and at the
11  time there was nothing like that.
12        Very close to the time that this came
13  out -- again, as I've said many times, I don't
14  know the exact timing -- Solaris had a version
15  that did something similar that was specific to
16  the Solaris operating system. You could not do
17  what this -- these patents describe on Linux or
18  Unix or Windows. And so in particular on
19  Windows, it was a -- it was a solution. It was
20  a way to create a form of container capability
21  that was not present at the time.
22        So if you look at things now, you

33 (Pages 129 to 132)

VM_IBM_0000922

9/10/2024              VirtaMove Corp. v. Amazon.com, Inc., et al.              Donn Rochette

---

Page 133

1  can -- you know, it's a very different world,
2  but at the time, particularly on Windows, you
3  couldn't do anything like this.
4       And one of the things that was thought
5  to be quite useful and inventive was an ability
6  to run older versions of an application on newer
7  versions of an operating system. So companies
8  could upgrade their systems, get requisite
9  security updates and stuff that came with newer
10 operating systems and also be able to continue
11 running those old applications without having to
12 rebuild and recertify, all kinds of things like
13 that. It was -- for Windows and Unix, Linux, it
14 was helpful and useful.
15 BY MR. TONG:
16    Q. Thank you.
17       And you already somewhat started to
18 answer my next question, but, again, if you just
19 had one chance to say something to the judge or
20 jury about why the invention in the '814 patent
21 was valuable and worth patenting, what would you
22 say to the jury?

---

Page 134

1       MR. ANAPOL: Same objections. And
2  vague as to "value."
3       THE WITNESS: Well, again I would say
4  that at the time that the provisionals were
5  submitted, there wasn't the capability to do
6  this in any way on Windows. Now, there might
7  have been something that you could play with on
8  Linux or something like that, but it wasn't --
9  it wasn't a full-feature product or capability,
10 and the use of interposition/function overlays
11 in order to accomplish this was quite unique,
12 quite inventive.
13       As I outlined the discussion with the
14 guys at Solaris, they didn't think it was
15 possible. We sat down and went through, here's
16 how we did it, and there's a whole community of
17 people that went, oh, yeah, that's a -- that is
18 different, that's unique, that's inventive and,
19 you know, works well with Unix and Windows. So
20 I would say that at the time it was a valuable
21 way to consider container techniques and
22 capabilities.

---

Page 135

1       I'll also reiterate that it really had
2  nothing to do with OnCore. What OnCore was
3  doing was very different. Despite the broad use
4  of the term "container," they're not the same.
5  BY MR. TONG:
6    Q. Okay. Thank you.
7       Next two questions are going to be
8  about the '058 patent.
9       So for the '058 patent, which is titled
10 "Computing System Having User Mode Critical
11 System Elements As Shared Libraries," if you
12 could only have one chance to say something to
13 the jury about why the invention in this patent
14 is, in fact, new and inventive, what would you
15 tell the jury?
16       MR. ANAPOL: Same objections.
17       THE WITNESS: It was taking
18 functionality that heretofore at the time of the
19 invention was only available and only
20 implemented in protected kernel-space code. It
21 wasn't moving it out of protected space. It
22 wasn't copying it. It was performing

---

Page 136

1  similar-type behaviors in user mode. That's the
2  term "critical system elements."
3       The -- maybe the simplest example is
4  the use of Application A in one of these
5  container environments could use an IP address;
6  Application B could use a different IP address.
7  With -- you could not do that without the
8  capability in these function overlays and this
9  interposition capability. The applications
10 would not function without an ability to manage
11 these networking components.
12       Same example with versions of the
13 operating system; right? An older version of
14 an -- an application that was running on an
15 older version of the operating system could not,
16 at the time that this was created, run on a
17 newer version of the operating system because
18 the libraries and other configuration files were
19 not compatible. And so you -- this gave you the
20 ability to maintain compatibility.
21       The big -- the important thing about
22 this is it gave people in the data center the

---

34 (Pages 133 to 136)

VM_IBM_0000923

Case 2:24-cv-00093-JRG    Document 114-17    Filed 12/19/24    Page 36 of 42 PageID #:
8655
9/10/2024          VirtaMove Corp. v. Amazon.com, Inc., et al.          Donn Rochette

