## UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF TEXAS
## MARSHALL DIVISION

| | | |
|---|---|---|
| VIRTAMOVE, CORP., | § | Case No. 2:24-cv-00093-JRG |
| | § | (Lead Case) |
| Plaintiff, | § | |
| | § | |
| v. | § | **JURY TRIAL DEMANDED** |
| | § | |
| HEWLETT PACKARD ENTERPRISE | § | |
| COMPANY, | § | |
| | § | |
| Defendant. | § | |
| | § | |

| | | |
|---|---|---|
| VIRTAMOVE, CORP., | § | Case No. 2:24-cv-00064-JRG |
| | § | (Member Case) |
| Plaintiff, | § | |
| | § | |
| v. | § | **JURY TRIAL DEMANDED** |
| | § | |
| INTERNATIONAL BUSINESS | § | |
| MACHINES CORP., | § | |
| | § | |
| Defendant. | § | |
| | § | |
| | § | |

## IBM'S OPENING CLAIM CONSTRUCTION BRIEF

## TABLE OF CONTENTS

I.    INTRODUCTION ........................................................................................... 1

II.   LEGAL STANDARDS .................................................................................. 1

III.  THE ASSERTED PATENTS ....................................................................... 3

      A.    Overview of the '500, '038, and '634 Patents ........................................ 3

      B.    Overview of the '858 patent ................................................................... 4

IV.   DISPUTED TERMS ..................................................................................... 6

      A.    "A system, comprising …wherein the one or more isolated environments
            are created during installation of the one or more applications … wherein
            the one or more isolated environments are removed as part of an uninstall
            of the one or more applications" (Claim 1 of the '500, '634, and '038
            patents) ................................................................................................. 6

      B.    "the system resources" (Claim 19 of the '500 patent and Claim 19 of the
            '038 patent) .......................................................................................... 11

      C.    "appropriate for infrastructure configuration mapping" (Claims 1 and 19
            of the '858 patent) ............................................................................... 14

      D.    "instance of an image" (Claims 1 and 19 of the '858 patent) ............... 16

      E.    "capturing" (Claim 1 of the '858 patent) ............................................. 20

      F.    "non-functional requirement" (Claims 3–5 and 7 of the '858 patent) ... 23

      G.    "module" (Claim 18 of the '858 patent) ............................................... 25

      H.    "cloud infrastructure" (Claims 1, 4–6, 8–12, and 19 of the '858 patent) ..... 29

V.    CONCLUSION ........................................................................................... 30

# TABLE OF AUTHORITIES[1]

**Page(s)**

**Cases**

*AGIS Software Dev., LLC v. Huawei Device USA Inc.*,
    No. 2:17-CV-513-JRG, 2018 WL 4908169 (E.D. Tex. Oct. 10, 2018)...................................28

*Aria Diagnostics, Inc. v. Sequenom, Inc.*,
    726 F.3d 1296 (Fed. Cir. 2013)..............................................................................................8

*Blazer v. Best Bee Bros. LLC*,
    No. 2022-1033, 2022 WL 16954848 (Fed. Cir. 2022) ................................................17, 18, 30

*CardWare Inc. v. Samsung Elecs. Co.*,
    No. 2:22-CV-141-JRG-RSP, 2023 WL 5434763 (E.D. Tex. Aug. 23, 2023) ..................13, 14

*Cheetah Omni LLC v. Alcatel-Lucent Inc.*,
    939 F. Supp. 2d 649 (E.D. Tex. 2013)...................................................................................11

*Dayco Prods., Inc. v. Total Containment, Inc.*,
    258 F.3d 1317 (Fed. Cir. 2001)..............................................................................................12

*In re Downing*,
    754 F. App'x 988 (Fed. Cir. 2018) .........................................................................................13

*Dyfan, LLC v. Target Corp.*,
    28 F.4th 1360 (Fed. Cir. 2022) ..................................................................................3, 26, 28

*Energizer Holdings, Inc. v. Int'l Trade Comm'n*,
    435 F.3d 1366 (Fed. Cir. 2006)..............................................................................................13

*Estech Sys. IP, LLC v. Mitel Networks, Inc.*,
    No. 2:21-cv-00473-JRG-RSP, 2023 WL 2695093 (E.D. Tex. Mar. 28, 2023) ................18, 22

*Freeny v. Fossil Grp., Inc.*,
    No. 2:18-CV-00049-JRG-RSP (E.D. Tex. May 10, 2019)........................................................6

*GE Lighting Sols., LLC v. AgiLight, Inc.*,
    750 F.3d 1304 (Fed. Cir. 2014)..........................................................................................18, 22

*Gesture Tech. Partners, LLC v. Huawei Device Co.*,
    No. 2:21-CV-40-JRG, 2021 WL 4760632 (E.D. Tex. Oct. 12, 2021)....................................13

---

[1] All emphases herein are added unless otherwise noted.

*Huawei Techs. Co. v. Verizon Commc'ns, Inc.*,
    No. 20-cv-0030, 2021 WL 150442 (E.D. Tex. Jan. 15, 2021) ................................................27

*IPXL Holdings, L.L.C. v. Amazon.com, Inc.*,
    430 F.3d 1377 (Fed. Cir. 2005)...................................................................................2, 6, 7, 8

*JVW Enters., Inc. v. Interact Accessories, Inc.*,
    424 F.3d 1324 (Fed. Cir. 2005)..........................................................................................3

*Liebel–Flarsheim Co. v. Medrad, Inc.*,
    358 F.3d 898 (Fed. Cir. 2004).............................................................................................2

*Markman v. Westview Instruments, Inc.*,
    52 F.3d 967 (Fed. Cir. 1995)...............................................................................................2

*MasterMine Software, Inc. v. Microsoft Corp.*,
    874 F.3d 1307 (Fed. Cir. 2017)........................................................................................3, 6

*Microprocessor Enhancement Corp. v. Tex. Instruments Inc.*,
    520 F.3d 1367 (Fed. Cir. 2008)...........................................................................................6

*Nanoco Techs. Ltd. v. Samsung Elecs. Co.*,
    No. 2:20-cv-00038-JRG, 2021 WL 1890453 (E.D. Tex. May 10, 2021).................................2

*Nautilus, Inc. v. Biosig Instruments, Inc.*,
    572 U.S. 898 (2014)...........................................................................................................2

*Nevro Corp. v. Boston Sci. Corp.*,
    955 F.3d 35 (Fed. Cir. 2020).............................................................................................23

*Niazi Licensing Corp. v. St. Jude Med. S.C., Inc.*,
    30 F.4th 1339 (Fed. Cir. 2022) ....................................................................................22, 25

*Noah Sys., Inc. v. Intuit Inc.*,
    675 F.3d 1302 (Fed. Cir. 2012).........................................................................................29

*Nw. Univ. v. Universal Robots A/S*,
    No. 21-149 (MN), 2024 WL 231457 (D. Del. Jan. 22, 2024) .................................................26

*Panoptis Pat. Mgmt., LLC v. Blackberry Ltd.*,
    No. 2:16-CV-62-JRG-RSP, 2017 WL 497571 (E.D. Tex. Feb. 7, 2017) ...............................28

*Phillips v. AWH Corp.*,
    415 F.3d 1303 (Fed. Cir. 2005)......................................................................................2, 11

*Phx. Licensing, L.L.C. v. AAA Life Ins. Co.*,
    No. 2:13-CV-1081, 2015 WL 3866832 (E.D. Tex. June 22, 2015) ...................................14, 16

*Polaris PowerLED Techs., LLC v. Samsung Elecs. Am., Inc.*,
  No. 2:22-CV-00469-JRG, 2024 WL 3013293 (E.D. Tex. June 14, 2024) ............................20

*RightQuestion, LLC v. Samsung Elecs. Co.*,
  No. 2:21-CV-00238-JRG, 2022 WL 1154611 (E.D. Tex. Apr. 18, 2022) ..........................7, 8

*S3G Techology, LLC v. UniKey Techs., Inc.*,
  No. 16-cv-400, 2017 WL 5178837 (E.D. Tex. July 7, 2017) ..........................................26, 27

*SciMed Life Sys., Inc. v. Advanced Cardiovascular Sys., Inc.*,
  242 F.3d 1337 (Fed. Cir. 2001)................................................................................................17

*Sol IP, LLC v. AT&T Mobility LLC*,
  No. 2:18-CV-00526-RWS-RSP, 2019 WL 6879403 (E.D. Tex. Dec. 17, 2019)..................13

