# UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF TEXAS
## MARSHALL DIVISION

| | |
|---|---|
| VIRTAMOVE, CORP., | |
| Plaintiff, | Case No. 2:24-cv-00093-JRG |
| v. | (Lead case) |
| HEWLETT PACKARD ENTERPRISE COMPANY, | **JURY TRIAL DEMANDED** |
| Defendant. | |
| VIRTAMOVE, CORP., | |
| Plaintiff, | Case No. 2:24-CV-00064-JRG |
| v. | (Member case) |
| INTERNATIONAL BUSINESS MACHINES CORP., | **JURY TRIAL DEMANDED** |
| Defendant. | |

## <u>DEFENDANTS' RESPONSIVE CLAIM CONSTRUCTION BRIEF</u>

## TABLE OF CONTENTS

**Page**

I.  INTRODUCTION ..................................................................................................... 1

II. DISPUTED CLAIM TERMS .................................................................................... 1

    A.  The '814 Patent ............................................................................................. 1

        1.  "disparate computing environments" (claim 1) ................................. 2

        2.  "system files" (claims 1, 10) .............................................................. 6

    B.  The '058 Patent ............................................................................................. 8

        1.  "critical system elements" / "operating system critical system elements" / "shared library critical system elements" (claim 1) ........................... 9

        2.  "functional replicas" (claim 1) ......................................................... 15

        3.  "shared library" (claim 1) ................................................................ 19

        4.  "forms a part of the one or more of the plurality of software applications" (cl. 1) ........................................................................ 22

III. CONCLUSION ....................................................................................................... 26

## <u>TABLE OF AUTHORITIES</u>

**Page(s)**

**Cases**

*Abbott Lab'ys v. Sandoz, Inc.*,
    544 F.3d 1341 (Fed. Cir. 2008)............................................................................11

*Abbott Labs. V. Novopharm Ltd.*,
    323 F.3d 1324 (Fed. Cir. 2003)............................................................................25

*Bombardier Recreational Prods., Inc. v. Arctic Cat Inc.*,
    331 F. Supp. 3d 902 (D. Minn. 2018), *aff'd*, 785 F. App'x 858 (Fed. Cir. 2019) ................................................................................................................12

*BookIT Oy v. Bank of Am. Corp.*,
    817 F. App'x 990 (Fed. Cir. 2020) ....................................................................3, 5

*CA, Inc. v. Netflix, Inc.*,
    No. 2:21-CV-00080-JRG-RSP, 2021 WL 5323413 (E.D. Tex. Nov. 16, 2021) (Payne, J.)..........................................................................................................12

*Chimie v. PPG Indus., Inc.*,
    402 F.3d 1371 (Fed. Cir. 2005)............................................................................24

*Clear Imaging Rsch., LLC v. Samsung Elecs. Co.*,
    No. 2:19-cv-0326-JRG, 2020 WL 6384731 (E.D. Tex. Oct. 30, 2020) ...............18

*Comput. Stores Nw., Inc. v. Dunwell Tech, Inc.*,
    No. CV-10-284-HZ, 2011 WL 2160931 (D. Or. May 31, 2011) ..........................17

*Cypress Lake Software, Inc. v. Samsung Elecs. Am. Inc.*,
    382 F. Supp. 3d 586 (E.D. Tex. May 10, 2019)....................................................10

*Dow Chem. Co. v. Nova Chems. Corp. (Canada)*,
    803 F.3d 620 (Fed. Cir. 2015)..............................................................................10

*Edwards Lifesciences LLC v. Cook Inc.*,
    582 F.3d 1322 (Fed. Cir. 2009)............................................................................25

*Geodynamics, Inc. v. Dynaenergetics US, Inc.*,
    No. 2:15-CV-1546-RSP, 2016 WL 6217181 (E.D. Tex. Oct. 25, 2016)...............18

*Grp. One, Ltd. v. Hallmark Cards, Inc.*,
    407 F.3d 1297 (Fed. Cir. 2005)............................................................................21

*Halliburton Energy Servs., Inc. v. M-I LLC*,
    514 F.3d 1244 (Fed. Cir. 2008)............................................................................15

*Intell. Ventures I LLC v. T-Mobile USA, Inc.*,
  902 F.3d 1372 (Fed. Cir. 2018)................................................................10

*Intelligent Agency, LLC v. 7-Eleven, Inc.*,
  No. 4:20-CV-0185-ALM, 2022 WL 760203 (E.D. Tex. Mar. 11, 2022) ................................25

*Interval Licensing LLC v. AOL, Inc.*,
  766 F.3d 1364 (Fed. Cir. 2014)...........................................................9, 15, 18

*JumpSport, Inc. v. Acad., Ltd.*,
  No. 6:17-CV-414-RWS-JDL, 2018 WL 4090471 (E.D. Tex. Aug. 28, 2018).........................7

*Liberty Ammunition, Inc. v. United States*,
  835 F.3d 1388 (Fed. Cir. 2016).............................................................14

*Martek Biosciences Corp. v. Nutrinova, Inc.*,
  579 F.3d 1363 (Fed. Cir. 2009)...................................................1, 3, 7, 20

*NobelBiz, Inc. v. Glob. Connect, L.L.C.*,
  701 F. App'x 994 (Fed. Cir. 2017) .........................................................14

*O2 Micro Int'l Ltd. v. Beyond Innovation Tech. Co.*,
  521 F.3d 1351 (Fed. Cir. 2008)..........................................................14, 23

*Omega Eng'g, Inc. v. Raytek Corp.*,
  334 F.3d 1314 (Fed. Cir. 2003).............................................................25

*Pavo Sols. LLC v. Kingston Tech. Co.*,
  35 F.4th 1367 (Fed. Cir. 2022) ............................................................21

*Personalized Media Commc'ns, LLC v. TCL Corp.*,
  No. 2:17-CV-433-JRG, 2018 WL 3207436 (E.D. Tex. June 29, 2018) ............................20

*Pfizer, Inc. v. Ranbaxy Labs. Ltd.*,
  457 F.3d 1284 (Fed. Cir. 2006).............................................................17

*Phillips v. AWH Corp.*,
  415 F.3d 1303 (Fed. Cir. 2005)........................................................ *passim*

*Profectus Tech. LLC v. Huawei Techs. Co.*,
  No. 6:11-cv-474, 2014 WL 1575719 (E.D. Tex. Apr. 17, 2014), *aff'd*, 823 F.
  3d 1375 (Fed. Cir. 2016).................................................................11

*SkinMedica, Inc. v. Histogen Inc.*,
  727 F.3d 1187 (Fed. Cir. 2013)..........................................................3, 7

*Sonix Tech. Co. v. Publ'ns Int'l, Ltd.*,
  844 F.3d 1370 (Fed. Cir. 2017).............................................................13

*Sta-Rite Indus., LLC v. ITT Corp.*,
    682 F. Supp. 2d 738 (E.D. Tex. 2010) ....................................................................................25

*In re Taasera Licensing LLC, Pat. Litig.*,
    No. 2:22-MD-03042-JRG, 2023 WL 8628323 (E.D. Tex. Dec. 13, 2023) ...............12, 17, 18

*Teva Pharms. USA, Inc. v. Sandoz, Inc.*,
    789 F.3d 1335 (Fed. Cir. 2015)..............................................................................................10