Page 137

1   ability to upgrade their operating system
2   without having to go back and recompile,
3   recertify, rebuild, redeploy certain
4   applications.
5       Q.  Thank you.
6           And last question:  For the '058 patent
7   at the time of filing, if you had one chance to
8   explain to the judge and jury why the invention
9   was valuable, what would you tell them?
10      MR. ANAPOL:  Same objections.
11      THE WITNESS:  I think I would focus on
12  the -- 1, the use of this in Windows.  At the
13  time this was filed, you could not do anything
14  like this on Windows.
15      No. 2, the ability to run older
16  applications on new operating systems.  At that
17  time it was a pretty big deal.  It's a very big
18  deal.  And if you think about, for example,
19  security updates -- everybody knows about
20  security updates now.  It's very important to be
21  able to get a new version of the operating
22  system apply updates to that which include all

Page 138

1   the security updates and stuff you need.  When
2   you do that, you break the older applications.
3           So what is your option?  Your option is
4   to run with an older version of the operating
5   system, to pay more licensing fees, to pay -- to
6   run with relatively less secure environments.
7           This technology, as defined in '058,
8   would allow you to update those environments,
9   provide consistency across your data center, get
10  into a more secure environment, manage the
11  number of licenses you have, and at the same
12  time be able to continue to use the applications
13  that have been around for a while.
14          That is one of the major advantages
15  that people saw with the technology as defined
16  in '058.
17  BY MR. TONG:
18      Q.  Thanks.  Just one follow-up question.
19          You said that was one of the major
20  advantages.
21          Were there any other secondary or
22  tertiary advantages?

Page 139

1       MR. ANAPOL:  Same objections.
2       THE WITNESS:  The ability to get around
3   the port number limitations was another -- was
4   an advantage.  The ability to use multiple IP
5   addresses on the same environment that would
6   otherwise be rather difficult to do are a couple
7   of other examples.
8       MR. TONG:  All right.  Thank you so
9   much for your time, Mr. Rochette.
10          Jeremy, I pass the witness.
11      MR. ANAPOL:  Thank you, Peter.
12
13          FURTHER EXAMINATION
14  BY MR. ANAPOL:
15      Q.  So, Mr. Rochette, I just have a few
16  follow-up questions related to what Mr. Tong
17  asked you about.
18          So he mentioned your conversation with
19  Nigel Stokes.
20          Do you remember that?
21      A.  Yes.
22      Q.  When you worked at Trigence and

Page 140

1   developed the '058 and '814 patents, was
2   Mr. Stokes there?
3       A.  Not to my knowledge, no.  Never spoke
4   with -- no.
5       Q.  So when did Mr. Stokes become
6   interested in these patents?
7       A.  I don't know when.  I just know that a
8   couple months ago he reached out to me on
9   LinkedIn.
10      Q.  So Mr. Stokes had no interest in the
11  patents at the time they were filed; correct?
12      A.  That's my understanding.
13      MR. TONG:  Objection.  Calls for
14  speculation.
15  BY MR. ANAPOL:
16      Q.  All right.  Okay.  And we talked
17  earlier about the patent claims versus the rest
18  of the patent.
19          Do you remember that?
20      A.  Yes.
21      Q.  Did you write the claims in either the
22  '814 or the '058 patent?

35  (Pages 137 to 140)

Case 2:24-cv-00093-JRG    Document 114-17    Filed 12/19/24    Page 37 of 42 PageID #: 8656

9/10/2024              VirtaMove Corp. v. Amazon.com, Inc., et al.              Donn Rochette

Page 141

1    A.  They were written by a patent attorney,
2    not by me.
3        Q.  And the testimony you gave today about
4    differences between the patents and other
5    technology we discussed, was that informed by
6    the claims?
7        A.  No.
8        Q.  So it's possible that the lawyer who
9    wrote the claims didn't capture the distinctions
10   that you discussed; is that right?
11       A.  I could only speculate, but -- yeah, I
12   don't know.
13       Q.  Well, we don't want you to speculate,
14   so let's talk about one of the things you
15   identified.
16       A.  Okay.
17       Q.  You said that before the patents, there
18   was some container capability on Solaris but not
19   on Windows.
20          Do you remember that?
21       A.  Yes.
22          MR. ANAPOL:  Billy, can you pull up