*Sonix Tech. Co. v. Publ'ns Int'l, Ltd.*,
  844 F.3d 1370 (Fed. Cir. 2017).............................................................................................10

*STA Grp. LLC v. Motorola Sols., Inc.*,
  No. 2:23-CV-00030-JRG-RSP, 2024 WL 3843731 (E.D. Tex. July 10, 2024) ...............19, 23

*Thorner v. Sony Comput. Ent. Am. LLC*,
  669 F.3d 1362 (Fed. Cir. 2012)............................................................................................2, 29

*Traxcell Techs., LLC v. Huawei Techs. U.S. Inc.*,
  No. 2:17-cv-00042-RWS-RSP (E.D. Tex. Jan. 4, 2019) .........................................................6

*UltimatePointer, L.L.C. v. Nintendo Co., Ltd.*,
  816 F.3d 816 (Fed. Cir. 2016)..................................................................................................6

*Vascular Sols. LLC v. Medtronic, Inc.*,
  117 F.4th 1361 (Fed. Cir. 2024) .............................................................................................19

*Versa Corp. v. Ag-Bag Int'l Ltd.*,
  392 F.3d 1325 (Fed. Cir. 2004).........................................................................................11, 12

*Vitronics Corp. v. Conceptronic, Inc.*,
  90 F.3d 1576 (Fed. Cir. 1996)..................................................................................................2

*Watts v. XL Sys., Inc.*,
  232 F.3d 877 (Fed. Cir. 2000)................................................................................................26

*Williamson v. Citrix Online, LLC*,
  792 F.3d 1339 (Fed. Cir. 2015).........................................................................................3, 26

## Statutes

35 U.S.C. § 112 ............................................................................................... *passim*

35 U.S.C. §112(6) .....................................................................................................25

## **TABLE OF EXHIBITS**

| Exhibit No. | Description |
|---|---|
| Exhibit 1 | U.S. Pat. No. 8,943,500 |
| Exhibit 2 | U.S. Pat. No. 9,697,038 |
| Exhibit 3 | U.S. Pat. No. 10,606,634 |
| Exhibit 4 | U.S. Pat. No. 9,722,858 |
| Exhibit 5 | January 9 Email Thread between Parties |
| Exhibit 6 | IBM's First Supplemental Responses to the 2nd Set of Interrogatories (No. 15) |
| Exhibit 7 | Declaration of Angelos Stavrou Regarding IBM Counterclaim Patents |
| Exhibit 8 | Joint Claim Construction and Prehearing Statement |
| Exhibit 9 | VirtaMove's Company Webpage |
| Exhibit 10 | "Capture": Microsoft Computer Dictionary (5th Ed. 2002) |
| Exhibit 11 | "Capture": Webster's New World Computer Dictionary (10th Ed. 2003) |
| Exhibit 12 | Platespin Documentation (NetIQ Webpage) |
| Exhibit 13 | VMware vCenter Converter Documentation (VMware Webpage) |
| Exhibit 14 | VMDK Documentation (VMware Webpage) |

## I.    INTRODUCTION

Defendant/Counterclaim-Plaintiff International Business Machines Corp. ("IBM" or "Defendant") submits this Opening Claim Construction Brief in support of its proposed constructions of the disputed claim terms in U.S. Pat. Nos. 8,943,500 ("the '500 patent"), 9,697,038 ("the '038 patent"), 10,606,634 ("the '634 patent"), and 9,722,858 ("the '858 patent") (collectively, the "Counterclaim Patents").  *See* Exs. 1–4.

IBM's constructions adhere to long-established principles of claim construction, by interpreting the disputed terms in accordance with plain and ordinary meanings as understood by a person of ordinary skill in the art ("POSITA") at the time of the invention.  IBM's constructions also are supported by the intrinsic record, including the claim language, the patents' specifications, and their prosecution histories. Extrinsic evidence, including the unrebutted opinions of the only expert involved in claim construction, Dr. Stavrou, further supports IBM's proposals.

In contrast, Plaintiff/Counterclaim-Defendant VirtaMove, Corp. ("VirtaMove" or "Plaintiff") improperly seeks to render several claim terms indefinite, despite clear disclosures in the intrinsic record that provide a POSITA with reasonable certainty regarding the terms' scope. VirtaMove's indefiniteness arguments are inconsistent with both Federal Circuit precedents and this Court's guidance.  In addition, VirtaMove's narrow constructions should be rejected because they run afoul of the cardinal rule of claim construction prohibiting interpretations that improperly import limitations from certain embodiments while excluding others.

For these reasons, IBM respectfully requests that the Court reject VirtaMove's attempts to introduce ambiguity where none exists and to instead adopt the plain and ordinary meanings proposed by IBM.

## II.    LEGAL STANDARDS

Claim terms should be construed consistent with their "ordinary and customary meaning,"

1

which is "the meaning that the term[s] would have [be] to a person of ordinary skill in the art in question at the time of the invention, i.e., as of the effective filing date of the patent application." *Phillips v. AWH Corp.*, 415 F.3d 1303, 1312–13 (Fed. Cir. 2005) (citations omitted).  Where a patentee does not redefine a term or clearly disavow scope, the term's plain and ordinary meaning should govern.  *Thorner v. Sony Comput. Ent. Am. LLC*, 669 F.3d 1362, 1365 (Fed. Cir. 2012).

A claim construction analysis begins with the intrinsic evidence.  *Vitronics Corp. v. Conceptronic, Inc.*, 90 F.3d 1576, 1582 (Fed. Cir. 1996).  The specification is "the single best guide to the meaning of a disputed term" and is usually "dispositive."  *Phillips*, 415 F.3d at 1315 (citation omitted).  Accordingly, "it is improper to read limitations from a preferred embodiment described in the specification—even if it is the only embodiment—into the claims absent a clear indication in the intrinsic record that the patentee intended the claims to be so limited."  *Liebel–Flarsheim Co. v. Medrad, Inc.*, 358 F.3d 898, 913 (Fed. Cir. 2004).  After consulting the intrinsic evidence, a court may examine the extrinsic evidence, or "all evidence external to the patent and prosecution history."  *Markman v. Westview Instruments, Inc.*, 52 F.3d 967, 980 (Fed. Cir. 1995).

35 U.S.C. § 112 requires a patent's claims to "inform those skilled in the art about the scope of the invention with reasonable certainty."  *Nautilus, Inc. v. Biosig Instruments, Inc.*, 572 U.S. 898, 910 (2014); *see also Nanoco Techs. Ltd. v. Samsung Elecs. Co.*, No. 2:20-cv-00038-JRG, 2021 WL 1890453, at *8 (E.D. Tex. May 10, 2021) ("Indefiniteness does not require absolute certainty, but only reasonable certainty around the boundaries of the term.").

While a claim may be indefinite if it improperly mixes statutory claim types (*i.e.*, an apparatus and a method of using that apparatus), *see IPXL Holdings, L.L.C. v. Amazon.com, Inc.*, 430 F.3d 1377 (Fed. Cir. 2005), later cases have clarified that the mere presence of functional language in an apparatus claim does not necessarily trigger *IPXL*-type indefiniteness unless the

2

claim affirmatively **requires user action** to complete infringement.  *See MasterMine Software, Inc. v. Microsoft Corp.*, 874 F.3d 1307, 1316 (Fed. Cir. 2017) (claims not indefinite where they describe a system's function and do not require a user to perform a step).

The absence of the word "means" in claim language raises a rebuttable presumption that a term does not constitute a means-plus-function limitation under 35 U.S.C. § 112, ¶ 6.  *Williamson v. Citrix Online, LLC*, 792 F.3d 1339, 1348–49 (Fed. Cir. 2015).  "In cases where it is clear that a claim term itself connotes some structure to a person of ordinary skill in the art, the presumption that § 112, ¶ 6 does not apply is determinative in the absence of more compelling evidence of the understanding of one of ordinary skill in the art."  *Dyfan, LLC v. Target Corp.*, 28 F.4th 1360, 1366 (Fed. Cir. 2022) (internal quotation omitted) ("code"/"application" not subject to § 112, ¶ 6).

The construction of terms subject to §112, ¶ 6 includes "two steps.  First, [the Court] determine[s] the claimed function. Second, [the court] identif[ies] the corresponding structure in the written description that performs that function." *See JVW Enters., Inc. v. Interact Accessories, Inc.*, 424 F.3d 1324, 1330 (Fed. Cir. 2005).