*VirtaMove, Corp. v. Amazon.com, Inc. et al.*,
    No. 7:24-cv-00030-ADA-CTG (W.D. Tex. Nov. 12, 2024), ECF No. 77 .............................25

Vstream Techs., LLC v. PLR Holdings, LLC,
    No. 6:15-CV-974-JRG-JDL, 2016 WL 6159624 (E.D. Tex. Oct. 24, 2016) ............10, 12, 18

*Vstream Techs., LLC v. PLR Holdings*,
    LLC, No. 6:15CV974-JRG-JDL, 2016 WL 6211550 (E.D. Tex. Sept. 27, 2016) ............................................................................................................................10, 12, 18

*Warner-Jenkinson Co. v. Hilton Davis Chem. Co.*,
    520 U.S. 17 (1997)..................................................................................................................18

## I.    INTRODUCTION

There are six disputed terms across the two patents asserted by Plaintiff VirtaMove, Corp. ("VirtaMove") in this case: U.S. Patent Nos. 7,519,814 ("the '814 Patent") and 7,784,058 ("the '058 Patent") (collectively, "Asserted Patents").   The patentee provided unambiguous lexicography that controls the construction of four of the six claim terms—"disparate computing environments" and "system files" in the '814 Patent and "shared library" and "forms a part of the one or more of the plurality of applications" in the '058 Patent.  *See Martek Biosciences Corp. v. Nutrinova, Inc.*, 579 F.3d 1363, 1380 (Fed. Cir. 2009); *Phillips v. AWH Corp.*, 415 F.3d 1303, 1316 (Fed. Cir. 2005). VirtaMove's attacks on these express definitions are not supported by the intrinsic evidence and do not justify departing from the patentee's clear definitions.

For the two remaining terms in the '058 Patent—"critical system element" and "functional replica"—the patentee also provides express lexicography, but provides definitions that leave the terms hopelessly ambiguous. As a result, and as explained in the unrebutted testimony of Defendants' expert (Ex. 1 ("Stavrou Decl.") at 2), the '058 Patent claims fail to inform a skilled artisan of the scope of the claimed subject matter, rendering these claims indefinite.

## II.    DISPUTED CLAIM TERMS

### A.    The '814 Patent

The '814 Patent describes a method of allowing software applications "to be easily moved between platforms," and, specifically, between servers with different operating systems in disparate computing environments.  Dkt. 143-2 ("'814 Pat."), at 1:65-2:3, 3:23-47, 6:59-61.[1] The '814 Patent proposes to use a specific type of "secure application container" to move the applications.  *Id.*, at 2:23-49.  The so-called "secure" containers recited in the claims have specific

---

[1] All references to the '814 Patent are to Dkt. 143-2.

components, including a set of "associated system files" for "use with a local kernel residing permanently on one of the servers." *Id.*, at cl. 1. As the Examiner acknowledged, containers for executing applications on different servers generally were known in the art before the '814 Patent. Ex. 2 ('814 Patent File History), December 10, 2008 Notice of Allowance, at 2 ("…alternatives utilizing resource containers and security containers applied to general-purpose, time-shared operating systems exist, such as the Linux-VServer; Soltesz, S., et al, 'Container-based Operating System Virtualization: A Scalable, High-performance Alternative to Hypervisors', SIGOPS Oper. Syst. Rev., Vol. 41, No. 3. (June 2007) . . . is generally known per se"); *see also id.,* ('814 Patent File History), June 3, 2008, Non-Final Rejection, at 4 & 9 ("The teachings of Forbes et al…whereas the use of software package manager distribution unit containing components for a software package and manifest file (i.e., '… container has …') that supports the installation…"). Ultimately, the independent claims were allowed only after the patentee added several additional limitations, including that (a) the associated system files are "copies or modified copies" of local system files that remain resident on the server; and (b) the application software "cannot be shared" between secure containers.

1.    **"disparate computing environments" (claim 1)**

| VirtaMove's Proposed Construction | Defendants' Proposed Construction |
|---|---|
| environments run by standalone computers | environments where computers are stand-alone or where there are multiple computers and where they are unrelated |

Claim 1 of the '814 Patent recites "a system having a plurality of servers … operating in disparate computing environments." '814 Pat., at cl. 1. The term "disparate computing environments" appears in the preamble, which the parties agree is limiting here. Dkt. 124, at Appx. A. The only dispute is whether "disparate computing environments" should be construed

according to the patentee's express definition in the specification. The answer unequivocally is yes.

"There can be no clearer definitions than those expressly recited in the patent." *BookIT Oy v. Bank of Am. Corp.*, 817 F. App'x 990, 993–94 (Fed. Cir. 2020). Here, Defendants' proposed construction is the exact definition the patentee provided for the term:

> The following definitions are used herein:
> Disparate computing environments: Environments where computers are stand-alone or where there are plural computers and where they are unrelated.

'814 Pat., at 2:16-19. The lexicography is unambiguous—the patentee explicitly defined the term under a "definitions" heading in the specification, making clear that this definition must be "used herein." *Id.* The definition is not only explicit but also entirely consistent with the term's use in the claims. Even VirtaMove acknowledges that the specification's definition is "clear." Dkt. 143, at 1. "When a patentee explicitly defines a claim term in the patent specification, the patentee's definition controls." *Martek*, 579 F.3d at 1380 (collecting cases); *SkinMedica, Inc. v. Histogen Inc.*, 727 F.3d 1187, 1195–96 (Fed. Cir. 2013) (citation omitted) ("If the specification reveals 'a special definition given to a claim term by the patentee that differs from the meaning it would otherwise possess[,] ... the inventor's lexicography governs.'"); *Phillips*, 415 F.3d at 1316 ("[T]he specification may reveal a special definition given to a claim term by the patentee that differs from the meaning it would otherwise possess. In such cases, the inventor's lexicography governs").

VirtaMove now proposes to rewrite its own definition in two ways: (1) by substantively altering one part; and (2) by entirely omitting another part of the definition. Neither has merit.

***First,*** VirtaMove improperly and without explanation substitutes words in the patentee's express lexicography. Specifically, VirtaMove replaces "environments ***where*** computers are stand

alone" ("or <u>where</u> there are multiple computers and where they are unrelated") with "environments ***run by*** standalone computers"—a change that alters the meaning of the term. The phrase "<u>disparate</u> computing environments" in the claim describes the relationship (or lack thereof) between the computing environments, meaning they are unrelated, or stand-alone. This definition is consistent with Figure 1, which illustrates two unrelated servers operating separately and independently, each with its own hardware and operating system. *See* '814 Pat., at Fig. 1; *see also id.*, at 6:59-63 ("Each server includes a processor and an independent operating system. Each operating system includes a kernel 12, hardware 13 in the form of a processor, and a set of associated system files."); *id.*, at 12:5-7 ("The terms [] server and computer are used interchangeably throughout this specification."). Although the parties agree that the computing environments must be disparate, VirtaMove's injection of the new phrase "***run by***" fundamentally changes the claim's meaning by introducing an operational requirement–suggesting that the term is met by a single stand-alone computer simply running an environment rather than multiple computers existing within distinct environments. By replacing "where" with "run by" VirtaMove attempts to eliminate the requirement that computing environments be independent and separate, effectively rewriting the claim scope to introduce a control-based requirement that does not exist anywhere in the patentee's definition. The specification does not support that revision, as it describes applications ***in*** an environment ***on*** a computer (not environments "***run by***" other computers) and explicitly distinguishes ***running*** operations from defining environments. *See e.g., id.*, at 1:27-30 (describing the state of the art creating an "environment where a collection of applications…must be separated with each application installed on an individual computer"), 7:5-6 (describing applications that can "execute in a secure environment"), 9:12-15 ("The default condition, if not customized for a specific container, will start a script that in turn ***runs*** other scripts.