Page 142

1    Exhibit 1010 and go to the claims, which are at
2    the end of the patent, starting Column 17.  And
3    can you blow up Claim 1 for us.
4        Q.  So, Mr. Rochette, do you see anything
5    in the claim that requires the invention to be
6    implemented on Windows or Linux?
7           MR. TONG:  Objection.  Calls for a
8    legal conclusion, expert opinion.  Daubert.
9    Also outside the scope of venue discovery.
10          THE WITNESS:  I don't think I've -- no.
11   And I don't think I've represented that it
12   required -- that anything in the patent is
13   required to run on Windows.
14          What I feel like I've been describing
15   is it is able to run on Windows, and at the time
16   that was a big enabler.  It was also able to run
17   on Windows and Linux.
18   BY MR. ANAPOL:
19       Q.  And it was able to run on Solaris;
20   right?
21       A.  It was able to run on Solaris.
22       Q.  And nothing in the patent claim says

Page 143

1    we're only claiming the invention outside of
2    Solaris; right?
3           MR. TONG:  Objection.  Foundation.
4    Scope.  Calls for a legal conclusion, expert
5    opinion.  Daubert.
6           THE WITNESS:  To my understanding,
7    there's nothing in this patent that says that it
8    is limited to Solaris or -- that it's limited to
9    any specific operating system.  I don't --
10   that's not my understanding.
11   BY MR. ANAPOL:
12       Q.  Okay.  Can you point to any language in
13   this claim that reflects the idea that you are
14   the first to do this type of container
15   functionality on Windows or Linux?
16          MR. TONG:  Objection.  Foundation.
17   Scope.  Calls for legal conclusions, expert
18   opinion.  Daubert.
19          MR. ANAPOL:  Okay.  I'll withdraw the
20   question.
21       Q.  Did you look at the patent claims and
22   compare them to Solaris zones or the OnCore

Page 144

1    operating system?
2        A.  No.  Not in preparation for this and --
3    no.
4        Q.  Did --
5        A.  I didn't look at the claims.  I didn't
6    read the claims.
7        Q.  Did you ever have a conversation with
8    the patent attorney who wrote the claims to
9    explain how OnCore operating system worked?
10          MR. TONG:  Objection.  Potentially
11   privileged.
12          Mr. Rochette, if you think your
13   conversations with your attorneys are
14   privileged, you absolutely do not have to answer
15   this question.
16          THE WITNESS:  I don't --
17          MR. TONG:  And, in fact, if you did
18   this as part of your work for either AppZero or
19   Trigence, you may not be able to waive privilege
20   at all.  So I would suggest that you do not
21   answer this question.
22          THE WITNESS:  Okay.

36 (Pages 141 to 144)

9/10/2024                    VirtaMove Corp. v. Amazon.com, Inc., et al.                    Donn Rochette

---

Page 145

1  BY MR. ANAPOL:
2      **Q.  Do you recall ever providing any**
3  **documentation about the OnCore operating system**
4  **to the patent attorney who answered these**
5  **claims?**
6          MR. TONG:  Same objection.  You don't
7  have to answer this question.
8          Privileged.
9  BY MR. ANAPOL:
10     **Q.  You're free, Mr. Rochette, to, I guess,**
11 **make your own decision here.  Mr. Tong doesn't**
12 **represent you.**
13         **I'll caution you that to the extent you**
14 **don't answer a question because Mr. Tong thinks**
15 **it's privileged and later we show that it's not**
16 **privileged, then we might have to have another**
17 **deposition to have you answer the question.**
18     A.  I had no conversations with anything --
19 about OnCore.  No conversations about OnCore.
20 It is my understanding and belief that OnCore is
21 very different than and unrelated to these
22 patents.