## III.    THE ASSERTED PATENTS

### A.    Overview of the '500, '038, and '634 Patents

The '500, '038, and '634 patents are all part of the same family of patents claiming inventions related to the isolation of applications in computer systems.  The three patents share the same specification, and the asserted claims are entitled to a priority date of at least April 10, 2009.

As their titles indicate, the '500, '038, and '634 patents' specification focuses on a novel "System and Method for Application Isolation."   The specification teaches "provid[ing] application isolation to one or more applications and their associated resources."  Ex. 1 ('500 patent) at Abstract.  In particular, "[t]he present invention provides… creat[ion of] an application isolation environment where applications can run unmodified, on un-modified operating systems

3

without requiring any virtual environments, virtual machines or virtual machine monitors." *Id.* at 2:35–39.

The specification explains that one of the most significant sources of "application incompatibilities" is "shared library conflict." *Id.* at 8:40-43. "By way of example, and not limitation, if a shared library is loaded on the system, and a new application installs an older version of the library, the older version may overwrite the newer version and render other applications non-functional based on having their shared library replaced by an incompatible older version. This is a common problem on both the Windows and Linux platforms." *Id.* at 8:42-49. One aspect of the invention solves this problem: "Using the preferred embodiment described above, the application would install the older library into its isolated environment and therefore not affect other applications. The application would load and use the older library without ever being aware that it was provided from the isolated environment, and other applications running on the system would be unaffected by the installation of the older library." *Id.* at 8:49–55.

The embodiment described in Fig. 4 of the specification illustrates how the "Interception Database (IDB) 122" is involved in the installation or uninstallation processes. The IDB "contains two main components, a rules engine 130 and the core resource mappings 132." *Id.* at 6:63–66. "The resource mapping 132 maintains mapping between public resources 134 and the corresponding private and isolated resources 136." *Id.* at 7:12–14. "The resource mapping 132 also consults the global exceptions 138 prior to translating any public to private or private to public resource requests." *Id.* at 7:14–16.

B.    **Overview of the '858 patent**

The '858 patent is titled "Management Infrastructure Analysis for Cloud Migration." The '858 patent explains that "[m]igration is the process of moving from a source environment to a target environment, such as a target IaaS cloud environment." Ex. 4 ('858 patent) at 1:30–32. The

'858 patent describes that "[h]eretofore, migration analysis has typically only focused on operating systems (OS) and applications, ***not infrastructure management***." *Id.* at 1:32–34.

To solve this problem, the '858 patent "provide[s] techniques for management ***infrastructure analysis*** for cloud migration." *Id.* at 1:38–39. For instance, Fig. 5 further provides an exemplary embodiment that describes discovery, analysis, capturing, and transportation processes that take place during migration. *See id.* at 9:55–10:56.



**Fig. 5**

*Id.*, Fig. 5 (annotated). Fig. 5 also describes using exemplar tools (such as PlateSpin software in 540) for controlling the transfer of instance captured in step 534. *See id.* The result of "transporting" can be either file or data. *See id.*

The '858 patent's claims are entitled to a priority date of at least May 14, 2011.[2]

---

[2] As set forth in Ex. 6 at 9, the named inventors of the '858 patent, including Matthew A. Markley, Amitkumar M. Paradkar, Venkata Vinay Parisa, and Birgit M. Pfitzmann, conceived of the inventions embodied in the patent's asserted claims no later than May 14, 2011. The inventors were diligent in continuously reducing these inventions to practice by conducting further testing following their initial conception and "Proof of Concept."

## IV.    DISPUTED TERMS

### A.    "A system, comprising …wherein the one or more isolated environments are created during installation of the one or more applications … wherein the one or more isolated environments are removed as part of an uninstall of the one or more applications" (Claim 1 of the '500, '634, and '038 patents)

| IBM:<br>Plain and ordinary meaning. | VirtaMove:<br>Indefinite. |
|---|---|

VirtaMove contends that the term "**a system**, comprising … wherein the one or more isolated environments are **created during installation** of the one or more applications … wherein the one or more isolated environments are **removed as part of an uninstall** of the one or more applications" is indefinite, arguing that the presence of verbs in the claim language makes it an invalid mixed method/apparatus claim.  Ex. 5 at 1.  VirtaMove's position is incorrect as a matter of law.  The Federal Circuit has repeatedly and consistently held that "verbs … represent permissible functional language used to describe capabilities" of an apparatus claim, and do not render the claims indefinite.  *MasterMine*, 874 F.3d at 1315 (Fed. Cir. 2017).  Here, as in *MasterMine* and numerous other cases where the Federal Circuit and other courts have recognized this principle, the verbs that VirtaMove cites merely work to claim a system that "possess[es] the recited structure [which is] *capable* of performing the recited functions."  *Id.* at 1315 (quoting *Microprocessor Enhancement Corp. v. Tex. Instruments Inc.*, 520 F.3d 1367, 1375 (Fed. Cir. 2008) (emphasis in original)); *Freeny v. Fossil Grp., Inc.*, No. 2:18-CV-00049-JRG-RSP, at *50 (E.D. Tex. May 10, 2019) ("unlike *IPXL* and *Katz*, the phrases describe the functional capabilities of the recited 'computer unit' and 'communication unit' rather than any particular step that must be performed by the user"); *Traxcell Techs., LLC v. Huawei Techs. U.S. Inc.*, No. 2:17-cv-00042-RWS-RSP, at *33–34 (E.D. Tex. Jan. 4, 2019) (term "a user … is able to set a no access flag" is directed to machine capability rather than to a user action); *UltimatePointer, L.L.C. v. Nintendo*

6

*Co., Ltd.*, 816 F.3d 816, 827 (Fed. Cir. 2016) (claim does not present *IPXL* issue when it "reflects the capability of [the claimed] structure rather than the activities of the user").

During the parties' conferral regarding claim construction, VirtaMove argued that *IPXL* supports its position. Ex. 5 at 1. However, the *IPXL* claims were found indefinite for **expressly claiming** a user action and **requiring it to be performed by a user**: *See IPXL Holdings,* 430 F.3d at 1383–84 (addressing claim term "[t]he system of claim 2 wherein … the user uses the input means to either change the predicted transaction information or accept the displayed transaction type and transaction parameters"). As this Court explained, the claim language in *IPXL* "**clearly required the user to take some action** with respect to a keypad, touchscreen …." *See RightQuestion, LLC v. Samsung Elecs. Co.*, No. 2:21-CV-00238-JRG, 2022 WL 1154611, at *9 (E.D. Tex. Apr. 18, 2022).

No such claims are at issue here. None of the claims under construction even mentions— let alone requires—any step that is performed by a user. "[N]othing in the[] limitations requires the user" to take any action—which, just as in *RightQuestion*, is made clear (in part) "from the passive-voice nature of the clause …." *RightQuestion*, 2022 WL 1154611, at *8, *9.

For example, claim 1 of the '500 patent recites that "the one or more isolated environments are created during installation of the one or more applications" and that "the one or more isolated environments are removed as part of an uninstall of the one or more applications." Ex. 1 ('500 patent), Cl. 1. Nothing in these passive-voice clauses mandates that **a user** must initiate or perform any of the recited actions, such as creation, installation, removal, or uninstalling. Rather, the claim describes the capability of the system and recites that the "system" must be able to perform these actions. *See id.* As Dr. Stavrou confirms, "the specification describes the system and apparatus with such functional capabilities." Ex. 7, ¶ 53. In marked contrast with the claims at issue in

*IPXL*—which described a specific step a user would take while using a computer-input device—there is no teaching in the '500, '634, and '038 patents' specification or claims about how users could, themselves, "create[]" or "remove[]" an environment in a computer. That is squarely the work of the claimed computer system. Nor do the claims even mention any tasks a user ***could*** perform, such as (hypothetically) using a user input tool to "request" that the computer create such an environment. VirtaMove cannot arbitrarily read a requirement that a user create or remove computing environments him- or herself into a claim where no such requirement exists. *See, e.g., Aria Diagnostics, Inc. v. Sequenom, Inc.*, 726 F.3d 1296, 1300 (Fed. Cir. 2013) ("Claim construction focuses primarily on the language of the claims.") (citation omitted). Indeed, the claim language's use of the passive voice in these limitations confirms that the claimed isolated environment is "created" and "removed" as part of ***the system***'s operation—*e.g.*, based on automatic configurations or scripts—rather than any user action requirement, which is nonexistent. *See RightQuestion*, 2022 WL 1154611, at *10.