4

A script associated with each application is provided in the container file system"). VirtaMove has not provided any justification for why the Court should deviate from the patent's own definition, and accordingly, the Court should reject this post-issuance attempt to rewrite its patent specification and claims.

**Second**, VirtaMove admittedly "omits" the aspect of the definition specifying that the claim environments are "where there are plural computers and where they are unrelated," arguing (incorrectly) that it would be "inconsistent" to require computers in the claimed "system" to be "unrelated." Dkt. 143, at 2. VirtaMove's only support for this position is the unadjudicated litigation positions of different defendants in co-pending cases in a different district who argued that this term is indefinite. *Id.* But those third parties all ***agreed*** that VirtaMove's lexicography should apply ***in full*** for this term—just as Defendants propose here. *See* Dkts. 143-3, at 3 & 143-4, at 6. VirtaMove cannot rely on third parties' indefiniteness arguments to avoid the patentee's unmistakable intent in defining the term and narrowing its meaning to require that computers (or servers) be "unrelated." In context, the patentee added the definition of "disparate computing environments" in the same prosecution filing that introduced the term to the claim. *Compare* Ex. 2 ('814 Patent File History), September 13, 2004 Non-Provisional Application, at 3 & 31 *with* Exs. 3 ('103 Provisional Filing) & 4 ('619 Provisional Filing). Moreover, a key application of the '814 Patent is to address the problem of managing and supporting applications between disparate platforms. *See* '814 Pat., at 1:65-2:3. In this context, the patentee's intent to apply the full lexicography is clear. VirtaMove simply "cannot revise its invention to suit current litigation needs." *BookIT*, 817 F. App'x at 993–94 (citations omitted).

VirtaMove also argues that Defendants' proposed construction—which, again, is word-for-word identical to the specification's "definition" for that term—"would render the limitation

effectively meaningless, because the 'Solar System' is an 'environment where computers are standalone' and also an environment 'where there are multiple computers and where they are unrelated.'" Dkt. 143, at 2.  VirtaMove's attempted analogy is incoherent—the "environment" as used in the '814 patent and the lexicographic construction is clearly not directed to a planetary environment.  '814 Pat., at 3:29-30 (describing environments as a place where computer applications are executed).  Moreover, unless VirtaMove is aware of servers operating in another star system, its analogy would not actually meet the construction, as it only identifies one "environment" and not multiple "environment*s* where computers are standalone" (or, "where there are multiple computers and where they are unrelated").  The stand-alone, unrelated nature of multiple environments is how the '814 Patent defines "disparate computing environments"—a single environment like the Solar System could not be used to practice the claim.

### 2.    "system files" (claims 1, 10)

| VirtaMove's Proposed Construction | Defendants' Proposed Construction |
|---|---|
| No construction necessary; plain and ordinary meaning. | files provided within[2] an operating system and which are available to applications as shared libraries and configuration files |

The term "system files" is recited throughout claim 1.  '814 Pat., at cl. 1.  As with the first disputed term, the sole issue for this term is whether VirtaMove can depart from the express definition of "system files" in the specification, which is Defendant's construction:

The following definitions are used herein:

System files: System files are files provided within an operating system and which are available to applications as shared libraries and configuration files.

---

[2] Defendants' proposed construction inadvertently used the word "with" rather than "within;" the latter is the term used in the lexicography in the specification.  During the meet-and-confers with Plaintiff, Defendants made clear their intent to use the specification's definition.

*Id.*, at 2:16 & 2:52-54.  Like the first disputed term, the patentee expressly set forth this definition in a dedicated "definitions" section (*id.*) and incorporated it in the same filing that introduced the claim term. *Compare* Ex. 2 ('814 Patent File History), September 13, 2004 Non-Provisional Application, at 3 & 31 *with* Exs. 3 ('103 Provisional Filing) & 4 ('619 Provisional Filing).  Again, this is an unambiguous lexicographic definition, which must control the claim construction.  *Martek*, 579 F.3d at 1380; *SkinMedica*, 727 F.3d at 1195–96; *Phillips*, 415 F.3d at 1316.

VirtaMove again rejects its own lexicography, and instead argues that the term should be given its plain and ordinary meaning.  But that position is legally untenable.  When the patentee explicitly defines a term, the "inventor's lexicography governs" over so-called "plain meaning" no longer governs.  *See Phillips*, 415 F.3d at 1316 (the specification "may reveal a special definition given to a claim term by the patentee that differs from the [plain and ordinary] meaning it would otherwise possess. In such cases, the inventor's lexicography governs.").  The Court should reject VirtaMove attempts to shift the burden to Defendants to prove that the claimed "'system files' lack a plain meaning such that they need an explicit definition.'"  Dkt. 143, at 5.  The decision to define "system files" was not Defendants'—it was the patentee's.  The presumption in favor of a plain and ordinary meaning "does ***not*** arise when the patentee acts as his own lexicographer."  *See JumpSport, Inc. v. Acad., Ltd.*, No. 6:17-CV-414-RWS-JDL, 2018 WL 4090471, at *2 (E.D. Tex. Aug. 28, 2018) (citation omitted).

VirtaMove also raises several strawman arguments to attack the patentee's express definition.  First, VirtaMove argues that the lexicography improperly requires that "***each*** system ***file***"—individually—"need[s] to be ***both*** a shared library and a configuration file." Dkt. 143, at 4.  It does not.  Rather the claim recites system ***files*** (plural), and the express definition of system ***files***

7

(also plural) requires ***both*** "shared libraries ***and*** configuration files"—not that each individual file must simultaneously be both types. '814 Pat., at 2:52-54.  VirtaMove suggests other parts of the patent contradict Defendants' construction by listing configuration files and shared libraries separately.  Dkt. 143, at 2 (citing '814 Pat., at 2:55-3:13).  But after listing the exemplary "configuration files" and "shared libraries," that part of the patent says that "***together*** these shared library and configuration files form system files provided by the operating system."  '814 Pat., at 3:14-16.  That just confirms that ***both*** types of files "together" form "system files."

Then, VirtaMove argues that the term's express definition contradicts embodiments in the specification, which purportedly describe "system files" as including "other files," not just shared library files and configuration files.  *See* Dkt. 143, at 3.  But there is no contradiction.  After explicitly defining system files as those "available to applications as shared libraries and configuration files," the specification provides specific examples of shared libraries and configuration files used in an exemplary Linux Apache operating system.  '814 Pat., at 2:55-3:14.  The specification then states that "there may be any number of other files included as system files."  *Id.,* at 3:16-17.  In the context of the patentee's lexicography and those listed examples, "other files" refers to any number of other shared libraries and configuration files beyond the specifically-listed Linux Apache examples.  Indeed, in the same paragraph Plaintiff cites, the specification makes clear what types of files are "system files": "**together** these ***shared library files*** **and configuration files** **form system files** provided by the operating system."  *Id.*, at 3:14-16.