---

Page 146

1      **Q.  To the patent specification or to the**
2  **claims?**
3      A.  Both.
4      **Q.  And how did you reach your conclusion**
5  **that OnCore is different from the claims?**
6      A.  OnCore is doing something extremely
7  different.  OnCore has nothing do with any
8  function overlays, any preloading, any
9  networking redirection.  OnCore didn't do any of
10 that at all.
11     **Q.  So you just listed three things:**
12 **function overlays, preloading and networking**
13 **redirections.**
14         **Can you point to me in Claim 1 where**
15 **any of those three concepts are required?**
16         MR. TONG:  Objection.  Foundation.
17 Calls for a legal conclusion.  Calls for expert
18 opinion.  Daubert.
19         THE WITNESS:  Again, I haven't read the
20 claims.  I don't -- I don't feel capable
21 representing the claims.  I can tell you how the
22 technology works.  I can try to answer questions

---

Page 147

1  about how it works and what the intent is and
2  things like that, but I don't -- I have -- I
3  don't know what the claims are.
4  BY MR. ANAPOL:
5      **Q.  Okay.  But you just testified that**
6  **OnCore is different from the claims, so I'm just**
7  **trying to understand the basis for that**
8  **testimony.**
9      A.  Okay.
10     **Q.  But if you don't -- if that's not your**
11 **opinion, then that's fine.  I'm just trying to**
12 **clarify.**
13         MR. TONG:  Objection --
14         THE WITNESS:  OnCore is --
15         MR. TONG:  -- asked and answered.
16         THE WITNESS:  OnCore is very different
17 from any of this, from what's described in
18 these -- for the way in which these patents
19 work, OnCore is very different.  It is -- it's
20 very, very different.
21 BY MR. ANAPOL:
22     **Q.  And when you say "the way in which**

---

Page 148

1  **these patents work," are you talking about**
2  **what's claimed or what is disclosed in the**
3  **patents?**
4      A.  What is disclosed in the patents.
5  Again, I don't -- did not read the claims.  I
6  can't represent to you anything about the
7  claims.  I don't -- I didn't -- I don't -- I
8  don't know about the claims.  I didn't read
9  them.
10     **Q.  And your understanding is that those**
11 **were written by an attorney and not by you;**
12 **correct?**
13     A.  That's true.
14         MR. TONG:  Objection.  Asked and
15 answered.
16 BY MR. ANAPOL:
17     **Q.  And your answer that you just gave**
18 **about the claims and the fact that you haven't**
19 **read them and didn't write them, is that also**
20 **true of the '058 patent?**
21     A.  Yes.
22     **Q.  So whatever distinctions you pointed**

---

37  (Pages 145 to 148)

VM_IBM_0000926

9/10/2024            VirtaMove Corp. v. Amazon.com, Inc., et al.            Donn Rochette

---

Page 149

1  out between the '058 patent and either OnCore or
2  Solaris zones or other technology, that was by
3  comparison to the disclosure and not the claims?
4      MR. TONG:  Objection.
5  Mischaracterizes.
6      THE WITNESS:  The implementation -- if
7  by "disclosure" you meant the implementation,
8  then, yes, the way in which -- what is -- yes,
9  the way they're implemented.  I didn't
10 represent -- it was not my intention to
11 represent anything in the claims.
12 BY MR. ANAPOL:
13     Q.  Okay.  And, to your knowledge, did you
14 provide any information about the OnCore
15 operating system or the Solaris zones to the
16 patent examiner who was responsible for
17 examining these claims?
18     A.  I'm pretty confident in saying nothing
19 about -- that I didn't -- that there was no
20 conversation or interaction about OnCore.
21 Solaris zones, I don't know.  Could have been.
22 I don't recall.

---

Page 150

1      Q.  Okay.  You don't recall providing any
2  information about Solaris zones to the patent
3  examiner?
4      A.  I do not recall.
5      MR. TONG:  Objection.  Asked and
6  answered.
7  BY MR. ANAPOL:
8      Q.  And were you aware -- actually, I'll
9  withdraw that question.  You already answered
10 it.
11     And were you aware that there was a
12 product called Linux V-Server that provided
13 containers on Linux?
14     MR. TONG:  Objection.  Vague.
15 Ambiguous.  Foundation.
16     THE WITNESS:  I'm not aware of Linux
17 V-Server, no.
18 BY MR. ANAPOL:
19     Q.  So when you testified earlier that
20 Linux didn't have the capability provided by
21 these patents, you had not done any comparison
22 between the patents and Linux V-Server; correct?