VirtaMove is likely to argue that because installation must occur for there to be infringement, the claims necessarily require user action. Again, however, no such limitation is present, nor is it implicitly required. The claims merely require ***the system*** to have the capability to perform the recited installation/uninstallation. On their face, the claims are agnostic to how these actions are triggered, whether it is via an automated process or some unclaimed user input. Critically, nothing in the claims or the specification supports VirtaMove's proposed extra requirement ***mandating*** user input.

In fact, the patents' specification directly supports IBM's plain reading of the claim language. Like the claims, the specification never requires the user to perform any installation or uninstallation. On the contrary, installation and uninstallation are described as ***the system***'s

capabilities.  For example, the specification states that the system, including the interception layer (IL) and the Interception database (IDB), are capable of creating isolated environments during installation and of removing isolated environments during uninstallation, and that ***"the installation process" is automatic*** because it can "request a resource" on its own:

> FIG. 2 illustrates by way of example embodiment **40 *installation*** of a typical application "AppXYZ" **42**.  ***The Interception Layer (IL) 50*** intercepts all calls to system libraries and the operating system.  IL **50** communicates with the Interception Database (IDB) **58** to ***create a private and isolated environment*** where the application can execute without depending on or affecting other parts of the environment.  By way of example, and not limitation, first ***the installation process requests a resource 44***, ***such as opening a file***.  The resource request is intercepted by ***IL 50*** and a request to create **54** a private instance of the resource is made to the Interception Database (IDB) **58**.

Ex. 1 ('500 patent) at 5:52–58.  Figure 2 illustrates this disclosure and likewise requires no user action:



*Id.*, Fig. 2 (annotated to highlight that components of the system perform installation).  Similarly, the specification's description of the system's uninstallation capability does not require any user action or intervention:

9

> FIG. 3 illustrates by way of example embodiment **80**, ***un-installation of a typical application*** AppXYZ **82**. The un-installation uses and requests resources **84**, which are intercepted by the IL **86** and redirected **88** by the IDB **90**, as described above. All actions, such as deletion of files, are re-directed to the private and isolated location. When the un-install terminates, sometimes called exit( ), the exit is intercepted **92** by the IL **86**, and forwarded **94** to the IDB **90**. The IDB **90** ***removes*** all entries mapping **100** application AppXYZ **82** resources **96** against its isolated environment **98**. ***The application is now uninstalled***, and all isolation information has been removed.

*Id.* at 6:45–56; *see also id.*, Fig. 3 (annotated to highlight that components of the system perform uninstallation). Notably, the only user actions described in the specification relate to creating and saving a document, *see id.* at 6:23–29, or choosing to store data outside the isolated environment, *see id.* at 6:36. These actions are irrelevant to installation/uninstallation, much less do they support any requirement that a user must perform installation or uninstallation.

Further, a POSITA would have understood with reasonable certainty that the claimed system performs these functions independently of user intervention. As Dr. Stavrou confirms, "[f]rom a technical perspective … a POSITA reading the '500 patent and the claim language would have understood that 'created during installation' and 'removed as part of an uninstall' are both functional capabilities of the system as claimed." Ex. 7, ¶ 53.

Tellingly, besides attorney argument, VirtaMove has not offered any support for its position that a user must perform the claimed installation/uninstallation. At bottom, the claim language, the specification, and the extrinsic evidence all confirm that a POSITA would have understood this claim language as reciting the claimed system's capability and not requiring any user intervention. "Indefiniteness must be proven by clear and convincing evidence[,]" and no evidence of indefiniteness exists here. *Sonix Tech. Co. v. Publ'ns Int'l, Ltd.*, 844 F.3d 1370, 1377 (Fed. Cir. 2017). The Court therefore should reject VirtaMove's attempt to manufacture an indefiniteness argument by injecting a nonexistent user action requirement into the claims.

### B.     "the system resources" (Claim 19 of the '500 patent and Claim 19 of the '038 patent)

| IBM: | VirtaMove: |
|---|---|
| Plain and ordinary meaning. | Indefinite. |

VirtaMove contends that the term "the system resources" in claim 19 of both the '500 and '038 patents is indefinite, arguing that it is unclear whether this term encompasses all system resources or only a subset, and further asserting that the term lacks antecedent basis. *See* Ex. 5 at 1–2. VirtaMove's arguments are unfounded.

The term "the system resources" is not indefinite because the claim language itself provides sufficient clarity. "If the scope of a claim would be reasonably ascertainable by those skilled in the art, then the claim is not indefinite." *Cheetah Omni LLC v. Alcatel-Lucent Inc.,* 939 F. Supp. 2d 649, 678 (E.D. Tex. 2013) (citations omitted). Claims should be given their plain and ordinary meaning as understood by a POSITA. *See Phillips,* 415 F.3d at 1313-14 (Fed. Cir. 2005) (holding that "[c]laim terms are generally given their plain and ordinary meaning, which is the meaning understood by one of ordinary skill in the art when read in the context of the claims, specification, and prosecution history."). Here, the claims in question recite "maintaining ***mapping*** between ***the system resources inside*** the one or more isolated environments ***and outside***." Ex. 1 ('500 patent), Cl. 19; Ex. 2 ('038 patent), Cl. 19. Based on this language, a POSITA would understand that the claimed "system resources" can be met by any system resources that satisfy the recited description—*i.e.*, system resources ***mapped*** between the isolated environments inside and outside. Moreover, the Federal Circuit has repeatedly recognized that the plural form of a term "can describe a universe ranging from one to some higher number, rather than requiring more than one item." *Versa Corp. v. Ag-Bag Int'l Ltd.*, 392 F.3d 1325, 1330 (Fed. Cir. 2004) ("the use of 'channels' in the plural does not imply that multiple channels are required by the claim") (quoting

*Dayco Prods., Inc. v. Total Containment, Inc.*, 258 F.3d 1317, 1328 (Fed. Cir. 2001)).  Similar to the language at issue in *Versa*, this claim term, on its face, can refer to ***mapping*** one or more system resources ***inside*** the isolated environment with one or more system resources ***outside*** the isolated environment.  *See Versa*, 392 F.3d at 1330 (finding "the context in which the patentee used the plural here supports a similar interpretation" that plural here refers to "one or more").

Further, nothing in the specification requires "all" or even a "plurality" of the system resources to be mapped.  The specification similarly does not indicate that all resources must be mapped.  On the contrary, the specification describes embodiments such as that depicted in Figure 2, where the resource request can be for a single file: "request[ing] ***a resource 44***, ***such as opening a file***." Ex. 1 ('500 patent) at 5:58–60, Fig. 2.  "The resource request is intercepted by ***IL 50*** and a request to create **54 *a private instance of the resource*** is made to the Interception Database (IDB) **58**."  *Id.* at 5:60–63.  In this manner, "[t]he resource mapping 132 maintains ***mapping*,"** including mapping an external resource to "***a private instance*** of the resource," such as the file, inside the isolated environment.  *See id.* at 7:12–14.  Figure 4 further illustrates the structure of the Interception Database, which contains core resource mappings that track and maintain each mapping between public resources (resources "outside") and their corresponding private and isolated resources (resources "inside").  *See id.* at 6:63–7:16. Nowhere does the specification require that ***every*** system resource must be mapped.  Indeed, contradicting VirtaMove's primary argument, the specification expressly acknowledges that not all resources need to be mapped: "The global exceptions contain all resources that should not be remapped to the isolated environments." *See id.* at 7:6–9.  Moreover, the specification describes embodiments where a mapping could involve only "a private instance" of the system component, such as mapping external to internal memory or a single file, confirming that the disclosed invention is not required to map all system

12

resources. *See id.* at 5:50–67. Especially given this consistent disclosure in the specification, a POSITA would have understood "the system resources" term to refer to the system resources that are mapped between the inside and outside of the isolated environments, making this term sufficiently definite.

Indeed, an actual POSITA's understanding also supports this reading. Dr. Stavrou confirmed that a POSITA would have been familiar with the meaning of the term "system resources" as used here. *See* Ex. 7, ¶ 59.