### B.    The '058 Patent

The '058 Patent addresses software applications that share common resources, including so-called "critical system elements" (or "CSEs").  Dkt. 143-6 ("'058 Pat."), at 1:21-28. [3]  The

---

[3] All references to the '058 Patent are to Dkt. 143-6.

patent addresses limitations in "centralized control" of these CSEs by an operating system, including "conflicts" between multiple applications requesting the same CSEs. *Id.*, at 1:25-32. The purported improvement of the '058 Patent is to minimize such conflicts by replicating CSEs in an operating system and making the replicas available in a "shared library" as so-called "shared library CSEs" (or "SLCSEs") that applications can access. *Id.*, at 2:10-21. The claims of the '058 Patent specifically require that some SLCSEs be "functional replicas" of "OS critical system elements" and that the shared library CSEs "form[] a part of" a software application when accessed by that application from the shared library. *See, e.g., id.*, at cl. 1.

### 1. "critical system elements" / "operating system critical system elements" / "shared library critical system elements" (claim 1)

| VirtaMove's Proposed Construction | Defendants' Proposed Construction |
|---|---|
| any service or part of a service, 'normally' supplied by an operating system, that is critical to the operation of a software application" | Indefinite |

The term "***critical*** system elements" is inherently subjective, as it relates to varying degrees of importance, and neither the intrinsic record nor the relevant art provides any objective standard to guide a POSITA in determining when a service is "critical" to the operation of a software application.[4] It is well-established that "facially subjective claim language without an objective boundary" is indefinite. *Interval Licensing LLC v. AOL, Inc.*, 766 F.3d 1364, 1373 (Fed. Cir. 2014). The objective boundary analysis is straight-forward: to be definite, the claim must inform those of skill in the art what is protected and what is not. *See id.,* at 1371 ("The claims, when read

---

[4] VirtaMove's proposed construction includes the terms "normally supplied" and "critical." Both terms are indefinite under this standard. However, to minimize the number of disputes before the Court, defendants will focus their arguments on the indefiniteness of "critical" as it pertains to the operation of a software application.

in light of the specification and the prosecution history, must provide objective boundaries for those of skill in the art."); *Cypress Lake Software, Inc. v. Samsung Elecs. Am. Inc.*, 382 F. Supp. 3d 586, 610 (E.D. Tex. May 10, 2019); *Vstream Techs., LLC v. PLR Holdings*, LLC, No. 6:15CV974-JRG-JDL, 2016 WL 6211550, at *6–8 (E.D. Tex. Sept. 27, 2016), *report and recommendation adopted*, No. 6:15-CV-974-JRG-JDL, 2016 WL 6159624 (E.D. Tex. Oct. 24, 2016) (finding "sufficiently correct" and "not sufficiently correct" indefinite). A claim is indefinite when the question of infringement hinges upon a subjective determination or the "unpredictable vagaries of any one person's opinion," the claim is indefinite. *Intell. Ventures I LLC v. T-Mobile USA, Inc.*, 902 F.3d 1372, 1381 (Fed. Cir. 2018); *Dow Chem. Co. v. Nova Chems. Corp. (Canada)*, 803 F.3d 620, 625 (Fed. Cir. 2015); *Teva Pharms. USA, Inc. v. Sandoz, Inc.*, 789 F.3d 1335, 1344–45 (Fed. Cir. 2015).

Here, neither the claims nor the specification provides any guidance to a POSITA regarding what makes a system element "critical." The claims do not say what elements are critical, but merely identify components that "hav[e]" or "store[]" critical system elements, that "instance[s]" of critical system elements are "provided" to applications, and that critical system elements "perform[]" (or are "related to") an unspecified "function." '058 Patent, at cl. 1. The specification's definition of "critical system element" that VirtaMove adopts as its proposed construction offers no additional guidance. Rather, the definition is circular, identifying critical system elements as those elements that are critical: "any service or part of a service, 'normally' supplied by an operating system, ***that is critical to the operation of a software application***." '058 Pat., at 6:6–8. That description merely repeats the disputed word ("critical"), and therefore fails to set any bounds for what system elements are critical versus non-critical. The Federal Circuit (and this Court) have repeatedly found that such tautological definitions, which merely restate the term

at issue are not useful for resolving claim construction disputes. *See, e.g.*, *Abbott Lab'ys v. Sandoz, Inc.*, 544 F.3d 1341, 1360 (Fed. Cir. 2008) ("'Claim construction'" is for the purpose of explaining and defining terms in the claims, and usually requires use of words other than the words that are being defined"); *Profectus Tech. LLC v. Huawei Techs. Co.*, No. 6:11-cv-474, 2014 WL 1575719, at *7 (E.D. Tex. Apr. 17, 2014), *aff'd*, 823 F. 3d 1375 (Fed. Cir. 2016) (rejecting construction of "to make active or more active" as "activating," and observing that Plaintiff's circular definition "is simply a recitation of the words the Court is seeking to define").

Nor is the word "critical" a well-known term of art in the context of software applications such that the patent would not need to set a boundary. *See* Ex. 1 (Stavrou Decl.), ¶ 33. On the contrary, the IEEE Dictionary (unrebutted and unaddressed by VirtaMove) defines "criticality" as "[a] *subjective* description of the intended use and application of the system. Software criticality properties *may include safety, security, complexity, reliability, performance, or other characteristics.*" *Id.*, ¶ 47; IBMHPE_VM_000000018. Not only does that definition confirm that whether a system element is "critical" is a subjective determination, but it lists a series of different and themselves subjective properties that a POSITA might need to consider.

Indeed, as Dr. Stavrou explains in his unrebutted testimony, a POSITA could select from any number of considerations to determine criticality, including the intended use of a software application by one user or another, whether the requirements of the service were available through other mechanisms, and what type of fault rises to the level of criticality. *See* Ex. 1 (Stavrou Decl.), ¶¶ 34–38, 46–47. To one user, a service might be "critical" if its unavailability may disrupt the software's functionality. Another user might focus on the service's frequency of use by an application. And yet another user might consider services to be "critical" if they cause performance degradation or directly enable specific features of the application. *See id.* Moreover, even if two

users assessed criticality based on the same property, there is no objective standard for determining the threshold between non-critical and critical. One user could set a threshold for criticality for a given service based on whether it is used once per session by an application whereas another user could set the threshold at five times per session. Given these many possible considerations, the evidence before the Court does not provide any objective boundary for determining criticality as applied to the purported invention.