---

Page 151

1      A.  I don't recall doing any -- I don't
2  recall there being any mention of V-Server, no.
3      Q.  And have you ever heard of something
4  called User Mode Linux?
5      A.  Yes.
6      Q.  And what's your understanding of User
7  Mode Linux?
8      A.  I don't recall the details of it.
9  There's -- there's a lot of -- I don't know.
10 I'd have to go back and look at that.  I
11 remember -- I remember it, and there were
12 discussions about it, but I don't recall at this
13 moment how it works.
14     Q.  So do you recall ever providing any
15 information about User Mode Linux to the patent
16 examiner?
17     A.  I don't recall answering any questions
18 about that in the context of the patent, no.
19 Not to my recollection.
20     Q.  And so when you testified earlier that
21 certain aspects of the patent seemed inventive
22 to you, did you check to see whether any of

---

Page 152

1  those aspects were in User Mode Linux?
2      A.  I believe there was some -- that we did
3  look at User Mode Linux, but it's not -- the
4  conclusion -- it was pretty easy to conclude
5  that they weren't the same and they weren't
6  going to be -- we were providing something very
7  different from that, but I don't recall the
8  details.
9      Q.  So you can't recall what you thought
10 was inventive about the patents compared to User
11 Mode Linux?
12     A.  No, I can't recall how User Mode Linux
13 works.  No.  I would have to go back --
14     MR. TONG:  Jeremy --
15 BY MR. ANAPOL:
16     Q.  Do you --
17     MR. TONG:  -- [overspoken] User Mode
18 Linux and the --
19     (The reporter requested clarification.)
20     MR. TONG:  Yeah.  I'm objecting to the
21 line of questions of User Mode Linux as outside
22 the scope.

38  (Pages 149 to 152)

VM_IBM_0000927

Case 2:24-cv-00093-JRG    Document 114-17    Filed 12/19/24    Page 40 of 42 PageID #: 8659

9/10/2024                VirtaMove Corp. v. Amazon.com, Inc., et al.                Donn Rochette

Page 153

1        MR. ANAPOL:  All right.  Well, I don't
2  have any more questions on User Mode Linux, so
3  that's fine.
4        **Q.  Do you recall testifying earlier,**
5  **Mr. Rochette, about the capability of running**
6  **different operating systems -- sorry.  Let me**
7  **rephrase.**
8        **Do you recall testifying earlier about**
9  **running applications from an earlier version of**
10  **an operating system on a later version of an**
11  **operating system?**
12        A.  Yes.
13        **Q.  And do you recall Solaris having that**
14  **capability?**
15        A.  I don't -- I don't recall whether or
16  not you could run older versions of applications
17  in Solaris zones and stuff like that.  I don't
18  recall.
19        **Q.  You don't know whether Solaris 9**
20  **applications could run in zones on Solaris 10?**
21        A.  I don't recall, no.
22        **Q.  And are you aware of a system called**

Page 154

1  **Alpine from the University of Washington?**
2        MR. TONG:  Objection to the scope of
3  questioning as outside the scope of cross.
4        THE WITNESS:  I am aware of Alpine
5  Linux.
6  BY MR. ANAPOL:
7        **Q.  Oh, sorry.  Not Alpine Linux.  It's a**
8  **library called Alpine that ran on top of BSD.**
9        A.  Oh.  No, I'm not aware of that.
10        MR. TONG:  Same objection.  Outside the
11  scope.
12  BY MR. ANAPOL:
13        **Q.  So when you testified earlier about**
14  **having this ability to avoid port conflicts as**
15  **part of the patents, you don't know whether the**
16  **Alpine library that ran on BSD had that**
17  **capability or not?**
18        A.  I'm not aware --
19        MR. TONG:  Same objection.
20        THE WITNESS:  -- of Alpine, no.  I
21  don't know how it works.
22