VirtaMove's argument that the term lacks antecedent basis likewise lacks merit. Courts have consistently held that the absence of explicit antecedent basis does not render a claim indefinite if its scope is reasonably ascertainable. For example, the Federal Circuit has held "the lack of an antecedent basis does not render a claim indefinite as long as the claim 'apprises one of ordinary skill in the art of its scope and, therefore, serves the notice function required by [§ 112 ¶ 2]." *In re Downing*, 754 F. App'x 988, 996 (Fed. Cir. 2018) (claim not indefinite where "claim 1 only references one 'end user' ... [and] claim 1's recitation of one end user could only refer to the end user using the product"). This Court has also repeatedly rejected indefiniteness arguments based on purported lack of antecedent basis when the term is otherwise reasonably clear. *See, e.g.*, *CardWare Inc. v. Samsung Elecs. Co.*, No. 2:22-CV-141-JRG-RSP, 2023 WL 5434763, at *23 (E.D. Tex. Aug. 23, 2023) (citing *Energizer Holdings, Inc. v. Int'l Trade Comm'n*, 435 F.3d 1366, 1370 (Fed. Cir. 2006)); *Gesture Tech. Partners, LLC v. Huawei Device Co.*, No. 2:21-CV-40-JRG, 2021 WL 4760632, at *37 (E.D. Tex. Oct. 12, 2021).

Here, as discussed above, the scope of the "system resources" term is "reasonably clear in the context of the claim as a whole," which specifies the mapping relationship between system resources inside and outside the isolated environments. *Sol IP, LLC v. AT&T Mobility LLC*, No.

13

2:18-CV-00526-RWS-RSP, 2019 WL 6879403, at *14 (E.D. Tex. Dec. 17, 2019); *see also CardWare Inc.*, 2023 WL 5434763, at *27 ("[a] claim is not invalid for indefiniteness if its antecedent basis is present by implication") (citations omitted). As noted above, the specification further describes that mapping relationship and provides examples of systems resources, such as memory, storage, and CPUs. *See* Ex. 1 ('500 patent) at 2:54–57, 6:63–7:16 (examples of system resource mapping). The claimed system resources' connection to claim 18's "resources" term also provides clear and consistent context that applications use system resources. *See id.,* Cl. 18. In addition, Dr. Stavrou has offered unrebutted expert evidence confirming that a POSITA would have understood that "'the system resources' refers to the system resources inside the one or more isolated environments and outside the isolated environment, as recited in the claims." Ex. 7, ¶ 59. Accordingly, this term is not indefinite, and it should be given its plain and ordinary meaning.

### C.    "appropriate for infrastructure configuration mapping" (Claims 1 and 19 of the '858 patent)

| IBM:<br>Plain and ordinary meaning. | VirtaMove:<br>Indefinite. |
|---|---|

Contrary to VirtaMove's position (Ex. 5 at 4), the term "appropriate" as used in this term is not a term of subjective degree. Rather, in the context of the infrastructure configuration mapping required by the claim language, and as illustrated by the exemplary embodiments disclosed in the specification, this term recites an objective determination and therefore is not indefinite. *See Phx. Licensing, L.L.C. v. AAA Life Ins. Co.*, No. 2:13-CV-1081, 2015 WL 3866832, at *5 (E.D. Tex. June 22, 2015) ("Given these numerous exemplary embodiments, the Court finds that the claims, viewed in light of the specification" is definite).

The claim language, on its face, is clear and readily understandable to a POSITA. Claim 1 of the '858 patent recites "analyzing said at least one source infrastructure management

14

component … to determine that said at least one source infrastructure management component is *appropriate for* infrastructure configuration *mapping* to said target cloud infrastructure."  Ex. 4 ('858 patent), Cl. 1.  This claim language indicates that as part of the "analyzing" step of claim 1, a "determin[ation]" is made regarding the "appropriate[ness]" of the "infrastructure configuration *mapping*" from the "source infrastructure component" to "said target cloud infrastructure."  In other words, read as a whole, this claim language sets forth an objective criterion for determining *the mapping* claimed in claim 1.  Indeed, Dr. Stavrou has confirmed that a POSITA would understand the claimed mapping as involving analyzing a given source management component's compatibility with the target cloud infrastructure, and that this compatibility—*i.e.*, the recited "appropriate[ness]"—is determined objectively, rather than subjectively.  *See* Ex. 7, ¶ 68.

The '858 patent's specification further confirms that the term should be given its plain and ordinary meaning.  The specification states that "map[ping] the infrastructure configuration" is performed "based on the cloud infrastructure *config standards* … and the discovered source infrastructure configs and/or logs."  Ex. 4 ('858 patent) at 32:33–36, 33:9–15 ("it is advisable to *analyze compatibility* between components to be retained and new components to be used"); *see also id.*, Fig. 16 (explaining "map[ping]").  Mapping based on the source infrastructure configurations, logs, and the cloud infrastructure config standards is yet another example of the objective requirements that must be analyzed to determine whether a source infrastructure management component is "appropriate for infrastructure configuration mapping" to target cloud infrastructure, as the claims require.  *See* Ex. 7, ¶¶ 68–69.

The specification also explains that the analysis step disclosed in claim 1 "can involve . . . examining for conflicts," another objective determination.  Ex. 4 ('858 patent) at 32:44–46.  Moreover, whether there is a conflict is a binary determination, not a matter of degree.  The

15

specification provides concrete examples illustrating this point, such as Fig. 20, which depicts an exemplary embodiment with "a possible user interface for a decision about a conflict." *Id.* at 37:51–52, Fig. 20. The specification explains that in Fig. 20, "a query is made whether the management software entered in the field 'Middleware name' conflicts with any software in the cloud SCE+, version 1.5." *Id.* at 37:55–57. In addition, the specification provides concrete examples of an "infrastructure configuration mapping," such as mapping the "HP event filters" to "IBM Tivoli Monitoring (ITM) event filters … which might be used in the target environment." *Id.* at 32:54–60; *see also* Ex. 7, ¶ 69 ("Such specific examples further shows that a POSITA would have readily understood the term with reasonable certainty.").

Ultimately, "[a] patentee need not define his invention with mathematical precision in order to comply with the definiteness requirement." *Phx. Licensing*, 2015 WL 3866832, at *6 (quotation omitted) (rejecting indefiniteness argument where "none of the claims require a selected product to be most appropriate, not as appropriate, or least appropriate. Indeed, the specification provides examples … [of what] is determined to be appropriate."). Here, the intrinsic record provides a sufficient description and examples of the required objective analysis to allow a POSITA to understand the "appropriate for infrastructure configuration mapping" term with reasonable certainty. Extrinsic evidence also supports that the term recites an objective determination. *See* Ex. 7, ¶ 70. Accordingly, this term should have its plain and ordinary meaning.

### D.    "instance of an image" (Claims 1 and 19 of the '858 patent)

| IBM: | VirtaMove: |
|---|---|
| Plain and ordinary meaning, which is "an occurrence or copy of an image." | Image: a template that includes virtual hardware suggestions and a virtual disk containing at least an operating system.<br><br>Instance of an image: a virtual machine derived from an image, which further includes virtual hardware allocations |

|  | and a hypervisor of virtual machine runtime.<br><br>In the alternative: Indefinite. |
|---|---|

Limiting a claim to a disclosed embodiment by reading into the claim a limitation from the written description is strictly prohibited and, in fact, is "one of the cardinal sins of patent law." *Blazer v. Best Bee Bros. LLC*, No. 2022-1033, 2022 WL 16954848, at *4 (Fed. Cir. 2022) (quoting *SciMed Life Sys., Inc. v. Advanced Cardiovascular Sys., Inc.*, 242 F.3d 1337, 1340 (Fed. Cir. 2001)). Here, VirtaMove seeks to do exactly that, as it contends the terms "image" and "instance of an image" should be narrowly construed as "a template that includes virtual hardware suggestions and a virtual disk containing at least an operating system" and "a virtual machine derived from an image, which further includes virtual hardware allocations and a hypervisor of virtual machine runtime," respectively. VirtaMove's proposed constructions also improperly exclude other expressly disclosed embodiments of the invention.

VirtaMove's proposed constructions are based on the embodiments described at 50:52–51:10 of the '858 patent's specification—and in particular, the paragraph that starts: "Furthermore in this regard …." Yet, in the preceding paragraph, the '858 patent makes clear that this passage refers only to ***"one or more embodiments* …." Ex. 4 ('858 patent) at 50:40-45. Critically, VirtaMove's proposed definitions are confined to those embodiments:

> Advantageously, ***one or more embodiments*** provide techniques for replacing the disks associated with an existing virtual machine with disks of another virtual machine, or images thereof, without impacting functionality or the identity of the virtual machine.…
>
> Furthermore in this regard, and referring now to FIG. 34, ***in at least some embodiments***, there are four states overall, as listed below. An "image" is offline/dormant/static, as in "image" of a virtual machine. ***An instance*** is a running virtual machine or registered to be able to run in a virtual machine, as in ***an "instance" of an image***. As in FIG. 34, "a virtual machine image" or "image" or "virtual machine template" 3402 includes a virtual disk 3406 containing at least an

> operating system, and virtual hardware suggestions 3408 such as CPU, memory, and/or disk. A "virtual machine" or "instance" or ***"instance of an image" 3404 includes 3406 and 3408***, as well as virtual hardware allocations 3410 of CPU, memory, and/or disk, and a hypervisor of virtual machine runtime 3412. The aforementioned four states include . . . .