VirtaMove's own failure to provide a definition of the term "critical" speaks volumes. Rather than point to any definition in the intrinsic record, provide extrinsic support from the art, or even introduce its own definition in its briefing, VirtaMove merely relies on the circular definition that describes "critical system elements" of a software as being "critical" to the software. Dkt. 143, at 5–7; *Vstream Techs.,* 2016 WL 6211550, at *6-8, *report and recommendation adopted*, 2016 WL 6159624 (finding the term "sufficiently correct" indefinite because "[t]he specification does not provide any guidance as to what 'criteria' would be appropriate to determine whether the output was sufficiently correct" and "[t]he extrinsic record indicates that there are not enough objective boundaries to make a person of skill in the art reasonably certain of the meaning of this term."); *In re Taasera Licensing LLC, Pat. Litig.*, No. 2:22-MD-03042-JRG, 2023 WL 8628323, at *20 (E.D. Tex. Dec. 13, 2023) (finding the term "substantially real time" indefinite because Plaintiff "points to nothing that explains where one ends and the other begins."). VirtaMove cannot point to any objective boundary because there is none. The patent's failure to "provide an objective standard to measure against" makes this term indefinite. *CA, Inc. v. Netflix, Inc.*, No. 2:21-CV-00080-JRG-RSP, 2021 WL 5323413, at *14 (E.D. Tex. Nov. 16, 2021) (Payne, J.) (finding indefiniteness where "claim language and specification fail to provide an objective standard for measuring 'minimiz[es/ing],' and 'maximizing'"); *Bombardier Recreational Prods.,*

*Inc. v. Arctic Cat Inc.*, 331 F. Supp. 3d 902, 912 (D. Minn. 2018), *aff'd*, 785 F. App'x 858 (Fed. Cir. 2019) (emphasis added) (term "***natural*** operating position" held invalid because it lacked "sufficiently objective meaning").

Faced with these deficiencies, VirtaMove first incorrectly claims that Dr. Stavrou "acknowledged that criticality of services ***would be*** understandable to a POSITA given the context of both the operating system and software applications[.]" Dkt. 143, at 7 (emphasis in original). Far from acknowledging that a POSITA would understand whether a service is critical or not for a given operating system and applications, Dr. Stavrou specifically stated that such a determination remains wholly "subjective" even in the context of a specific operating system and specific applications, as the "universe of considerations" in identifying criticality is unbounded by the patent and varies widely among those skilled in the art.. *See* Ex. 1 (Stavrou Decl.), ¶¶ 34–38, 47–48. As his unrebutted expert testimony explains, even if a POSITA knew the specific software application or operating system in question, s/he still would have no objective way to determine whether a given software's use of that service is "critical" as recited by the claims. *See id.* (Stavrou Decl.), ¶¶ 34–38, 46–48; *Sonix Tech. Co. v. Publ'ns Int'l, Ltd.*, 844 F.3d 1370, 1377 (Fed. Cir. 2017) ("We have found terms of degree indefinite … when such guidance is lacking."). Dr. Stavrou unequivocally confirmed this unbounded, subjective determination in his deposition. *See, e.g.*, Ex. 5 (Stravrou Dep. Tr.) at 33:11–12 ("Because the term 'critical,' it's a term of degree"); 33:18–21("And at the same time that there is the critical, it requires quantification – it's a term of degree"); 37:8–17 ("In the literature there are many different ways of quantifying what is critical and the degree of criticality … You need to understand basically the different attributes that goes to the word 'critical'"). At bottom, the patent never explains ***how*** that criticality is to be evaluated, nor does it provide any restriction on the variability of the claimed "plurality of software

13

applications" or their respective operations, and unrebutted expert testimony confirms that without such guidance in the patent itself, a person of ordinary skill would be incapable of distinguishing with reasonable certainty between those system elements that are critical and those that are not.

VirtaMove's arguments do nothing to resolve the impossible and improper challenges that a jury will face in having to determine what service constitutes a "critical" system element as required by the '058 patent. Without an objective standard in the intrinsic record, adopting VirtaMove's circular construction would reduce the case to a debate over what it means to be a "critical" service or not, forcing the jury to resolve this claim construction dispute based on competing, yet undefined interpretations of criticality. That is not the proper role of a jury. *See O2 Micro Int'l Ltd. v. Beyond Innovation Tech. Co.*, 521 F.3d 1351, 1360 (Fed. Cir. 2008) (when parties dispute the proper scope of claims, "the court, not the jury, must resolve that dispute"); *NobelBiz, Inc. v. Glob. Connect, L.L.C.*, 701 F. App'x 994, 997 (Fed. Cir. 2017). The Court must be able to assist the jury by resolving this dispute—and it cannot meaningfully do so by adopting VirtaMove's circular definition.

Likewise, the ambiguity of "critical" allows an expert to arbitrarily identify a given service as "critical" in the (unspecified) context of the accused operating system and software applications, while simultaneously deeming the same service non-critical for validity purposes in the context of prior art operating systems and applications. This inconsistency in applying infringement and/or validity analyses to a single, reasonably certain meaning further confirms the indefiniteness of the term. *Liberty Ammunition, Inc. v. United States*, 835 F.3d 1388, 1398 (Fed. Cir. 2016) (finding "reduced area of contact" indefinite where results of infringement analysis varied depending on what baseline contact areas were compared to accused products). Because the intrinsic record, extrinsic record, and VirtaMove itself all fail to provide any clear answer to the question of what

14

constitutes a "critical" system element, a finding of indefiniteness is warranted. *See Interval Licensing LLC*, 766 F.3d at 1371.

### 2. "functional replicas" (claim 1)

| VirtaMove's Proposed Construction | Defendants' Proposed Construction |
|---|---|
| substantial functional equivalents or replacements of kernel functions | Indefinite |

VirtaMove does not meaningfully dispute that the term "functional replicas" likewise lacks the requisite objective boundaries to properly inform a POSITA as to its scope. *See Halliburton Energy Servs., Inc. v. M-I LLC*, 514 F.3d 1244, 1251 (Fed. Cir. 2008) ("Even if a claim term's definition can be reduced to words, the claim is still indefinite if a person of ordinary skill in the art cannot translate the definition into meaningfully precise claim scope.") The phrase is never used within the specification, and only appears in the claim.[5] *See* Ex. 1 (Stavrou Decl.) ¶ 61. Notably, VirtaMove does not argue that "functional replicas" has a plain and ordinary meaning, nor has VirtaMove presented any expert testimony that the term has any recognized meaning in the art, particularly when applied to the allegedly "non-conventional" SLCSEs "of the claimed invention." *See, e.g.,* Dkt. 143, at 5-6. In fact, Defendants' unrebutted expert declaration confirms that no such meaning exists. *See* Ex. 1 (Stavrou Decl.), ¶ 51.

As an initial matter, the patent contradicts the ordinary meaning of the term "replica" by explicitly stating that a "replica" is "preferably ***not*** an exact copy." '058 Patent at 1:66-2:3 (emphasis added), 8:27-32 ("replica" that is "copy of a CSE" is "not a preferred embodiment"). But the specification does not offer any explanation of what similarities or differences between

---

[5] Outside the claim, the only other mention of "functional replica" in the intrinsic record took place during prosecution, when the patentee sought to distinguish a prior art reference merely by reusing the claim language, contending that "[n]owhere does Cabrero et al. disclose the SLCSEs stored in the shared library being *functional replicas* of OSCSEs, or in other words, replacements." Dkt. 143-8 ('058 Patent File History), July 1, 2009 Response at 8 (emphasis added).

system elements are sufficient to be the claimed "replica."  For instance, while stating that a "replica" should have "*similar* attributes" to or "*essentially* a same functionality" as a corresponding CSE, *id.* at 1:66-2:3, 9:49-56, the specification offers no objective measure or threshold for determining which attributes must be similar, the level of similarity is required, or when functionality is "essentially" the same to be considered a replica.  Likewise, the '058 Patent provides that a "replicated CSE may *differ slightly* from its counterpart in the OS," *id.* at 5:26-28, but again offers no explanation or examples as to, for example, how the SLCSE may differ from its OSCSE counterpart, what kinds of differences are covered, or how many or what types of differences would qualify as "slight," versus considerable, or something in between. Without any guidance from the specification, the claim term remains entirely subjective, leaving a POSITA unable to understand the scope of the claims with any certainty (let alone reasonable certainty).