Page 155

1  BY MR. ANAPOL:
2        **Q.  And we talked a lot about LD_Preload**
3  **and function overlays.**
4        **Do you remember that?**
5        A.  Yes.
6        **Q.  And do you know if the function overlay**
7  **aspect of what you developed was recited in the**
8  **patent claims?**
9        A.  The behavior was described, yes -- oh,
10  in the claims.  You asked about the claims.  No,
11  I don't know about the claims.  No.
12        MR. ANAPOL:  Thank you so much for your
13  time, Mr. Rochette.  No further questions.
14
15        FURTHER EXAMINATION
16  BY MR. TONG:
17        **Q.  I have just one very short line of**
18  **questioning, Mr. Rochette, and then we should be**
19  **done after this.**
20        **So when Jeremy was questioning you, you**
21  **had answered that you have not read or written**
22  **the claims.**

Page 156

1        **When you had filed for the -- strike**
2  **that.**
3        **When you were in the process of filing**
4  **for the '058 patent application, would it have**
5  **been your intent for the claims to capture the**
6  **technology as you understood and described it**
7  **today?**
8        MR. ANAPOL:  Objection.  Vague.  Lacks
9  foundation.  Calls for speculation.  Improper
10  hypothetical.
11        THE WITNESS:  That seems logical.
12  BY MR. TONG:
13        **Q.  And same question for the other patent,**
14  **the -- sorry.  I'm blanking on the number.**
15        **Same question for the '814 patent:**
16  **When you were in the process of filing for the**
17  **'814 patent, would it have been your intent for**
18  **the claims to capture the technology as you**
19  **understood and described it today?**
20        MR. ANAPOL:  Same objections.
21        THE WITNESS:  I don't -- I honestly
22  don't -- I would -- I don't know.  The claims

39  (Pages 153 to 156)

VM_IBM_0000928

Case 2:24-cv-00093-JRG   Document 114-17   Filed 12/19/24   Page 41 of 42 PageID #: 8660

9/10/2024                VirtaMove Corp. v. Amazon.com, Inc., et al.          Donn Rochette

Page 157

1  were very -- very abstract to me.  The lawyer
2  did them, and we had conversations about the
3  technology and how it worked.  I would --
4  BY MR. TONG:
5    Q.  Don't --
6      MR. ANAPOL:  Don't --
7  BY MR. TONG:
8    Q.  Don't discuss anything --
9      MR. ANAPOL:  Peter -- Peter, you have
10  to let him finish his answer.
11     MR. TONG:  Well, I'm going to tell him
12  not to reveal anything privileged.
13    Q.  So to the extent you're about to say
14  anything about your discussions with a lawyer,
15  don't reveal that.  But otherwise, go ahead and
16  finish answering the question.
17    A.  Yeah, in a very -- discussions about
18  the claims were always very vague and very
19  legal, and I would -- I don't know.  I make
20  no -- I don't know how to -- I don't know how to
21  defend or answer your questions about claims.  I
22  just don't.  I'm not the right guy to do that.

Page 158

1    Q.  Yeah, to clarify my question, it's not
2  whether or not the claims ended up one way or
3  another.  My question was about your intent at
4  the time.
5      Would it have been your intent for your
6  patent to capture the technology as you
7  understood and described it today?
8      MR. ANAPOL:  Same objections --
9      THE WITNESS:  It was my --
10     MR. ANAPOL:  -- and relevance.
11     THE WITNESS:  It was my intent to get
12  the description of the invention -- to describe
13  it as it worked.  That was my intent.  It's up
14  to the company and the lawyers and so forth to
15  nail down the claims.  That was not my -- I
16  wasn't involved.  Not my -- no intent.  My
17  intent was to be able to describe how the
18  invention worked.
19     MR. TONG:  Okay.  Thank you,
20  Mr. Rochette.
21     Pass the witness.  And we should be
22  done.