*Id.* at 50:40–51:10; *see also id.* at Fig. 34. In proposing constructions that are based on specific embodiments to the exclusion of other embodiments, VirtaMove has committed "one of the cardinal sins of patent law." *Blazer*, 2022 WL 16954848, at *4.

Indeed, VirtaMove's constructions fail to take into account other disclosed embodiments. *See GE Lighting Sols., LLC v. AgiLight, Inc.*, 750 F.3d 1304, 1311 (Fed. Cir. 2014) (citation omitted) ("where claims can reasonably [be] interpreted to include a specific embodiment, it is incorrect to construe the claims to exclude that embodiment, absent probative evidence on the contrary."); *Estech Sys. IP, LLC v. Mitel Networks, Inc.*, No. 2:21-cv-00473-JRG-RSP, 2023 WL 2695093, at *6 (E.D. Tex. Mar. 28, 2023) (rejecting construction because it would exclude disclosed embodiments) (Payne, J.). The '858 patent's specification expressly teaches that "instance" and "image" can take on alternative meanings in other embodiments that are different from what VirtaMove is proposing, which are indeed captured in IBM's proposed plain meaning of this term: "an occurrence or copy of an image" but not in VirtaMove's narrow construction. *See* Ex. 4 ('858 patent) at 15:30–36 ("Instance: An operating system instance together with all software running on this operating system. It may be physical (i.e., directly running on a server) or virtual (i.e., already running on a hypervisor)" and "[i]mage: File representation of an instance.). VirtaMove's proposed construction of "instance of an image" as "a ***virtual*** machine" completely excludes the "***physical***" embodiments of the "instance" disclosed by the patent. Further, in the embodiment disclosed in Fig. 22, "[the] original image is imported into the image library 2202 as version zero …[and] an ***instance of the*** original ***image*** is started at 2230." *Id.* at 44:45–51, 45:1–15; *see also id.* at Fig. 22. This embodiment describes the "original image" as "version zero" and

later "***instances*** 2236, 2238, 2240" as each having "incremental change." *Id.* at 45:4–18.  This embodiment and its examples of instances as different versions further support that this term has a plain and ordinary meaning, which is "an occurrence or copy" of an original image.  VirtaMove's definition is unduly narrow and is inconsistent with this other embodiment.

Despite relying on two express descriptions from the specification (which happen to be overly narrow as constructions, because they describe only one set of embodiments), VirtaMove argues in the alternative that the term is indefinite.  However, the intrinsic record makes clear that "instance of an image" is a term well understood by a POSITA.  This term should be given its plain and ordinary meaning, which is "an occurrence or copy of an image."

"Instance of an image" is not indefinite, because both the claim language and the specification provide reasonable clarity to a POSITA regarding its scope.  *See, e.g.*, *STA Grp. LLC v. Motorola Sols., Inc.*, No. 2:23-CV-00030-JRG-RSP, 2024 WL 3843731, at *12 (E.D. Tex. July 10, 2024).  This term is recited in the discovering element of claims 1 and 19, which provides that "at least one source infrastructure management component" in the "source computing system" ***is*** "an instance of an image."  Ex. 4 ('858 patent), Cl. 1.  While that example alone would have informed a POSITA of the term's scope, the specification (as discussed above) provides additional examples of source infrastructure management components, including a server, a client, configurations, logs, and processes.  *See id.* at 34:23–25.  Thus, this term is not indefinite.  *See Vascular Sols. LLC v. Medtronic, Inc.*, 117 F.4th 1361, 1370–71 (Fed. Cir. 2024) (rejecting indefiniteness challenge where "[t]he claims themselves indicate to a person skilled in the field how to measure the boundary, claim-by-claim.").

Moreover, even VirtaMove's own proposed construction based on particular embodiments shows this term is not indefinite, as the patent provides a detailed explanation of the meaning of

"instance of an image" in the context of those embodiments. *See id.* at 50:40–51:10. The specification also provides an additional description in the context of other embodiments, further confirming the term is not indefinite. *See id.* at 15:30–36 (further explaining "Instance" and "[i]mage: File representation of an instance.").

In addition, Dr. Stavrou has provided unrebutted testimony that the terms "image" and "instance" would have been understood by a POSITA. *See* Ex. 7, ¶ 76; *Polaris PowerLED Techs., LLC v. Samsung Elecs. Am., Inc.*, No. 2:22-CV-00469-JRG, 2024 WL 3013293, at *9 (E.D. Tex. June 14, 2024) (rejecting indefiniteness argument because defendant "has not shown a skilled artisan would have difficulty understanding the scope of the term").

Finally, the parties previously agreed that "instance" means "an occurrence or copy" as used in the VirtaMove asserted patent—U.S. Pat. No. 7,784,058—which is in a similar field and uses the term in a similar context. *See* Ex. 8 at 7; Ex. 9 at 1. For these reasons, the term "an instance of an image" is not indefinite and should be given its plain and ordinary meaning of "an occurrence or copy of image."

### E. "capturing" (Claim 1 of the '858 patent)

| **IBM**: | **VirtaMove**: |
|---|---|
| Plain and ordinary meaning. | Indefinite.<br><br>In the alternative, "transferring into a file." |

VirtaMove incorrectly contends that the term "capturing" in claim 1 of the '858 patent is indefinite. The intrinsic record makes clear that a POSITA would not have difficulty understanding the scope of this term and that it should be given its plain and ordinary meaning.

The claim language by itself provides the requisite clarity. As recited in claim 1, a computer executing the computer executable instructions disclosed in the claim "***capture[s]*** said

at least one source infrastructure management component determined appropriate for infrastructure configuration mapping for migration to said target cloud infrastructure." Ex. 4 ('858 patent), Cl. 1.  This language makes clear what is captured (the "source infrastructure management component"), in what context (when that component is "determined appropriate for infrastructure configuration mapping"), and by what ("a computer executing the computer executable instructions disclosed in the claim").  In view of this context, a POSITA would have readily given the term "capturing" its plain and ordinary meaning, which generally would include recording, acquiring, or extracting data, inputs, or events from a system, environment, or stream.  *See* Exs. 10–11.  Moreover, as VirtaMove implicitly concedes via its alternative construction, the verb "capture" has at least one recognized meaning in this context ("transferring into a file")—although, as explained below, the patent does not limit "capturing" to that definition.  Accordingly, the term is not indefinite.

Indeed, the '858 patent's specification confirms that "capturing" has a clear and well-understood meaning to a POSITA.  For example, the specification provides a detailed description of "step 534, wherein the instances to be migrated are ***captured***."  *See* Ex. 4 ('858 patent) at 10:19–52.  This capture step "can include, for example, both physical-to-virtual (P2V) and virtual-to-virtual (V2V) techniques with one or more suitable tools."  *Id.* at 10:34–35.  The specification goes on to suggest as a ***non-limiting*** example suitable tools that can carry out the capturing step, listing products such as PlateSpin Migrate, which is a migration tool from NetIQ Corporation, and VMware vCenter Converter, which is capable of snapshotting a system before migration and is available from VMware, Inc., Palo Alto, CA.  *See id.* at 10:35–41; Exs. 12–13.  Moreover, "in one or more ***non-limiting exemplary embodiments***, the end result of step 534 is a Virtual Machine Disk Format (VMDK) file."  Ex. 4 ('858 patent) at 10:41–43, Figs. 5, 12.  VMDK files are files

that "store data representing a virtual machine's hard disk drive." Ex. 14. These detailed examples provided in the specification are more than sufficient to inform a POSITA with reasonable certainty of the meaning of the term "capturing." *See Niazi Licensing Corp. v. St. Jude Med. S.C., Inc.*, 30 F.4th 1339, 1347 (Fed. Cir. 2022) (term not indefinite where "[t]he written description, likewise, provided . . . exemplary designs and specific examples").