In attempt to avoid indefiniteness, VirtaMove argues that the claim term at issue is "functional replica,' not just 'replica,'" and that its proposed construction for "functional replica" allegedly provides an "important clarification" that saves what it admits is a term of degree.  Dkt. 143, at 8.  But far from providing an "important clarification," VirtaMove's proposal is nothing more than a hodgepodge of words that has nothing to do with the claimed "functional replica." *See id.*

VirtaMove's proposed "definition" of "functional replica" is based on part of a single sentence in the specification describing what the "critical system element library" may include: "The CSE library includes *replicas* or *substantial functional equivalents* <u>*or*</u> *replacements of kernel functions*." '058 Patent at 8:27–29 (emphasis added). Far from providing a scope of "functional replica," that sentence simply offers certain possibilities for what the library can include: 1) "replicas"; or 2) "substantial functional equivalents"; or 3) "replacements of kernel

functions." At best, the patent explains that the term "**replica**[] shall encompass any of these meanings," but makes no effort to explain what the narrower term – **functional** replica – means. '058 Patent at 8:27–29.

Neither the patent nor VirtaMove's brief explains what the modifier "functional" adds to the term "replica." VirtaMove contends that "substantially functional equivalents. . . is logically the broadest" of the definitions of replica, and so incorporates that into its construction. Dkt. 143, at 9 (internal quotations omitted). But there is no basis to assume that a **functional replica** is necessarily broader than a **replica** – indeed, the presence of a modifying word prior to replica indicates that a functional replica is a limited subset of "replica." *See, e.g.*, *Comput. Stores Nw., Inc. v. Dunwell Tech, Inc.*, No. CV-10-284-HZ, 2011 WL 2160931, at *9 (D. Or. May 31, 2011) (explaining that a modifier, such as 'viewing' in the claim term 'viewing hole' must impose a meaningful limitation to the word "hole."). Nothing in the intrinsic or extrinsic record supports VirtMove's claim that a "functional replica" must be a "substantial functional equivalent of a replica," which is instead merely an attempt to rewrite the claim term to preserve validity. *Pfizer, Inc. v. Ranbaxy Labs. Ltd.,* 457 F.3d 1284, 1292 (Fed. Cir. 2006) (noting that courts "should not rewrite claims to preserve validity").

Even under VirtaMove's unsupported contention that a "functional replica" is a "substantial functional equivalent or replacement of kernel functions," VirtaMove's reliance on the phrase "**substantial** functional equivalents" only compounds its indefiniteness problem. "Substantial" is an undefined term of degree, offering no clarity as to what kinds or how much functional equivalence is required to satisfy the claim. *See, e.g.*, *In Re: Taasera Licensing LLC*, 2023 WL 8628323, at *20 (finding term "substantially real time" indefinite, where patent recited both "real time" and "substantially real time" and specification failed to provide "objective

17

guidance to understand difference"); *Geodynamics, Inc. v. Dynaenergetics US, Inc.*, No. 2:15-CV-1546-RSP, 2016 WL 6217181, at *14–16 (E.D. Tex. Oct. 25, 2016) (finding term "substantially equal to the total depth of penetration/(the tunnel)" indefinite where intrinsic evidence failed to define bounds of "substantially equal"). The specification does not resolve this ambiguity. The specification's only other use of the words "substantial" or "substantially" occurs in the sentence: "[T]herefore, a service in the kernel is *substantially* replicated in user mode through the use of shared libraries." '058 Patent 5:29–34. The patent offers no guidance regarding what degree of deviation from the kernel-mode service's function is permissible for a replica to qualify as a "substantial functional equivalent," which is especially problematic because the patentee deviated from ordinary meaning in specifying that replicas are "preferably not an exact copy," as explained above. *See, e.g.*, '058 Patent, at 1:66-2:3. Thus, applying VirtaMove's construction, there are no "objective boundaries" to allow a POSITA to determine when infringement occurs. *Interval Licensing LLC*, 766 F.3d at 1371.

In response, VirtaMove suggests that the Supreme Court's decision in *Warner-Jenkinson* forecloses indefiniteness challenges to the use of "substantially." Dkt. 143, at 9; *see Warner-Jenkinson Co. v. Hilton Davis Chem. Co.*, 520 U.S. 17 (1997). Not so. The decision in *Warner-Jenkinson* relates to the doctrine of equivalents standard, ***not*** whether the term "substantially" is always definite in the context of claim construction. 520 U.S. at 21, 29. Indeed, several courts – including this one – have found that the term "substantially" can render claims indefinite where, as here, the intrinsic evidence lacks clear, objective standards to define the permissible degree of variation. *See, e.g.*, *In Re: Taasera Licensing LLC,* 2023 WL 8628323; *Geodynamics, Inc.*, 2016 WL 6217181; *Vstream Techs., LLC*, 2016 WL 6211550, at *8 (Love, J.) (noting that "sufficiently" is a term of degree akin to "substantially," and finding "sufficiently correct" to be indefinite), *report and recommendation adopted*, 2016 WL 6159624 (Gilstrap, J.); *Clear Imaging Rsch., LLC*

18

*v. Samsung Elecs. Co.,* No. 2:19-cv-0326-JRG, 2020 WL 6384731, at *20-21 (E.D. Tex. Oct. 30, 2020) ("substantially blur free" indefinite because the patents did not provide sufficient guidance to determine the term's scope).

Because the evidence of record fails to provide any objective standard for what constitutes a "functional replica," this term is indefinite.

### 3.    "shared library" (claim 1)

| VirtaMove's Proposed Construction | Defendants' Proposed Construction |
|---|---|
| an application library *whose* code space *is* shared among all user mode applications | an application library code space shared among all user mode applications. The code space is different than that occupied by the kernel and its associated files. The shared library files are placed in an address space that is accessible to multiple applications, wherein an "application library" is "a collection of functions in an archive format that is combined with an application to export system elements |

The disputed term "shared library" is recited in the claims of the '058 Patent in the context of "a shared library having shared library critical system elements (SLCSEs) stored therein." '058 Pat. at cl. 1.  VirtaMove does not dispute the presence of a lexicographical definition for "shared library" in the patent (Dkt. 143, at 12), or that Defendants' construction directly corresponds with the full definition expressly set forth in the specification:

> By way of introduction, a number of terms will now be defined.

> Application library: A collection of functions in an archive format that is combined with an application to export system elements.
> Shared library: An application library code space shared among all user mode applications. The code space is different than that occupied by the kernel and its associated files. The shared library files are placed in an address space that is accessible to multiple applications.

'058 Patent at 6:4–5, 6:46–53 (emphasis added).[6] Under well-established Federal Circuit law, this express lexicography governs. *See Phillips*, 415 F.3d at 1316 ("[T]he specification may reveal a special definition given to a claim term by the patentee that differs from the meaning it would otherwise possess. In such cases, the inventor's lexicography governs."); *Martek*, 579 F.3d at 1380 ("When a patentee explicitly defines a claim term in the patent specification, the patentee's definition controls."); *Personalized Media Commc'ns, LLC v. TCL Corp.*, No. 2:17-CV-433-JRG, 2018 WL 3207436, at *15 (E.D. Tex. June 29, 2018).