Page 159

1      Can you confirm, Jeremy?
2      MR. ANAPOL:  Yes.
3      Thanks again for your time,
4  Mr. Rochette.
5      MR. TONG:  Thank you so much.
6      THE WITNESS:  Am I free to go?
7      MR. ANAPOL:  You are free to go.
8      MR. TONG:  Mr. Rochette -- we can go
9  off the record.
10     THE VIDEOGRAPHER:  Okay.  We are going
11  off the record.  This deposition is concluded at
12  2:39.
13     (Discussion held off the record.)
14     THE REPORTER:  Counsel, do you need a
15  rough draft of this?
16     MR. ANAPOL:  Yes, please.
17     THE REPORTER:  And, Peter, do you need
18  a rough?
19     MR. TONG:  Yes.
20     (Whereupon, at 2:44 P.M. CDT
21     the deposition of DONN ROCHETTE
22     was adjourned.)

Page 160

1  STATE OF CALIFORNIA        )
2  COUNTY OF LOS ANGELES      )  SS.
3
4      I, AUDRA E. CRAMER, CSR No. 9901, in and for the
5  State of California, do hereby certify:
6      That, prior to being examined, the witness named
7  in the foregoing deposition was by me duly sworn to
8  testify the truth, the whole truth and nothing but the
9  truth;
10     That said deposition was taken down by me in
11  shorthand at the time and place therein named, and
12  thereafter reduced to typewriting under my direction,
13  and the same is a true, correct and complete transcript
14  of said proceedings;
15     I further certify that I am not interested in the
16  event of the action.
17     Witness my hand this 18 day of September,
18  2024.
19
20     _____
21        Certified Shorthand
          Reporter for the
22        State of California

VM_IBM_0000929

Case 2:24-cv-00093-JRG    Document 114-17    Filed 12/19/24    Page 42 of 42 PageID #:
8661

9/10/2024         VirtaMove Corp. v. Amazon.com, Inc., et al.         Donn Rochette

Page 161

1   Donn Rochette, c/o
    Pro se

2

3

    Case: VirtaMove Corp. v. Amazon.com, Inc., et al.
4   Date of deposition: September 10, 2024
    Deponent: Donn Rochette

5

6   Please be advised that the transcript in the above
    referenced matter is now complete and ready for signature.
7   The deponent may come to this office to sign the transcript,
8   a copy may be purchased for the witness to review and sign,
9   or the deponent and/or counsel may waive the option of
10  signing. Please advise us of the option selected.
11  Please forward the errata sheet and the original signed
12  signature page to counsel noticing the deposition, noting the
13  applicable time period allowed for such by the governing
14  Rules of Procedure. If you have any questions, please do
15  not hesitate to call our office at (202)-232-0646.

16

17

18  Sincerely,
19  Digital Evidence Group
20  Copyright 2024 Digital Evidence Group
21  Copying is forbidden, including electronically, absent
22  express written consent.

Page 163

1   Digital Evidence Group, LLC

2   1730 M Street, NW, Suite 812

3   Washington, D.C.  20036

4   (202)232-0646

5

6            ERRATA SHEET

7

8   Case: VirtaMove Corp. v. Amazon.com, Inc., et al.

9   Witness Name: Donn Rochette

10  Deposition Date: September 10, 2024

11  Page No.    Line No.    Change

12

13

14

15

16

17

18

19

20

21  _____    _____

22  Signature              Date

Page 162

1   Digital Evidence Group, L.L.C.
    1730 M Street, NW, Suite 812
2   Washington, D.C. 20036
    (202) 232-0646
3
4   SIGNATURE PAGE
    Case: VirtaMove Corp. v. Amazon.com, Inc., et al.
5   Witness Name: Donn Rochette
    Deposition Date: September 10, 2024

6

7   I do hereby acknowledge that I have read
    and examined the foregoing pages
8   of the transcript of my deposition and that:

9   (Check appropriate box):
    ( ) The same is a true, correct and
10  complete transcription of the answers given by
    me to the questions therein recorded.
11  ( ) Except for the changes noted in the
    attached Errata Sheet, the same is a true,
12  correct and complete transcription of the
13  answers given by me to the questions therein
14  recorded.

15

16  _____    _____
17  DATE                   WITNESS SIGNATURE

18

19

20

21  _____    _____
22  DATE                   NOTARY

41  (Pages 161 to 163)