VirtaMove's alternative construction—narrowly equating "capturing" with "transferring into a file"—is flawed because VirtaMove's interpretation would exclude a preferred embodiment of the patent, a fundamental error in claim construction. *See GE Lighting Sols.*, 750 F.3d at 1311; *Estech*, 2023 WL 2695093, at *6. As illustrated above, "capturing" does not need to result in transferring into a file, because it is just "one or more **non-limiting exemplary embodiments** …" Ex. 4 ('858 patent) at 10:41–43; *see also id.* at 10:54–55, Fig. 7. Further, "[d]ata 544 outside the boot disk may be transported separately from the aforementioned vmdk file," indicating the result of the capture step 534 can comprise **data** that is not written into a file. *Id.* at 10:41–43; *see also id.* at 10:54–55, Fig. 7. Figure 5 further confirms this disclosure and depicts that what is transported after "capturing" can be either in a file **or** in the form of data.



*Fig. 5*

*Id.*, Fig. 5 (annotated); *see also id.* at 19:18–43, Fig. 7 (showing "instance capture" as "p2v, v2v",

i.e., including "virtual-to-virtual").  VirtaMove's narrow "transferring into a file" construction therefore is incorrect because it would exclude other disclosed embodiments.

For these reasons, VirtaMove's indefiniteness arguments and its overly narrow alternative construction should be rejected, and the term should be given its plain and ordinary meaning.

### F.    "non-functional requirement" (Claims 3–5 and 7 of the '858 patent)

| **IBM**:<br>Plain and ordinary meaning. | **VirtaMove**:<br>Indefinite. |
| --- | --- |

VirtaMove contends that the term "non-functional requirement" as recited in Claims 3, 4, 5, and 7 of the '858 patent is indefinite because it does not specify which infrastructure requirements qualify as non-functional.  However, the claim language and the specification both provide clear guidance regarding the meaning of this term.

As the Federal Circuit held, "[t]he test for indefiniteness is not whether infringement of the claim must be determined on a case-by-case basis.  Instead, it is whether a claim 'inform[s] those skilled in the art about the scope of the invention with reasonable certainty.'"  *STA Grp. LLC v. Motorola Sols.,* 2024 WL 3843731, at *12 (quoting *Nevro Corp. v. Boston Sci. Corp.*, 955 F.3d 35, 39 (Fed. Cir. 2020)).  Here, claim 3 of the '858 patent recites, "wherein said computer executable instructions further cause the computer to perform the additional method step of ***deriving a description of non-functional requirements*** of said source management infrastructure."  Ex. 4 ('858 patent), Cl. 3.  Claim 4 recites, in relevant part, "***a description of non-functional requirements*** of a target management infrastructure of said target cloud infrastructure" and "mapping said ***description of said non-functional requirements*** of said source management infrastructure with said ***description of said non-functional requirements*** of said target management infrastructure."  *Id.*, Cl. 4.  Claim 5 recites, "said mapping of said ***description of said non-functional requirements*** of said source management infrastructure with said ***description of***

*said non-functional requirements* of said target management infrastructure." *Id.*, Cl. 5.  Claim 7 recites "wherein said mapping . . . is at least partially based on said mapping of said *description of said non-functional requirements* of said source management infrastructure with said *description of said non-functional requirements* of said target management infrastructure.").  The structure and language of these claims make clear to a POSITA that "non-functional requirement" refers to specific requirements used in each specific context, such as mapping the source management infrastructure with the target management infrastructure.  *See id.*, Cls. 5, 7.  A POSITA would readily recognize that the claims do not require an exhaustive or case-by-case list of every non-functional requirement, but rather certain specific requirements in the context of each claim, *e.g.*, deriving a description in claim 3 and mapping the descriptions in claims 3, 5, and 7.

The '858 patent's specification further confirms that a POSITA would have understood the term with reasonable certainty.  For example, the specification provides descriptions of specific types of "non-functional requirements," including SLAs (service level agreements"):

> *In some cases*, in the obtaining step, the *description* of the target cloud infrastructure includes cloud infrastructure software standards 16310, cloud infrastructure software configurations 16320, and/or *an application-level description* 16330 of the target management infrastructure (*i.e.*, *a description of non-functional requirements* on the management infrastructure).… These can include, for example, *an SLA or non-functional requirement*, but *SLAs can be seen as non-functional requirements* as well.

*Id.* at 39:40–49.  The patent explains that these "SLAs" are agreements that "provide[] cloud computing resource allocation and management such that required service levels are met" and that they provide "pre-arrangement for, and procurement of, cloud computing resources for which a future requirement is anticipated in accordance with an SLA." *Id.* at 7:65–8:4.  "Other examples [of non-functional requirements] include change windows, up-to-dateness policies (such as for patches or in monitoring for problems), auditing requirements, and the like." *Id.* at 39:50–53.  The specification further teaches that non-functional requirements "can be set as part of an application

24

program interface (API)." *Id.* at 31:65–66. In connection with Figure 16, the specification states that "[i]n some cases, in obtaining step, the description of the target cloud infrastructure includes cloud infrastructure software standards 16310, cloud infrastructure software configurations 16320, and/or ***an application-level description*** 16330 of the target management infrastructure (***i.e., a description of non-functional requirements on the management infrastructure***)." *Id.* at 39:40–46; *see also id.* at Fig. 16.

Given these examples illustrating the meaning of "non-functional requirements"—*e.g.*, "SLAs" or "up-to-dateness policies"—a POSITA would have understood this term with reasonable certainty. In fact, SLAs are well-understood agreements frequently used in cloud computing services. *See* Ex. 7, ¶ 94. Accordingly, VirtaMove's indefiniteness challenge should be rejected, and the term should be given its plain and ordinary meaning. *See, e.g.*, *Niazi Licensing*, 30 F.4th 1339 at 1347 (term not indefinite where "[t]he written description, likewise, provided . . . exemplary designs and specific examples").

### G. "module" (Claim 18 of the '858 patent)

| IBM: | VirtaMove: |
|---|---|
| Plain and ordinary meaning.<br><br>Not subject to 35 U.S.C. § 112, ¶ 6. | Each reference to "module" is governed by 35 U.S.C. §112(6), and is indefinite. |

Contrary to VirtaMove's argument, the term "module" as used in claim 18 of the '858 patent does not constitute a means-plus-function term because the claim language itself connotes sufficient structure for each claimed module. And even if this term were subject to the requirements of § 112, ¶ 6 as a means-plus-function term (it is not), sufficient structure is recited in the claim and disclosed in the patent's specification to prevent indefiniteness.

As a threshold matter, the lack of the word "means" in the claim language raises a rebuttable presumption that the term in question does ***not*** constitute a means-plus-function

limitation. *Williamson* 792 F.3d at 1348–49 (Fed. Cir. 2015); *see also Watts v. XL Sys., Inc.*, 232 F.3d 877, 879–81 (Fed. Cir. 2000). In deciding whether the challenger sufficiently rebuts this presumption, the Court must look to the specification, the prosecution history, and the extrinsic evidence to determine whether the recited "module" "connotes sufficiently definite structure to a [POSITA]." *Nw. Univ. v. Universal Robots A/S*, No. 21-149 (MN), 2024 WL 231457, at *4–5 (D. Del. Jan. 22, 2024). The word "module" as it appears in the claim "should be read in light of [the] disclosure." *S3G Techology, LLC v. UniKey Techs., Inc.*, No. 16-cv-400, 2017 WL 5178837, at *7 (E.D. Tex. July 7, 2017) (holding "dialogue module" did not constitute a means-plus-function term because, read in light of the disclosure, it has sufficient structure).

VirtaMove cannot overcome the presumption. The recited "module" terms are not means-plus-function limitation because the claim language itself connotes sufficient structure. *See id. at *7; see also Dyfan, LLC*, 28 F.4th at 1366. Notably, the claim language itself provides clear structure for each referenced module. Claim 18 recites:

> 18. The non-transitory computer readable medium of claim 1 … wherein ***the distinct software modules*** comprise a ***discovery tool module***, a ***description module***, and an ***infrastructure comparison engine module***;
>
> > wherein:
> >
> > > said ***discovering*** is carried out by said ***discovery tool module*** executing on said computer;
> > >
> > > said ***querying*** is carried out by said ***description module*** executing on said computer; and
> > >
> > > said ***analyzing*** is carried out by said ***infrastructure comparison engine module*** executing on said computer.