The definition of "shared library" as being an "application library code space" finds ample support in the claims and specification of the '058 Patent. As an initial matter, the parties appear to agree that a "code space" refers to a "physical memory space." *See* Br,. at 11 (quoting '058 Pat. at 3:39-45). In this context, in the same ways that a physical brick-and-mortar library is a space where books are stored, the patentee defined and claimed the "shared library" as the physical memory space of a computer where the claimed SLCSEs are stored. '058 Pat. at cl. 1 ("a shared library ***having shared library critical system elements (SLCSEs) stored therein***.") (emphasis added). This logical and common sense understanding of the patentee's lexicography rebuts VirtaMove's conclusory argument that a "code space" being a "physical memory space" somehow "contradicts the notion that a shared library is *defined* as 'an application library code space.'" Dkt. 143, at 11-12. VirtaMove improperly attempts to override the patent's express definition by relying on a provisional application whose content materially differs from the actual patent specification, and claiming to correct alleged "typographical errors." *See* Dkt. 143, at 11–12. However, VirtaMove fails to demonstrate that this is an obvious typographical mistake warranting

---

[6] The term "shared library" encompasses "application library," which is another term with a lexicographic definition. Defendants' construction nests the application library definition into the shared library definition.

a departure from the patentee's clear, lexicographic definition. District courts can correct only "obvious minor typographical and clerical errors in patents." *Pavo Sols. LLC v. Kingston Tech. Co.*, 35 F.4th 1367, 1373 (Fed. Cir. 2022).  Importantly, "[c]orrection is appropriate '***only if*** (1) the correction is not subject to reasonable debate based on consideration of the claim language and the specification and (2) the prosecution history does not suggest a different interpretation of the claims.'" *Id*. (quoting *Grp. One, Ltd. v. Hallmark Cards, Inc.*, 407 F.3d 1297, 1303 (Fed. Cir. 2005)). "The error must be 'evident from the face of the patent' ... and the determination 'must be made from the point of view of one skilled in the art[.]'" *Pavo Sols., LLC,* 35 F. 4th at 1373 (quoting *Grp. One,* 407 F.3d at 1303.

The definition as written is coherent and deliberate, particularly given that operating systems contain distinct types of code spaces, some of which are specifically designed to store shared libraries. The fact that a separate definition, addressing a different type of library, includes the additional words VirtaMove seeks to insert does not indicate a typographical error. Rather, it reflects intentional selectivity–a deliberate effort to provide greater specificity regarding the type of code space in which the shared library resides.

VirtaMove's proposed construction fundamentally alters the claim's scope. The patentee's lexicographic definition explicitly requires that the code space be an "application library code space," or in other words, that the "shared library" be a specific type of physical memory space for storing specific kinds of things (which the claim then expressly identifies as SLCSEs). VirtaMove's proposed revision, however, broadens the scope, to be something (application library) that merely has a shared code space associated with it in some way. This broadening allows the code space to encompass any shared code space, thereby contradicting the express limitation in the original definition, and changes the core of the definition from referring to a physical

memory space to something that has a physical memory space associated with it. Moreover, even if the Court was to entertain VirtaMove's typographical error argument, VirtaMove fails to justify why the alleged "correction" would require truncating the remainder of the express definition provided by the patentee.

This is not an effort to correct an error—it is an attempt to rewrite the claim language after the fact. The Court should reject this improper attempt to retroactively alter the patent's clear and express definition. Because "the inventor's lexicography governs," VirtaMove can neither rewrite nor delete any portions of the specification's express definition. *Phillips*, 415 F.3d at 1316.

4. **"forms a part of the one or more of the plurality of software applications" (cl. 1)**

| VirtaMove's Proposed Construction | Defendants' Proposed Construction |
|---|---|
| No construction necessary; plain and ordinary meaning. | Literally form a part of the application such that it resides in the same address space as application code, in contrast to a proxy that is exclusive of the application |

This term appears in a longer phrase describing the result of a software application accessing an SLSCE: "when one of the SLCsEs[sic] is accessed by one or more of the plurality of software applications it ***forms a part of the one or more of the plurality of software applications***."'058 Pat., at cl. 1. Defendants' construction is directly from the prosecution history, in which the patentee distinguished prior art by explaining that the "forms a part of…" phrase imposes two key requirements: (1) the SLCSE must "literally form part of the application;" and (2) it must "reside in the same address space as application code, in contrast to a proxy exclusive of the application." Dkt. 143-8, at 33. Notably, VirtaMove concedes that Defendants' construction is the correct meaning of the "forms a part of…" term. Dkt. 143, at 10 (agreeing that SLCSEs must "reside in the same address space as application code" when accessed and cannot be "exclusive of the application").

Notwithstanding the parties' substantive agreement, VirtaMove asks the Court not to construe it, because VirtaMove claims that the agreed requirements from the prosecution history are purportedly already inherent and understood in the term itself. *Id.* The term at issue—an SLSCE that "forms a part of the one or more of the plurality of software applications"—and its agreed meaning are far from well understood concepts to a lay jury. Indeed, contradicting VirtaMove's contention that the agreed-upon meaning is "just a reinforcement of plain meaning of the literal claim language," the patentee had to explicitly clarify the meaning of the term in order to respond to the Examiner's own, ***different*** understanding. Dkt. 143-8, at 33, 57 (the Examiner finding that O'Rourke's user mode "proxies" "form[ed] a part of…" a software application ("controlling agent") when the application accesses the proxies), 33 (patentee disagreeing with the Examiner's understanding and distinguishing O'Rourke's proxies as not satisfying the "forms a part of…" limitation). Adopting the meaning the patentee ascribed to this technical term during prosecution (which VirtaMove does not dispute) will clarify its scope and avoid later disputes. *See O2 Micro Int'l Ltd. V. Beyond Innovation Tech. Co.*, 521 F.3d 1351, 1360 (Fed. Cir. 2008) ("When the parties raise an actual dispute regarding the proper scope of these claims, the court, not the jury, must resolve that dispute."). Construing the term will avoid a dispute about whether a SLCSE can "form a part of" an application if it runs in a context "exclusive of the application." It cannot, as the prosecution history states and VirtaMove agrees, and the jury should not be required to determine this claim scope. Dkt. 143, at 10.

Although the Court can construe the term based on the parties' agreement alone, the statements also reflect a clear and unmistakable intent to distinguish the O'Rourke prior art and disclaim the Examiner's original understanding of the scope of the "forms a part of…" term. In particular, during prosecution, the patentee distinguished the claimed invention from prior art (the

"O'Rourke" reference) by arguing that O'Rourke's "controlling agents" do not disclose that "when one of the SLCSEs is accessed…it forms a part of the application." To support this distinction, the patentee clarified that the phrase "forms a part of…" imposes two key requirements: (1) the SLCSE must "literally form part of the application;" and (2) it must "reside in the same address space as application code, in contrast to a proxy exclusive of the application.[7]" Based on this argument, the patentee overcame the Examiner's rejection. Defendants' proposed construction is drawn directly from the prosecution history.

```
al., Col. 10, lines 33-40, for example).  Indeed, the
controlling agent 44 fails to disclose that when one of the
SLCSEs is accessed by one or more of the plurality of software
applications, it forms a part of the one or more of the
plurality of software applications.  In other words, the SLCSEs
literally form part of the application.  SLCSEs reside in the
same address space as application code, in contrast to a proxy
that is exclusive of the application.
```

Dkt. 143-8, at 33 (annotations added).