Ex. 4 ('858 patent), Cl. 18. Moreover, claim 18 depends on claim 1 and therefore should be read in connection with claim 1, which describes the structure corresponding for each of the modules recited in claim 18:

1. A non-transitory computer readable medium comprising computer executable instructions which when executed by a computer cause the computer to perform the method of:

> ***discovering***, in a ***source computing system having a source management infrastructure***, at least one source infrastructure management component, wherein said at least one source infrastructure management component is an instance of an image, and wherein said at least one source infrastructure management component is running in a customer environment;
>
> ***querying a database*** to obtain a description of a target cloud infrastructure;
>
> ***analyzing*** said at least one source infrastructure management component using said description of said target cloud infrastructure to determine that said at least one ***source infrastructure management component*** is appropriate for infrastructure configuration
>
> ….

*Id.,* Cl. 1.  As shown when claims 1 and 18 are read together, the claim language itself connotes sufficient structure such that the "module" terms are not subject to § 112 as means-plus-function limitations: (1) the discovery tool module performs the function of "discovering" using the structure of "***a source computing system having a source management infrastructure***"; (2) the description module performs the function of "***querying***" using the structure of "***a database*** to obtain a description of a target cloud infrastructure"; and (3) the infrastructure comparison engine module executes the function of "***analyzing***" using "said at least one ***source infrastructure management component***" in the manner described in claim 1.  *Id.*.  A POSITA reading the claims therefore would have understood each "module" to refer to the corresponding structural components recited in the claim language itself for carrying out the specified actions.  As such, the recited modules are ***not*** means-plus-function terms subject to § 112, ¶ 6.  *See, e.g.*, *Huawei Techs. Co. v. Verizon Commc'ns, Inc.*, No. 20-cv-0030, 2021 WL 150442, at *12 (E.D. Tex. Jan. 15, 2021) ("receiving module," "processing module," and "generating module" were not means-plus-function terms because "it appears undisputed that the claims are directed to … equipment"); *S3G Techology*, 2017 WL 5178837, at *6 ("dialogue module" not a means-plus-function term because

27

it was understood as referring to "code or instructions"); *Dyfan, LLC*, 28 F.4th at 1366.

Further, even assuming for the sake of argument that these terms were subject to § 112, ¶ 6, the claim language and the specification both provide sufficient corresponding structure for each module by detailing its algorithm, functionality, and interactions. Specifically, the specification describes in detail the corresponding structure for each claimed module: (1) "a ***discovery tool module*** [carries] out functionality 16100 (optionally with sub-modules to carry out 16110, 16120, 16130, and/or 16140)"; (2) "***a description module*** [holds] description 16300 (optionally with sub-data-structures for data 16310, 16320, 16330)"; and (3) "an ***infrastructure comparison engine module*** 16200 (optionally with sub-modules to implement functionality 16210, 16220, 16230, and/or 16240)." Ex. 4 ('858 patent) at 70:33–40. Each row of Fig. 16 also describes the corresponding structure of the respective module and explains its specific algorithmic details, including through charts that identify the components involved:



*Id.*, Fig. 16 (annotated). The intrinsic evidence therefore discloses corresponding structure that is more than sufficient to avoid indefiniteness. *See Panoptis Pat. Mgmt., LLC v. Blackberry Ltd.*, No. 2:16-CV-62-JRG-RSP, 2017 WL 497571, at *5 (E.D. Tex. Feb. 7, 2017) (finding sufficient structure in view of "disclosure of the ***objectives*** of the 'determination unit' and ***how the unit operates*** within the context of the claimed invention"); *AGIS Software Dev., LLC v. Huawei*

28

*Device USA Inc.*, No. 2:17-CV-513-JRG, 2018 WL 4908169, at *11 (E.D. Tex. Oct. 10, 2018) (citing *Noah Sys., Inc. v. Intuit Inc.*, 675 F.3d 1302, 1312 (Fed. Cir. 2012)) ("The specification can express the algorithm in any understandable terms including as a mathematical formula, in prose, or ***as a flow chart,*** or in any other manner that provides sufficient structure.'").  Indeed, as Dr. Stavrou has explained, there is no doubt that a POSITA would have "understood [these] descriptions to provide structure and illustrate the operations involved."  Ex. 7, ¶ 101.  Thus, VirtaMove's indefiniteness argument should be rejected, and the term "module" should be given its plain and ordinary meaning.

### H.    "cloud infrastructure" (Claims 1, 4–6, 8–12, and 19 of the '858 patent)

| **IBM**:<br>Plain and ordinary meaning, which is "a network of interconnected nodes." | **VirtaMove**:<br>Plain and ordinary meaning, which is "an infrastructure comprising a network of interconnected nodes that provides for on-demand self-service, broad network access, resource pooling, rapid elasticity, and measured service providing transparency for both the provider and consumer of the utilized service." |
|---|---|

VirtaMove proposes a needlessly restrictive definition of "cloud infrastructure" that is not helpful to a POSITA in understanding the term.  In fact, VirtaMove's construction runs afoul of the bedrock principle that a term's plain and ordinary meaning should govern where a patentee does not redefine the term or clearly disavow claim scope.  *Thorner*, 669 F.3d at 1365.

VirtaMove appears to base its proposal on the specification's explanation of the five characteristics of "cloud model," ***not*** "cloud infrastructure."  *See* Ex. 4 ('858 patent) at 4:15–47.  But VirtaMove has failed to explain why the terms "cloud model" and "cloud infrastructure" should be treated as synonymous, when "cloud infrastructure" is used more than 60 times in the patents while "cloud model" appears only once, at 4:15–16.  Moreover, even assuming for the sake

of arguments that the two terms have the same meaning, the specification expressly states that the five traits of "cloud model" are merely characteristics that the cloud model "*may* include." *Id.* at 4:15–16.  Because those characteristics are not required, it is improper to include them in a claim construction.  *See Blazer*, 2022 WL 16954848, at \*4 (holding it is improper to limit a claim by reading into it a limitation from a particular embodiment in the written description).

VirtaMove's proposed construction is unduly narrow and overly complicated in view of the '858 patent's simple and understandable description of infrastructure in cloud computing: "A cloud computing environment is service oriented with a focus on statelessness, low coupling, modularity, and semantic interoperability.  ***At the heart of cloud computing*** is an ***infrastructure*** comprising ***a network of interconnected nodes***."  Ex. 4 ('858 patent) at 5:29–33.  Dr. Stavrou has opined that this disclosure reflects the term's plain and ordinary meaning.  *See* Ex 7, ¶ 107.

VirtaMove's proposal is inconsistent with this plain and ordinary meaning of cloud infrastructure as a network of interconnected nodes, because if a network of interconnected nodes satisfies four out of the five characteristics that the specification states a cloud model "*may* include," VirtaMove's construction would lead to the nonsensical conclusion that it is not cloud infrastructure.  Notably, VirtaMove previously conceded that IBM's proposed construction, "a network of interconnected nodes," is an acceptable meaning of "cloud infrastructure," which calls into question why VirtaMove disputed this term in the first instance.  *See* Ex. 5 at 8.

The term "cloud infrastructure" should be given its plain and ordinary meaning as understood by a POSITA, which is "a network of interconnected nodes."

## V.    CONCLUSION

For the reasons set forth above, IBM respectfully requests that VirtaMove's unfounded indefiniteness arguments and improper proposed constructions be rejected in favor of giving the disputed terms their plain and ordinary meanings.

Dated:  February 21, 2025

Respectfully submitted,

/s/ Todd M. Friedman

Todd M. Friedman (*pro hac vice*)
KIRKLAND & ELLIS LLP
601 Lexington Avenue
New York, NY 10022
Telephone:    (212) 446-4800
Facsimile:     (212) 446-4900
Email: todd.friedman@kirkland.com

Brandon H. Brown
California State Bar No. 266347
Kyle Calhoun (*pro hac vice*)
KIRKLAND & ELLIS LLP
555 California Street
San Francisco, CA 94104
Telephone:    (415) 439-1400
Facsimile:     (415) 439-1500
Email: brandon.brown@kirkland.com
Email: kyle.calhoun@kirkland.com

*Of Counsel:*

Andrea L. Fair
Texas State Bar No. 24078488
MILLER FAIR HENRY PLLC
1507 Bill Owens Parkway
Longview, TX 75604
Telephone:    (903) 757-6400
Facsimile:     (903) 757-2323
Email:  andrea@millerfairhenry.com

*Attorneys for Defendant*
*International Business Machines Corp*

## <u>CERTIFICATE OF SERVICE</u>

The undersigned hereby certifies that all counsel of record who are deemed to have consented to electronic service are being served with a copy of this document via the Court's CM/ECF system pursuant to Local Rule CV-5(a)(3) on February 21, 2025.

*/s/ Todd M. Friedman*

Todd M. Friedman