The patentee's statements in response to the O'Rourke rejection constitute a clear and unambiguous disclaimer that narrows the scope of the "forms a part" limitation. It is well-established that "where the patentee has unequivocally disavows a particular claim scope to obtain a patent, prosecution disclaimer applies, narrowing the ordinary meaning of the claim." *Chimie v. PPG Indus., Inc.*, 402 F.3d 1371, 1384 (Fed. Cir. 2005); *Sta-Rite Indus., LLC v. ITT Corp.*, 682 F. Supp. 2d 738, 744 (E.D. Tex. 2010) (citing *Omega Eng'g, Inc. v. Raytek Corp.*, 334 F.3d 1314,

---

[7] The '058 Patent file history repeatedly confirms that a proxy merely acts as an intermediary, rather than functioning as part of the application itself. *See* Dkt. 143-8, January 5, 2010 Response at 9 ("[T]he user mode proxy filter is not a functional replica, but merely acts as an intermediary to the kernel mode filters."), 13 (same), 16 (same), 17 (same).

1323 (Fed. Cir. 2003) ("The doctrine of prosecution history disclaimer 'limits the interpretation of claims so as to exclude any interpretation that may have been disclaimed or disavowed during prosecution in order to obtain claim allowance.'")). Indeed, VirtaMove does not dispute that the patentee made these statements specifically to distinguish the claims from prior art. *See* Dkt. 143, at 10; *see also* Ex. 6 (Plaintiff's Responsive Claim Construction Brief, *VirtaMove, Corp. v. Amazon.com, Inc. et al.*, No. 7:24-cv-00030-ADA-CTG (W.D. Tex. Nov. 12, 2024), ECF No. 77)), at 16 ("The applicant distinguished prior art on the basis that the prior art's disclosure of a 'proxy' was not an SLCSE because it did not 'reside in the same address space as application code.'"). That disclaimer of scope—excluding "proxies" from the claim and requiring that SLCEs must literally form a part of an application and reside in the same code space as application code—led to the claim's allowance and informs the meaning of this claim term.[8]  Dkt. 143-8, at 8-17 (allowing claims immediately subsequent to submission of patentee's remarks).

Finally, VirtaMove's suggestion that the word "literally" is superfluous and should be excluded from the construction is unsupported.  *See* Dkt. 143, at 11.  The patentee used the term "literally" precisely to distinguish the software functionality that the Examiner initially found to meet the limitation—a "proxy that is exclusive of the application." Dkt. 143-8, at 33.  "Literally" is thus a substantive limitation and not an "undue emphasis" of the term because it explains the patentee's intent to distinguish a proxy, which although accessed by an application, does ***not*** form a part of the application.

_____

[8] This explanatory phrase—introduced after the claim term and the introductory phrase "In other words"—is also definitional.  *See Intelligent Agency, LLC v. 7-Eleven, Inc.*, No. 4:20-CV-0185-ALM, 2022 WL 760203, at *31-32 (E.D. Tex. Mar. 11, 2022); *see also Edwards Lifesciences LLC v. Cook Inc.*, 582 F.3d 1322, 1334 (Fed. Cir. 2009) ("[U]se of 'i.e.' signals an intent to define the word to which it refers."); *Abbott Labs. V. Novopharm Ltd.*, 323 F.3d 1324, 1330 (Fed. Cir. 2003) (holding that a patentee "explicitly defined" a term by using "i.e." followed by an explanatory phrase).

Given the clear disclaimer and the lack of any substantive dispute, Defendants' proposed construction must be applied.

## III.    CONCLUSION

For the reasons set forth above, we respectfully request that the Court adopt Defendants' constructions and indefiniteness positions.

<table>
<tr><td>Dated:  March 7, 2025</td><td>By:  <em>/s/ Todd M. Friedman</em></td></tr>
</table>

Todd M. Friedman (admitted *pro hac vice*)
KIRKLAND & ELLIS LLP
601 Lexington Avenue
New York, NY 10022
Telephone:    (212) 446-4800
Facsimile:    (212) 446-4900
Email: todd.friedman@kirkland.com

Brandon H. Brown
California State Bar No. 266347
Kyle Calhoun (admitted *pro hac vice*)
KIRKLAND & ELLIS LLP
555 California Street
San Francisco, CA 94104
Telephone:    (415) 439-1400
Facsimile:    (415) 439-1500
Email: brandon.brown@kirkland.com
Email: kyle.calhoun@kirkland.com

*Of Counsel:*

Andrea L. Fair
Texas State Bar No. 24078488
Email: andrea@millerfairhenry.com
MILLER FAIR HENRY PLLC
1507 Bill Owens Parkway
Longview, TX 75604
Telephone:    (903) 757-6400
Facsimile:    (903) 757-2323

*ATTORNEYS FOR DEFENDANT*
*INTERNATIONAL BUSINESS MACHINES*
*CORP.*

Dated:  March 7, 2025

By:  */s/ Katharine Burke*
Jennifer H. Doan
Texas Bar No. 08809050
Joshua R. Thane
Texas Bar No. 24060713
Haleigh Hashem
Texas Bar No. 24142230
HALTOM & DOAN
2900 St. Michael Drive, Suite 500
Texarkana, TX 75503
Telephone: (903) 255-1000
Email: jdoan@haltomdoan.com
Email: jthane@haltomdoan.com
Email: hhashem@haltomdoan.com

Katharine Burke (Lead Attorney)
DC Bar Number: 985333
Katharine.burke@bakerbotts.com
Samuel L. Kassa
DC Bar Number: 187255
Sam.kassa@bakerbotts.com
BAKER BOTTS L.L.P.
700 K Street, N.W.
Washington, DC 20001-5692
Tel: (202) 639-7700
Fax: (202) 639-7890

Douglas M. Kubehl
Texas Bar No. 00796909
Doug.kubehl@bakerbotts.com
Morgan Mayne
Texas Bar No. 24084387
Morgan.mayne@bakerbotts.com
Emily Deer
Texas Bar No. 24116352
Bethany Salpietra
Texas Bar No. 24097699
BAKER BOTTS L.L.P.
2001 Ross Avenue, Suite 900
Dallas, TX 75201-2980
Tel: (214) 953-6500
Fax: (214) 953-6503

David Lien (*pro hac vice*)
California Bar No. 313754
David.lien@bakerbotts.com

27

BAKER BOTTS L.L.P.
1001 Page Mill Road, Building One, Suite 200
Palo Alto, CA 94304-1007
Tel: (650) 739-7563
Fax: (650) 739-7663

*Attorneys for Defendant Hewlett Packard Enterprise Company*

## CERTIFICATE OF SERVICE

The undersigned hereby certifies that all counsel of record who are deemed to have consented to electronic service are being served with a copy of this document via the Court's CM/ECF system pursuant to Local Rule CV-5(a)(3) on March 7, 2025.

By: */s/ Todd M. Friedman*

Todd M. Friedman