# UNITED STATES DISTRICT COURT
# FOR THE EASTERN DISTRICT OF TEXAS
# MARSHALL DIVISION

| | | |
|---|---|---|
| VIRTAMOVE, CORP., | § | Case No. 2:24-cv-00093-JRG |
| | § | (Lead Case) |
| Plaintiff, | § | |
| | § | |
| v. | § | **JURY TRIAL DEMANDED** |
| | § | |
| HEWLETT PACKARD ENTERPRISE COMPANY, | § | |
| | § | |
| | § | |
| Defendant. | § | |
| | § | |

| | | |
|---|---|---|
| VIRTAMOVE, CORP., | § | Case No. 2:24-cv-00064-JRG |
| | § | (Member Case) |
| Plaintiff, | § | |
| | § | |
| v. | § | **JURY TRIAL DEMANDED** |
| | § | |
| INTERNATIONAL BUSINESS MACHINES CORP., | § | |
| | § | |
| | § | |
| Defendant. | § | |
| | § | |
| | § | |

## DEFENDANT INTERNATIONAL BUSINESS MACHINES CORP.'S OPPOSITION TO PLAINTIFF VIRTAMOVE'S MOTION FOR SUMMARY JUDGMENT OF IBM'S SIXTH, SEVENTH, EIGHTH AND ELEVENTH AFFIRMATIVE DEFENSES

## TABLE OF CONTENTS

**Page**

I.  INTRODUCTION ................................................................................ 1

II. RESPONSE TO STATEMENT OF THE ISSUES TO BE DECIDED BY THE COURT .................................................................................. 2

III. RESPONSE TO VIRTAMOVE'S STATEMENT OF UNDISPUTED MATERIAL FACTS ......................................................................... 2

    A.  Additional Facts Relating to Paragraphs 1–11 of VirtaMove's Statement of Undisputed Facts .................................................... 3

    B.  IBM Disputes Paragraph 12 of VirtaMove's Statement of Undisputed Facts Stated ................................................................ 5

    C.  Additional Facts Regarding Paragraph 13 of VirtaMove's Statement of Undisputed Facts .................................................... 6

    D.  Additional Facts Regarding Paragraphs 14–20 of VirtaMove's Statement of Undisputed Facts .................................................... 6

    E.  Additional Facts Regarding Paragraphs 21-22 of VirtaMove's Statement of Undisputed Facts .................................................... 9

IV. LEGAL STANDARD FOR SUMMARY JUDGMENT ................................ 12

V.  ARGUMENT .................................................................................. 13

    A.  IBM Has Presented Evidence Showing It Has an Express License Under the 2014 IBM Assistance Agreement. ............................ 13

    B.  IBM Has Presented Evidence Supporting Its Affirmative Defense Of Inequitable Conduct. ............................................................ 20

    C.  IBM Has Presented Evidence Supporting Its Affirmative Equitable Defenses of Waiver, Acquiescence, and Unclean Hands. ........................ 25

    D.  VirtaMove's Challenge to IBM's Marking Defense Is Moot. .................. 29

VI. CONCLUSION ............................................................................... 30

## TABLE OF AUTHORITIES

**Cases**                                                                          **Page(s)**

*222 Bloomingdale Rd. Assocs. v. NYNEX Props. Co.*,
   703 N.Y.S.2d 737 (N.Y. App. Div. 2000) ....................................................................15, 17

*Ampower-US, LLC v. WEG Transformers USA, LLC*,
   214 A.D.3d 1129 (N.Y. App. Div. 2023) ...............................................................................17

*Anderson v. Liberty Lobby, Inc.*,
   477 U.S. 242 (1986)..............................................................................................................12

*Ashe v. Corley*,
   992 F.2d 540 (5th Cir. 1993) ................................................................................................25

*ATD Corp. v. Lydall, Inc.*,
   159 F.3d 534 (Fed. Cir. 1998)...............................................................................................22

*Aventis Pharma S.A. v. Hospira, Inc.*,
   675 F.3d 1324 (Fed. Cir. 2012).............................................................................................20

*Celotex Corp. v. Catrett*,
   477 U.S. 317 (1986)..............................................................................................................25

*Commil USA, LLC v. Cisco Sys., Inc.*,
   575 U.S. 632 (2015)..............................................................................................................30

*Conan Props., Inc. v. Conans Pizza, Inc.*,
   752 F.2d 145 (5th Cir. 1985) ................................................................................................27

*Consol. Aluminum Corp. v. Foseco Int'l, Ltd.*,
   910 F.2d 804 (Fed. Cir. 1990)...............................................................................................29

*Digital Control, Inc. v. Charles Mach. Works*,
   437 F.3d 1309 (Fed. Cir. 2006).............................................................................................20

*EIS, Inc. v. IntiHealth Ger GmbH*,
   No. CV 19-1227-GBW, 2023 WL 6799332 (D. Del. Aug. 23, 2023)...................................22

*Equistar Chems., LP v. Westlake Chem. Corp.*,
   No. 6:14-CV-68, 2016 WL 4373713 (E.D. Tex. Feb. 26, 2016)...........................................28

*Ethicon Endo-Surgery, Inc. v. Covidien, Inc.*,
   No. 1:11-CV-871, 2013 WL 12178114 (S.D. Ohio Oct. 2, 2013) ........................................22

*Feifer v. Prudential Ins. Co. of Am.*,
　306 F.3d 1202 (2d Cir. 2002) .......................................................................15, 17

*Gilead Scis., Inc. v. Merck & Co.*,
　888 F.3d 1231 (Fed. Cir. 2018) ..............................................................................28

*Headwater Rsch. LLC v. AT&T Inc.*,
　No. 2:23-CV-397-JRG-RSP, Dkt. 242 (E.D. Tex. July 7, 2025) ............................27

*Intell. Ventures II LLC v. Sprint Spectrum, L.P.*,
　No. 2:17-CV-00662-JRG-RSP, 2019 WL 2959568 (E.D. Tex. Apr. 18, 2019),
　*R&R adopted*, No. 2:17-CV-00661-JRG-RSP, 2019 WL 1987204 (E.D. Tex.
　May 6, 2019) ............................................................................................................15

*JumpSport, Inc. v. Acad., Ltd.*,
　No. 6:17-CV-414-RWS-JDL, 2018 WL 10124888 (E.D. Tex. Sept. 6, 2018) ........27

*Kabushiki Kaisha Hattori Seiko v. Refac Tech. Dev. Corp.*,
　690 F. Supp. 1339 (S.D.N.Y. 1988) ..................................................................14, 15

*Keystone Driller Co. v. Gen. Excavator Co.*,
　290 U.S. 240 (1933) ................................................................................................28

*M. Eagles Tool Warehouse, Inc. v. Fisher Tooling Co.*,
　439 F.3d 1335 (Fed. Cir. 2006) ..............................................................................20

*Mars, Inc. v. TruRx LLC*,
　No. 6:13-CV-526-RWS-KNM, 2016 WL 4034789 (E.D. Tex. Mar. 1, 2016) .........26, 27

*Martinez v. Bally's La., Inc.*,
　244 F.3d 474 (5th Cir. 2001) ..................................................................................12

*Moore v. Kopel*,
　653 N.Y.S.2d 927 (N.Y. App. Div. 1997) .........................................................14, 17

*Norman v. Bodum USA, Inc.*,
　44 F.4th 270 (5th Cir. 2022) ...................................................................................12

*Novosteel SA v. U.S., Bethlehem Steel Corp.*,
　284 F.3d 1261 (Fed. Cir. 2002) ..............................................................................15

*Pennzoil-Quaker State Co. v. Miller Oil & Gas Operations*,
　779 F.3d 290 (5th Cir. 2015) ..................................................................................28

*Precision Instrument Mfg. Co. v. Auto. Maint. Mach. Co.*,
　324 U.S. 806 (1945) ................................................................................................29

*Raytheon Co. v. Indigo Sys. Corp.*,
  No. 4:07-CV-109, 2009 WL 2744057 (E.D. Tex. Aug. 25, 2009) .........................................27

*SB IP Holdings, LLC v. Vivint, Inc.*,
  No. 4:20-CV-00886, 2023 WL 5615780 (E.D. Tex. Aug. 30, 2023) .....................................20

*Shmaltz Brewing Co. v. Dog Cart Mgmt. LLC*,
  163 N.Y.S.3d 659 (N.Y. App. Div. 2022) .............................................................................17

*Sprint Commc'ns Co. L.P. v. Charter Commc'ns, Inc.*,
  No. CV 17-1734-RGA, 2021 WL 982726 (D. Del. Mar. 16, 2021) ......................................29

*Therasense, Inc. v. Becton, Dickinson & Co.*,
  649 F.3d 1276 (Fed. Cir. 2011)..............................................................................................29

*Therasense, Inc. v. Becton, Dickinson & Co.*,
  864 F. Supp. 2d 856 (N.D. Cal. 2012) ...................................................................................22

*VirnetXInc. v. Apple Inc.*,
  925 F. Supp. 2d 816 (E.D. Tex. 2013), *aff'd in part, vacated in part, rev'd in
  part sub nom. on other grounds by Virnetx, Inc. v. Cisco Sys., Inc.*, 767 F.3d
  1308 (Fed. Cir. 2014)..............................................................................................................30

**Statutes**

35 U.S.C. § 287...............................................................................................................................29

**Rules**

FED. R. CIV. P. 56(a) ......................................................................................................................12

**Other Authorities**

MPEP § 2001.06(a).........................................................................................................................21

## I.    INTRODUCTION

VirtaMove, Corp.'s ("VirtaMove")[1] motion for summary judgment on IBM's Affirmative Defenses (the "Motion")—concerning express license, inequitable conduct, equitable defenses, and marking—should be denied in its entirety. As to IBM's meritorious license defense, in its co-pending motion, IBM has presented evidence and legal support demonstrating that it is affirmatively licensed to use the accused technology under the parties' 2014 Assistance Agreement (the "Assistance Agreement"). Dkt. 240. Indeed, VirtaMove's Motion confirms that there are no factual disputes precluding grant of IBM's request for summary judgment, and instead relies only on a mischaracterization of law and attempted rewrite of the parties' license agreement. Accordingly, this Court may deny VirtaMove's Motion and grant IBM's co-pending motion for summary judgment on the license defense.

VirtaMove's other motions should likewise be denied. IBM has also presented ample factual and expert evidence in support of its inequitable conduct defense. That evidence includes that the '814 Patent applicants (the "Applicants") failed to disclose to the USPTO (1) statements made to the European Patent Office during prosecution of the European counterpart to the '814 Patent, that directly contradict representations made to the USPTO; and (2) material prior art—specifically Solaris and Solaris Zones.

VirtaMove's Motion also fails to address the substance of IBM's equitable defenses asserted in IBM's Eighth Affirmative Defense. VirtaMove's argument relies on a mischaracterization of the discovery record, where IBM plainly lays out the facts and substance of its waiver, acquiescence, and unclean hands defenses.  VirtaMove's attempt to self-select from the

---

[1]    VirtaMove was previously known as "Trigence" and "AppZero."  As used herein "Trigence," "AppZero," or "VirtaMove" refer to the same entity.

record to justify summary judgment should be denied.

Finally, given the Court's finding that the '058 Patent is invalid as a result of the indefiniteness of "functional replicas" (Dkt. 222), IBM's defenses against the '058 Patent are mooted and need not be resolved at this juncture.

## II.      RESPONSE TO STATEMENT OF THE ISSUES TO BE DECIDED BY THE COURT

1.      Whether VirtaMove's motion for summary judgment on IBM's License Defense should be denied because IBM has presented evidence showing that it was granted an express license to the accused technology under the 2014 IBM Assistance Agreement.

2.      Whether VirtaMove's motion for summary judgment on IBM's Inequitable Conduct Defense should be denied because IBM has presented evidence that the '814 Patent applicants: (a) withheld material statements made to the European Patent Office during the prosecution of the '814 Patent's European counterpart that directly contradicted representations they made to the USPTO; and (b) failed to disclose material prior art to the USPTO.

3.      Whether VirtaMove's motion for summary judgment regarding IBM's Equitable Defenses—including waiver, acquiescence, and unclean hands—should be denied because IBM has presented facts and evidence supporting each of those defenses.

4.      Whether VirtaMove's motion for summary judgment on IBM's Marking Defense should be denied as moot.

## III.     RESPONSE TO VIRTAMOVE'S STATEMENT OF UNDISPUTED MATERIAL FACTS

IBM does not dispute the accuracy of the facts stated in paragraphs 1–11, 13–21 of VirtaMove's Statement of Undisputed Facts. However, even if the limited facts set forth in those paragraphs captured the full scope of the factual circumstances relevant to VirtaMove's Motion—which they do not—those facts do not support VirtaMove's request for summary judgment. To

articulate the full set of relevant facts, IBM submits the following additional statement of undisputed material facts.

**A.    Additional Facts Relating to Paragraphs 1–11 of VirtaMove's Statement of Undisputed Facts**

1.    On May 5, 2006, the European Patent Office ("EPO") issued its first rejection of EP04021916.4—the European counterpart to the '814 Patent's application—in view of Schaefer. Dkt. 227-3 at "EPO First Rejection." The EPO determined that the only distinction between Schaefer and proposed Claim 1 was that the claimed unique identity included one or more network parameters. *Id.* at -1543–44. However, the EPO concluded that these network parameters were "widely used" in the field and represented a "common practise used to identify resources (including services) across global networks." *Id.* at -1554, -1594. As a result, the EPO determined that the claimed invention would be obvious to a person of ordinary skill in the art. *Id.* at -1541, -1547.

2.    On August 18, 2006, the Applicants responded to the EPO's First Rejection by amending Claims 1–17 to attempt to distinguish the claimed invention from Schaefer. *Id.*  at -1549–60. For example, the Applicants amended Independent Claim 1, explaining that "[n]ew claim 1 has been clarified to reflect differences between [Schaefer] and the present invention more precisely."  *Id.* at -1552.  The Applicants argued that the amended Claim "differs from … [Schaefer]" by requiring "a unique identifier [that] identifies each container and the application associated therewith," and asserted that "[n]o such unique identifier for both the container and the applications associated therewith is disclosed in [Schaefer]." *Id.* The Applicants also stated that under the amended Claim 1, "a unique identity is provided to each of the plurality of the containers," and that "[a]n application executing in the container environment uses the identity of the container as opposed to the identity that would otherwise be provided by the operating system."

*Id.* at -1556. Finally, the Applicants contended that amended Claim 1 was inventive because it enabled applications to run on different operating systems, even if not originally designed for them. *See id.* at -1553–57. The Applicants stated that "[i]n order to achieve this, the present invention uses containers, wherein executable applications are associated with containers and share a unique identity with these containers so they may be attributed to the correct container without problems." *Id.* at -1553.

3.     On March 31, 2008, following the EPO's Second Rejection, the Applicants argued that Claim 1 requires "each container of application software [to have] its own unique identity," and that "the application software has an identity of a container that it is associated with[]"—a feature they contended "differs significantly" from what was described in the EPO's official communication. Dkt. 227-3 at -1575–76. The Applicants further emphasized that "these features are indeed important for the capability of the instant invention to make it possible for applications to be executed on an operating system for which they were not intended or programmed." *Id.* at -1576. The Applicants asserted that "all of these features … together allow an application to run under an operating system for which the application was not intended" and reiterated that "each container of application software, a unique application object, has its own unique identity." *Id.* at -1577. The Applicants also stated that the claimed invention "provides secure containers of application software which each have a unique identifier and which each have the required files as defined in the claims, so as to be able to operate on different operating systems for which the application was not originally intended to run." *Id.* To distinguish the invention from Schaefer, the Applicants specifically relied on the use of "secure container of application software" that "utilize[s] its own unique network identity where that identity is independent of the OS"—a capability the Applicants contended is absent from both Schaefer and other prior art. *Id.* at -1579.

4.      The '814 Patent's applicants did not submit their responses to the EPO's rejections to the USPTO, nor did they amend Claim 1 of the '814 Patent to include the requirement that each container have its own "unique identity." *See* Dkt. 227-4.

**B.      IBM Disputes Paragraph 12 of VirtaMove's Statement of Undisputed Facts Stated**

5.      In paragraph 12 of its Statement of Undisputed Facts, VirtaMove asserts that "[t]he inventors do not know whether Solaris Zones (which is the alleged prior art feature in Solaris 10) existed before the '814 Patent's provisional applications." Dkt. 227 at 4. The '814 Patent claims priority to two provisional applications: No. 60/512,103 (filed on October 20, 2003) and No. 60/502,619 (filed on September 15, 2003). Dkt. 227-2 at Cover.

6.      Contrary to VirtaMove's purported statement of facts, evidence suggests that the inventors knew or should have known about Solaris Zones before the '814 Patent's provisional applications (or during the prosecution of the '814 Patent). Solaris Zones—and Solaris Containers—were described or otherwise identified in several publicly available articles that predate both provisional applications. *See, e.g.*, Ex. 1 (December 17, 2002 article regarding "Solaris Containers"); Ex. 2 (April 9, 2003 article regarding "Solaris Zones"); Ex. 3 (May 19, 2003 article regarding "Solaris Zones").

7.      Moreover, in 2003, Trigence had business interactions with Sun Microsystems— the creator of Solaris.  *See* Ex. 4 at -8704 (December 2003 Trigence Business Plan, "███████ ████████████████████████████████████████████████████████████████.").

8.      Evidence shows the '814 Patent's inventors were aware of Solaris Zones during the prosecution of the '814 Patent, including before the filing of the '814 Patent Application. *See* Exs. 5–11; Ex. 12 at 27:3–27:21, 88:17–89:1; Ex. 13 at 308:20–309:4; Ex. 14 at 284:23–287:24; *see also* Exs. 15–19.

9.      On May 5, 2025, named inventor Donn Rochette acknowledged that Solaris Zones disclosed all the limitations of the '814 Patent's claims. *See* Ex. 12. He also acknowledged that obtaining patent protection was critical in order for Trigence—a small start-up company—to secure early-stage investment. *See id.* at 59:4–7; *see also* Ex. 13 at 368:5–25; Ex. 4 at -8704; Ex. 20 at -3072.

### C.      Additional Facts Regarding Paragraph 13 of VirtaMove's Statement of Undisputed Facts

10.      In response to paragraph 13 of VirtaMove's Statement of Undisputed Material Facts, IBM does not dispute that its expert, Robert Stoll, did not offer an opinion on the inventors' intent to deceive. Mr. Stoll confirmed that he did not intend to opine on intent. Instead, he provided testimony on the factual bases from which such an inference could be drawn. *See* Dkt. 227-8 at 35:8–10 ("█████████████████████████████████████████████████████████████ █████████████████████████."), 35:21–23 ("█████████████████████ ███████████████████████████████████."), 36:18–21 ("████████████ ██████████████████████████████████████████████████████████████ █████████████████."); Ex. 21 ¶ 45 ("████████████████████████████ ███████████████████████████████.").

### D.      Additional Facts Regarding Paragraphs 14–20 of VirtaMove's Statement of Undisputed Facts

11.      VirtaMove provided IBM with ███████, including direct support and assistance, regarding the application migration and the adoption of Docker-based containerization technology on IBM's Cloud. *See, e.g.*, Exs. 22–33.

12.      At their depositions, VirtaMove's former CEO, Mr. Greg O'Connor, and current CEO, Mr. Nigel Stokes, testified regarding the ██████████ VirtaMove provided to IBM. *See*

*generally* Ex. 34 at 242:17–273:12; *see also* Ex. 35 at 451:17–452:19, 457:18–460:19, 460:22–462:23, 465:18–22.

13.    Mr. O'Connor testified that VirtaMove provided IBM with █████████ ████████████████████████████████████████████████████████████████ Ex. 34 at 237:4–9, 237:14–22. He further testified that this ██████ included, or related to, at least the "█████████████████████████████████," "a████████████████████████████ ██████████████," ███████████████," "██████████████████████████ ████████████████████████████," "███████████████████████████████ █████████████████████," "███████████████████████████████████████ ███████," "████████████████████████████████████████████████," "██████████████████████████████████████████████████████████████████, ████████████████████████████████████████████████████████████████ ████████████████████████████████████████████," "███████████████████ ███████████████," and "███████████████████████████████████████████").

*See id.* at 242:17–273:12; *see also* Ex. 35 at 451:17–452:19, 457:18–460:19, 460:22–462:23, 465:18–22.

14.    IBM's interrogatory responses and contemporaneous documents corroborate this testimony. *See, e.g.*, Dkt. 227-12; Ex. 36 (discussing ████████ from AppZero to IBM regarding integration of AppZero's tool with Docker containers and implementing Docker containers on IBM's cloud); Exs. 37–39 (communications between Mr. Falk and other IBM employees regarding adopting container technologies on IBM's cloud following discussions with AppZero).

15.     Other IBM and VirtaMove witnesses confirmed that VirtaMove provided ███████ suggesting that IBM implement containerization on its cloud platform—and that IBM adopted this Feedback. *See, e.g.*, Ex. 40 ¶¶ 9–10 ("█████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

██████████████████████."); *see also* Ex. 41 at 52:15–23 ("███████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

██████"); Ex. 42 at 78:22–79:4 ("█████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

██████████████████████████████████████████.").

16.     Andrew Wojnicki was not designated to testify regarding the technical feedback VirtaMove provided to IBM. *See* Ex. 43. Mr. Wojnicki testified only that he did not "█████████

█████████" of VirtaMove's ████████ to IBM. Dkt. 227-10 at 124:15. He did not testify that IBM did not use VirtaMove's ████████. *See id.*

17.     Section 5.1 of the 2014 IBM Assistance Agreement states that the Agreement does not grant IBM a license to VirtaMove's intellectual property "██████████████." Dkt. 227-9 § 5.1.

While § 5.1 states that IBM does not grant VirtaMove a license to any of IBM's copyrights, patents or other intellectual property rights in any materials provided to Supplier by IBM, the scope of the restriction on IBM's rights is narrower—*i.e.*, the section states that IBM does not receive " ███████ ████████████████ ," not that IBM does not receive " ████████████████████ " by VirtaMove.

18.    Section 5.3 of the 2014 IBM Assistance Agreement does not include any condition precedent requiring IBM to use VirtaMove's Feedback for the license granted in that section to be effective. *Id.* § 5.3.

19.    Nothing in the 2014 IBM Assistance Agreement suggests that § 5.1 overrides § 5.3. Rather, § 5.1 addresses IBM's rights in VirtaMove's software, whereas § 5.3 addresses IBM's rights to use " ████████████████████████ " provided by VirtaMove. *See generally id.*

20.    There is no conflict between the provisions of the 2014 IBM Assistance Agreement and its accompanying Statement of Work ("SOW"). *Compare* Dkt. 227-9, *with* Dkt. 227-11.

### E.    Additional Facts Regarding Paragraphs 21-22 of VirtaMove's Statement of Undisputed Facts

21.    IBM's response to VirtaMove's Interrogatory No. 22 (Dkt. 227-12) concerning "Equitable Defenses" included, in relevant part to VirtaMove's present Motion:

> **6. License and/or Exhaustion:**
>
> …
>
> Further, IBM asserts that it has an implied license to use the claimed technologies of the Asserted Patents and/or that VirtaMove is equitably estopped from asserting patent infringement of the Asserted Patents against IBM. For example, VirtaMove's own documents show that by 2014, VirtaMove knew IBM had entered into a strategic partnership with Docker and offered a "Containers service." *See, e.g.*, VM_IBM_0036343. Despite having such knowledge, VirtaMove continued to pursue business arrangements with IBM at least until 2024, at times even promoting its work around Docker and Kubernetes. *See, e.g.*, VM_IBM_0000457 (Nigel Stokes explaining to Bill Lobig, " █

9

██████████████████████████████████████████████████████ in 2021); VM_IBM_0034925; VM_IBM_0035227; VM_IBM_0035358.  At no[] point during its interactions with IBM did VirtaMove indicate—either to IBM directly or to the general public—that IBM's use of any containers, containerization, and application migration technology, including Docker and Kubernetes, infringes the Asserted Patents. *See, e.g.*, VM_IBM_0001915; VM_IBM_0001923; VM_IBM_0001958; O'Connor Tr., at 259:9-24, 282:19-25, 316:9-322:12.  Nor did VirtaMove ever demand a license from IBM for its use of containers, containerization, and application migration technology, including Docker and Kubernetes.  *See, e.g.*, O'Connor Tr., at 259:9-14; Stokes Tr., at 375:7-19. VirtaMove did not even accuse Docker of infringing the Asserted Patents, and instead, sought to establish a business relationship with Docker. *See, e.g.*, VM_IBM_0035059; VM_IBM_0035060; VM_IBM_0035063; VM_IBM_0035102 (VirtaMove explaining to Docker, "████████████████████████████████████████████████."); Stokes Tr., at 556:23-557:9.

…

**9. No Willful Infringement:**

IBM incorporates by reference its Responses to VirtaMove's Interrogatory Nos. 1, 2, 5, 8, and 13 and documents cited therein. IBM further incorporates by reference its responses to its bases for its defense of License and/or Exhaustion and Unenforceability, Equitable Estoppel, and/or Implied License.

…

Furthermore, IBM denies any purported willful infringement of the Asserted Patents to the extent that IBM has an express license to use the claimed technologies of the Asserted Patents as well as the technologies VirtaMove has accused of infringing the Asserted Patents.  For example, IBM and AppZero entered into an IBM Assistance Agreement (Agreement #4914008281) in June 27, 2014. *See, e.g.*, VM_IBM_0000840; VM_IBM_0022070; *see also* VM_IBM_0000866. Section 5.3 ("Rights") provides that

████████████████████████████████████████████████████████
████████████████████████████████████████████████████████
████████████████████████████████████ VM_IBM_0022070 at -071.  This Agreement remains in effect. *See, e.g.*, Stokes Tr., 488:19-492:22.

As to the nature and quality of "████████" provided to IBM by VirtaMove, Mr. O'Connor, VirtaMove's former Chief Executive Officer, testified that such "████████" included or otherwise related to at least the "████████████████████
████," "████████████████████████," ██████████████," "a
████████████ ██ ████████████
██ ████ ████████████ ██ ████
██████████████"



and "                                                                        ." *See, e.g.*, O'Connor Tr., at 242:17-273:12.

Furthermore, IBM denies any purported willful infringement of the Asserted Patents to the extent that IBM has an implied license to use the claimed technologies of the Asserted Patents and/or that VirtaMove is equitably estopped from asserting patent infringement of the Asserted Patents against IBM. For example, VirtaMove's own documents show that by 2014, VirtaMove knew IBM had entered into a strategic partnership with Docker and offered a "Containers service." *See, e.g.*, VM_IBM_0036343. Despite having such knowledge, VirtaMove continued to pursue business arrangements with IBM at least until 2024, at times even promoting its work around Docker and Kubernetes. *See, e.g.*, VM_IBM_0000457 (Nigel Stokes explaining to Bill Lobig, "                                                         ," in 2021); VM_IBM_0034925; VM_IBM_0035227; VM_IBM_0035358. At no[] point during its interactions with IBM did VirtaMove indicate—either to IBM directly or to the general public—that IBM's use of any containers, containerization, and application migration technology, including Docker and Kubernetes, infringes the Asserted Patents. *See, e.g.*, VM_IBM_0001915; VM_IBM_0001923; VM_IBM_0001958; O'Connor Tr., at 259:9-24, 282:19-25, 316:9-322:12. Nor did VirtaMove ever demand a license from IBM for its use of containers, containerization, and application migration technology, including Docker and Kubernetes. *See, e.g.*, O'Connor Tr., at 259:9-14; Stokes Tr., at 375:7-19. VirtaMove did not even accuse Docker of infringing the Asserted Patents, and instead, sought to establish a business relationship with Docker. *See, e.g.*, VM_IBM_0035059; VM_IBM_0035060; VM_IBM_0035063; VM_IBM_0035102 (VirtaMove explaining to Docker, "                                                         "); Stokes Tr., at 556:23-557:9.

…

*See* Dkt. 227-12 at 129–62.

22.      IBM's responses to VirtaMove's Interrogatory Nos. 1, 2, 3, 8, and 13 set forth facts and circumstances consistent with those described above, and were expressly incorporated by reference into IBM's response to VirtaMove's Interrogatory No. 22 concerning "Equitable Defenses:"

### 11. Equitable Defenses

IBM incorporates by reference its responses herein to its bases for its defenses of Failure to State a Claim, No Infringement, Invalidity, Prosecution History Estoppel and/or

Disclaimer, Ensnarement and/or Claim Vitiation, **License and/or Exhaustion**, Limitation on Damages, **Unenforceability, Equitable Estoppel, and/or Implied License, No Willful Infringement**, and No Injunctive Relief.

…

*Id.* at 162 (emphasis added). The incorporated responses relate to (among other topics) IBM's defenses of "License and/or Exhaustion," "Unenforceability, Equitable Estoppel, and/or Implied License," and "No Willful Infringement." *Id.*; *see also id.* at 7–11, 14–17, 69, 81–85, 98–102, 144–47, 129–62.

23.    At no point during the parties' business relationship did VirtaMove indicate to IBM that the use of any containers, containerization, or application migration technology—including the accused Docker- and Kubernetes-based products—infringes any VirtaMove's patents. *See, e.g.*, Dkt. 227-12 at 8–10, 15–17, 82–84, 99–101, 144–46, 157–59; Ex. 12 at 17:10–18:23; Ex. 34 at 256:7–259:24; Ex. 35 at 468:25–470:24; Ex. 41 at 78:18–23; Ex. 44 at 200:11–201:15; Ex. 45 at 52:2–53:17; Ex. 46; Ex. 47 at 66:23–72:25.

24.    IBM invested significant monetary and engineering resources into making Docker and Kubernetes containerization available on the IBM cloud. Ex. 40 ¶ 11. AppZero's suggestion that IBM should use Docker and Kubernetes containerization tools was a material factor in IBM's decision to implement Docker and Kubernetes on the IBM cloud. *Id.* ¶¶ 10, 13.

## IV.    LEGAL STANDARD FOR SUMMARY JUDGMENT

Summary judgment may not be granted if there is a genuine dispute as to any material fact, which includes "where, 'the evidence is such that a reasonable jury could return a verdict for the nonmoving party.'" *Norman v. Bodum USA, Inc.*, 44 F.4th 270, 272 (5th Cir. 2022) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)); FED. R. CIV. P. 56(a). Factual controversies are to be resolved in favor of the non-moving party. *Martinez v. Bally's La., Inc.*,

244 F.3d 474, 476 (5th Cir. 2001).

## V.    ARGUMENT

### A.    IBM Has Presented Evidence Showing It Has an Express License Under the 2014 IBM Assistance Agreement.

As set forth in detail in IBM's co-pending cross-motion for summary judgment (*see* Dkt. 240), § 5.3 of the 2014 IBM Assistance Agreement expressly grants "███████████████████ ███████████████████████████████████████████████████████████████ ████████████." Dkt. 227-9 at -0841.  That grant is clear and unambiguous under New York law, which governs the Assistance Agreement. *Id*. at -0840.  Contrary to VirtaMove's argument, neither § 5.1 of the Assistance Agreement nor § 7.0 of its accompanying SOW conflicts with § 5.3. Moreover, VirtaMove's argument that IBM must—but has failed to—show "███" of VirtaMove's Feedback is both legally and factually incorrect.

#### (i)    The Assistance Agreement Unambiguously Grants IBM a License To Use VirtaMove's "██████," Regardless of Whether the Feedback Includes Preexisting Intellectual Property.

VirtaMove advances two arguments to try to undermine the Assistance Agreement's plain and unambiguous grant of a fully paid-up license for IBM to use VirtaMove's ██████. Both arguments fail.

***First***, VirtaMove contends that § 7.0 of the SOW directly prohibits the grant of rights set forth in § 5.3 of the Assistance Agreement. *See* Dkt. 227 at 10–13.  Yet, the provision on which VirtaMove purports to rely states that "████████████████████████████████ ████████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████████ ████████████████████████." Dkt. 227-11 § 7.0 (emphasis added).  Section 5.3 of the Assistance Agreement falls squarely within that exception because it ***expressly*** states that the

agreement "███████████████████████████████████████████ ███████████████ ” Dkt. 227-9 § 5.3.

**Second**, VirtaMove suggests that because § 7.0 of the SOW refers to "████████ ██████████████████ ," it somehow requires any "██████████████" grant to specifically distinguish between pre-existing and post-existing intellectual property, and to specify which the grant covers. *See* Dkt. 227 at 12. But that interpretation adds a requirement that does not appear in the agreement. *See Moore v. Kopel*, 653 N.Y.S.2d 927, 929 (N.Y. App. Div. 1997) ("[A] contract is not rendered ambiguous just because one of the parties attaches a different, subjective meaning to one of its terms."). Section 7.0 sets forth an exception for "█████████████" grants that cover "██████ ██████████████." To determine whether a grant covers existing intellectual property, one must examine its language. *See, e.g., Kabushiki Kaisha Hattori Seiko v. Refac Tech. Dev. Corp.*, 690 F. Supp. 1339, 1342 (S.D.N.Y. 1988) (noting the specific terms of the grant clause are paramount in defining the scope of a license).

Here, § 5.3 broadly provides that ████████████████████████████████ ██████████████████████████████████████████████████████ ██████████████████████████████████████████████████████ ███████████████████████████████████████████ ." Dkt. 227-9 at -0841. On its face, "█████████ ██████████" includes intellectual property—and includes **both** pre-existing intellectual property and intellectual property acquired after the parties entered into the Agreement. That scope is consistent with the intent of the parties as indicated in § 5.3—namely, that IBM should be able to "████" **any** qualifying "████████████████████████" freely and without limitation, "████████████████ ██████████." *Id.*

Notably, far from limiting the grant to after-arising intellectual property, the only restrictions that the Assistance Agreement places on the scope of the covered Feedback is that VirtaMove must offer it "███████████████████████████" and it must relate to "███ ████." *Id.*  VirtaMove does not deny in its Motion that either of these requirements is met— and it is precluded from contesting these facts for the first time on reply. *See Intell. Ventures II LLC v. Sprint Spectrum, L.P.*, No. 2:17-CV-00662-JRG-RSP, 2019 WL 2959568, *3 (E.D. Tex. Apr. 18, 2019), *R&R adopted*, No. 2:17-CV-00661-JRG-RSP, 2019 WL 1987204 (E.D. Tex. May 6, 2019) ("It is black-letter law that arguments raised for the first time in a reply brief are waived 'as a matter of litigation fairness and procedure.'") (quoting *Novosteel SA v. U.S., Bethlehem Steel Corp.*, 284 F.3d 1261, 1273 (Fed. Cir. 2002)).  To narrow the license to exclude pre-existing intellectual property, the Assistance Agreement's drafters would have needed to include "appropriate words of restriction."  *Kabushiki Kaisha Hattori Seiko*, 690 F. Supp. at 1344.  But they did not.  Accordingly, on its face, the Feedback licensed to IBM under § 5.3 includes ***all*** qualifying "███████████████████," regardless of whether those ██████████████ ████████ arose before or after the Agreement.  *See 222 Bloomingdale Rd. Assocs. v. NYNEX Props. Co.*, 703 N.Y.S.2d 737 (N.Y. App. Div. 2000) ("Where a contract is clear and unambiguous on its face, its plain meaning should govern its interpretation."); *Feifer v. Prudential Ins. Co. of Am.*, 306 F.3d 1202, 1210 (2d Cir. 2002) ("It is axiomatic that where the language of a contract is unambiguous, the parties' intent is determined within the four corners of the contract[.]").

To try to justify excluding pre-existing intellectual property from § 5.3's scope—even though no such restriction exists in the language of the provision—VirtaMove nevertheless points to § 5.1 of the Assistance Agreement, which states: "██████████████████████████████ ████████████████████████████████████████████████████████████████████

████████████████████████████████████████████.”  Dkt. 227-9 at -0841 (emphasis

added).  VirtaMove argues that if § 5.3 granted IBM a license to pre-existing intellectual rights, it

would conflict with § 5.1 by giving IBM a free license to use VirtaMove's software.  *See* Dkt. 227

at 12–13.  However, that is incorrect—because §§ 5.1 and 5.3 are directed to different subjects. As

VirtaMove itself acknowledges, § 5.1 addresses the question of a potential license to the ***software***

VirtaMove was developing.  In contrast (and as discussed above), § 5.3 is a separate and distinct

provision that addresses—and expressly grants IBM a license to use—████████████████

████████████ that VirtaMove might provide related to the IBM cloud.  Reading these sections

together simply confirms that the parties agreed that IBM would not automatically obtain a license

to VirtaMove's software itself—but it ***would*** obtain a license to use other "████████████

████████" provided by VirtaMove, including (to the extent it was part of VirtaMove's

Feedback) other pre-existing intellectual property.

### (ii)    VirtaMove's Argument That § 5.3 Requires IBM To Have Used VirtaMove's Feedback Runs Contrary to Law and Fact.

VirtaMove further argues that IBM's license defense requires IBM to prove that it actually

"████" VirtaMove's Feedback, and it contends IBM has failed to do so.  *See* Dkt. 227 at 13–15.

That argument is legally and factually unsupported.

***First***, actual use of VirtaMove's Feedback is not a condition precedent to the existence of

a valid license covering the Feedback. Relying on the phrase "██████████████████████

████████████████████," VirtaMove argues that § 5.3 of the Assistance Agreement grants

IBM a license to VirtaMove's ████████ only if IBM "actually ***used*** that Feedback in designing

the Accused Products."  Dkt. 227 at 13–14.  On its face, however, § 5.3 gives IBM the ***right*** to use

any ████████████████████—it does not ***require*** IBM to use them. *See* Dkt. 227-9 at -

0841.  Under New York law, "a contractual duty ordinarily will not be construed as a condition

precedent absent clear language showing that the parties intended to make it a condition." *Ampower-US, LLC v. WEG Transformers USA, LLC*, 214 A.D.3d 1129, 1131 (N.Y. App. Div. 2023). Absent specific terms in the agreement that clearly establish the condition precedent—such as "provided that" or "on condition that"—courts generally do find a condition precedent. *See, e.g.*, *Shmaltz Brewing Co. v. Dog Cart Mgmt. LLC*, 163 N.Y.S.3d 659, 662 (N.Y. App. Div. 2022).

Here, where the Assistance Agreement lacks any such language, VirtaMove's misinterpretation should be rejected. Indeed, VirtaMove's argument that IBM was specifically required to use the ███ "in designing the Accused Products" contradicts the Agreement's plain language, which grants IBM "████████████████████ ███████████." Dkt. 227-9 at -0841 (emphasis added). VirtaMove's attempt to rewrite the express phrase "████████████████" as meaning "in designing the Accused Products" should be rejected. *See 222 Bloomingdale Rd. Assocs.*, 703 N.Y.S.2d at 737 ("Where a contract is clear and unambiguous on its face, its plain meaning should govern its interpretation."); *see also Feifer*, 306 F.3d at 1210; *Moore*, 653 N.Y.S.2d at 929.

**Second**, even if VirtaMove were correct that § 5.3 requires actual use of VirtaMove's ███ by IBM—which it does not—the record contains evidence of use. VirtaMove relies on deposition testimony from one of IBM's 30(b)(6) witness, Andy Wojnicki—who was not designated to testify regarding the technical materials and suggestions VirtaMove provided to IBM—to assert that "there is no evidence (or even allegation) that IBM ***used*** any of the ███ in developing the Accused Products." Dkt. 227 at 14. Yet, Mr. Wojnicki merely testified that he did not "know the specifics" of the ███ VirtaMove provided to IBM—not that IBM did not use VirtaMove's ███. Dkt. 227-10 at 124:15.

17

Meanwhile, other IBM and VirtaMove witnesses confirmed that VirtaMove provided ███████ suggesting IBM implement containerization on IBM's cloud platform—and that IBM implemented this ██████. VirtaMove's witness and former CEO Greg O'Connor admitted that VirtaMove provided IBM with ███████ on "████████████████████████████████████████████████████████████████████████████████████████." Ex. 34 at 237:4–9, 13–22; *see also generally id.* at 242:17–273:12 (testifying that VirtaMove's "████████" included, or related to, at a minimum, the "████████████████████████████████████," "████████████████████████████," "████████████," "█████████████████████," "█████████████████████," "████████████████████████████," "███████████████████████████████████████████████████," "████████████████████████████████████████████████████████████████████████████████████████," "████████████████████████," "████████████████████████████████████████," the "██████████████████████████████████████████," and "████████████████████████████████████████████"); Ex. 41 at 52:15–24 ("████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████."); Ex. 42 at 78:22–79:4 ("████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████

██████████████████████████████████████████████████████████████

████████████████████████████████████.").

IBM's interrogatory responses and contemporaneous documents corroborate this testimony.  *See, e.g.*, Dkt. 227-12; Ex. 36 (discussing ████████ AppZero provided to IBM concerning integrating AppZero's tool with Docker containers and implementing Docker containers on IBM's cloud); Exs. 37–39 (communications between Mr. Falk and other IBM employees regarding adopting container technologies on IBM's cloud following communications with AppZero).  And IBM employee Walter Falk testified that VirtaMove's ████████ encouraging IBM to use Docker and Kubernetes container technologies "███████████████████████ ██████████████████████████████████." Ex. 40 ¶¶ 9–10 ("████████████████ ██████████████████████████████████████████████████████████████ ██████████████████████████████████████████████████████████████ ██████████████████████████████████████████████████████████████ ██████████████████████████████████████████████████████████████ ██████████████████████████████████████████████████████████████ ██████████████████████████████████████████████████████████████ ██████████████████████████████████████████████████████████████ ██████████████████████████████████████████████████████████████ █████████████████████████████████████████████████████.").

Further, while VirtaMove argues that IBM has failed to show it used VirtaMove's Feedback to develop the Accused Products, it is VirtaMove itself that accuses those products of infringing based on features that were included in VirtaMove's Feedback.  *See* Dkt 240. VirtaMove cannot have it both ways.  If VirtaMove denies that IBM implemented its Feedback in

the Accused Products, VirtaMove cannot allege infringement based on technology that was part of the Feedback.

As set forth set in IBM's co-pending motion for summary judgment (Dkt. 240) the undisputed facts show that **IBM** is entitled to summary judgment that the Assistance Agreement provides it with an express license defeating VirtaMove's infringement claims. At a minimum, this Court should reject VirtaMove's cross-motion for summary judgment and the implausible contract interpretations offered by VirtaMove.

### B.      IBM Has Presented Evidence Supporting Its Affirmative Defense Of Inequitable Conduct.

The law of inequitable conduct is based on the principle that patent applicants—and those substantially involved in the preparation or prosecution of patent applications—owe a "duty of candor and good faith" to the USPTO. *SB IP Holdings, LLC v. Vivint, Inc.*, No. 4:20-CV-00886, 2023 WL 5615780, at *2 (E.D. Tex. Aug. 30, 2023); *see also M. Eagles Tool Warehouse, Inc. v. Fisher Tooling Co.*, 439 F.3d 1335, 1340 (Fed. Cir. 2006).  To prevail on this defense, IBM must show that (1) the information withheld from the USPTO was material; and (2) the applicant intended to deceive the Patent Office. *Aventis Pharma S.A. v. Hospira, Inc.*, 675 F.3d 1324, 1334 (Fed. Cir. 2012). Because both prongs are inherently fact-intensive, courts have observed that inequitable conduct is rarely suitable for resolution at summary judgment. *See SB IP Holdings*, 2023 WL 5615780, at *2 (citing *Digital Control, Inc. v. Charles Mach. Works*, 437 F.3d 1309, 1317 (Fed. Cir. 2006)). IBM's inequitable conduct defense is no exception.

Contrary to VirtaMove's assertion that no genuine dispute exists (*see* Dkt. 227), the record supports a finding of inequitable conduct during the '814 Patent's prosecution, because the Applicants failed to disclose statements made to the EPO during the prosecution of the '814 Patent's European counterpart—statements that directly contradicted representations the

Applicants made to the USPTO. The Applicants also failed to disclose material information—namely, the Solaris 10 prior art, including its Zones feature, despite the Solaris Zones' clear materiality to the claimed invention. Because this evidence satisfies the materiality and intent elements of inequitable conduct—and, at a minimum, presents genuine issues of facts regarding those elements—VirtaMove's request for summary judgment should be denied.

      **(i)**      **Evidence Shows the Applicants Committed Inequitable Conduct by Failing To Disclose the '814 Patent's European Counterpart Application.**

It is undisputed that the '814 Patent's applicants failed to disclose to the USPTO the EPO's rejections of the '814 Patent's European Counterpart Application EP04021916 over the Schaefer prior art reference—and also failed to disclose their responses to the EPO's rejections. The Applicants' responses to the EPO included: (1) narrowing Claim 1 of the European Counterpart Application to add a unique-identifier requirement—which was not added to the identical Claim 1 of the '814 Patent, despite purportedly being an "important" enabling feature of the claimed invention (*see* Dkt. 227-3 at -1566)—and (2) conceding to the EPO that the Schaefer reference disclosed certain limitations of the European Counterpart Application, despite later representing to the USPTO that the corresponding claimed invention of the '814 Patent was "new and unique." *See supra* Section III.A.

While VirtaMove contends that there is "no evidence that the [applicants] knew EPO's office action responses are material to prosecution in the U.S." (Dkt. 227 at 17), the Applicants' statements to the EPO are plainly inconsistent with the position they took before the USPTO, and IBM's technical expert Dr. Wicker confirmed that the content of the withheld statements was but-for material to the '814 Patent's prosecution. *See* Ex. 48 ¶¶ 1528–43. This is precisely the type of information that the Manual of Patent Examining Procedure ("MPEP") requires applicants to disclose to the USPTO. *See* MPEP § 2001.06(a) ("The inference that such prior art or other

information is material is especially strong where it has been used in rejecting the same or similar claims in the foreign application or where it has been identified in some manner as particularly relevant.").

Relying on *ATD Corp. v. Lydall, Inc.*, 159 F.3d 534 (Fed. Cir. 1998), VirtaMove nevertheless suggests the Federal Circuit has held that patentees do not need to disclose communications with foreign patent offices to the USPTO. *See* Dkt. 227 at 17–18. VirtaMove is wrong. *ATD Corp.* simply holds that applicants are not required to submit international search reports to the USPTO when the prior art in the report is already before the examiner. *See ATD Corp.*, 159 F.3d at 547. *ATD Corp.* did not address a situation—like that here—where the Applicants intentionally withheld material representations made to a foreign patent office regarding the scope of the claimed invention that contradict their representations to the USPTO. Courts have found such foreign representations can be material, especially when they bear on the allowable scope of the claimed invention. *See, e.g.*, *Therasense, Inc. v. Becton, Dickinson & Co.*, 864 F. Supp. 2d 856, 863 (N.D. Cal. 2012) (finding EPO briefs were "material" because "it is manifest that the withheld EPO briefs would have contradicted [patentee's] declaration and submission"); *Ethicon Endo-Surgery, Inc. v. Covidien, Inc.*, No. 1:11-CV-871, 2013 WL 12178114, at *4–5 (S.D. Ohio Oct. 2, 2013) (finding statements made to EPO were "material" because they "flatly contradict those found in the . . . patent specification itself") (citation omitted); *EIS, Inc. v. IntiHealth Ger GmbH*, No. CV 19-1227-GBW, 2023 WL 6799332, at *6–7 (D. Del. Aug. 23, 2023) (finding arguments related to a German Opposition Proceeding were relevant and non-cumulative because they were inconsistent with patentee's conduct before the USPTO). Indeed, in denying VirtaMove's motion to dismiss IBM's inequitable conduct claims, this Court itself recognized "an applicant owes a duty to disclose contradictory statements made in a foreign

prosecution even if the applicant timely disclosed the relevant prior art reference." Dkt. 158 at 7.

Notwithstanding the materiality of the withheld information, which itself gives rise to a genuine dispute of material fact, VirtaMove also contends there is no evidence that the Applicants chose to hide these statements to deceive the USPTO. *See* Dkt. 227 at 16–18. On the contrary, the record contains ample evidence demonstrating that the Applicants failed to disclose these statements with the intent to deceive the USPTO—including, at a minimum, the facts that the European Counterpart Application and the '814 Patent Application contained identical independent claims, were prosecuted contemporaneously, and had the same named inventors. *See id.* at 17; Dkt. 227-3; Dkt. 227-4.

The evidence shows that the Applicants also had a strong financial motive to deceive the USPTO. As a startup with limited capital, Trigence (now VirtaMove) relied on obtaining patents to attract venture capital funding and to qualify for tax incentives. *See, e.g.*, Ex. 12 at 59:4–7 (testifying that the purpose of Trigence's patents was to help obtain investments from third parties during the company's early stage); Ex. 13 at 368:5–25 (testifying that Trigence sought patent protection to attract investment, because patents were a "███████████████████████████ ███████████"); Ex. 4 at -8704; Ex. 20 at -3072; Ex. 49 at -1610. Given the facts surrounding the '814 Patent's prosecution, as well as Trigence's financial situation, there are—at a minimum— genuine disputes of material fact regarding the Applicants' intent to deceive the USPTO.

> **(ii)    Evidence Shows the Applicants Committed Inequitable Conduct by Failing To Disclose Solaris Zones.**

The '814 Patent's applicants also failed to disclose Solaris Zones to the USPTO. Despite VirtaMove's contention that "there was no evidence that the inventors knew Solaris Zones was prior art to begin with," Dkt. 227 at 18–19, the record—including internal emails, inventor logbooks, and inventor testimony—shows that before and during the '814 Patent's prosecution,

the Applicants were aware of Solaris Zones and its similarities to the '814 Patent's claimed invention. All three named inventors testified to having knowledge of Solaris Zones before the '814 Patent issued. *See* Ex. 12 at 88:17–89:1; Ex. 13 at 308:20–309:4; Ex. 14 at 284:23–287:24; *see also supra* Section III.B. Not only did the inventors know about Solaris Zones, but each inventor testified about meetings and other business interactions that they had with Sun Microsystems, Solaris Zones' creator. *See* Ex. 12 at 86:12–15; Ex. 13 at 419:21–23; Ex. 14 at 283:21–284:6; *see also supra* Section III.B.

The inventors and Trigence also plainly recognized the materiality of Solaris Zones to the '814 Patent's patentability. Named inventor Mr. Huffman testified that Solaris Zones was a competing product with functionality similar to Trigence's product based on the '814 Patent. *See* Ex. 14 at 281:6–282:22; *see also* Ex. 13 at 417:2–12. This testimony is corroborated by Trigence's internal documents, which expressly acknowledge the similarities between Solaris Zones and Trigence's AE product. *See* Ex. 5; Ex. 10; Ex. 18 (" ██████████████████████████ ██████████████████████████████████████████████████ "); Ex. 19. These admissions and internal documents confirm that Trigence understood Solaris Zones was a materially relevant technology.

Further, the record contains ample evidence that the '814 Patent's applicants withheld Solaris 10 and its Zones feature from the USPTO with the intent to deceive. Notably, named inventor Mr. Rochette conceded that Solaris Zones disclosed all the limitations of the '814 Patent. *See generally* Ex. 12. Mr. Rochette also acknowledged that, as noted above, obtaining patent protection was critical for Trigence—a small start-up company—to secure early-stage investment. *Id.* at 59:4–7. Given Trigence's awareness of Solaris Zones, its recognition of the similarities between the Solaris Zones technology and the '814 Patent's claimed invention, and its financial

interest in securing investment through patent protection, it is reasonable to infer that the Applicants intentionally withheld this material reference to avoid jeopardizing the '814 Patent's issuance. This evidence therefore gives rise to genuine disputes of material fact as to both Solaris Zones' materiality and the Applicants' intent to deceive when they failed to disclose this reference to the USPTO.

### C.  IBM Has Presented Evidence Supporting Its Affirmative Equitable Defenses of Waiver, Acquiescence, and Unclean Hands.

VirtaMove makes no meaningful attempt to satisfy its burden on summary judgment with respect to IBM's equitable defenses. Rather than substantively addressing the evidence supporting these defenses, VirtaMove relies solely on a conclusory assertion that IBM supposedly failed to disclose certain equitable defenses—waiver, acquiescence, and unclean hands—in IBM's interrogatory responses. Dkt. 227 at 21–23. VirtaMove also contends that IBM did not allege required elements for these defenses, including "(i) assurances by VirtaMove that induce[] reliance by the IBM, (ii) intentional relinquishment of a known right by VirtaMove, or (iii) allegedly extreme or unconscionable actions by VirtaMove." *Id.* at 22–23. In addition, VirtaMove baldly asserts that IBM has offered "no facts that can form the basis of acquiescence, waiver, or unclean hands." *Id.* at 22.

As an initial matter, as the moving party, VirtaMove "bears the initial burden of informing the district court of the basis for its motion." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). "It is not enough for the moving party to merely make a conclusory statement that the other party has no evidence to prove his case." *Ashe v. Corley*, 992 F.2d 540, 543 (5th Cir. 1993). Yet, in essence, that is all VirtaMove does in its summary judgment motion regarding IBM's equitable defenses.

In any event, VirtaMove's bald assertions are incorrect. IBM expressly disclosed these equitable defenses in its Answer to VirtaMove's Complaint. *See* Dkt. 115 at 10. Moreover, as IBM has made clear, the same facts that support IBM's defenses of waiver, acquiescence, and unclean hands also form the basis for its other equitable defenses—including equitable estoppel, implied license, lack of willful infringement, and unenforceability—and these facts are stated in detail in IBM's response to VirtaMove's Interrogatory No. 22. *See* Dkt. 227-12 at 7–11, 14–17, 69, 81–85, 98–102, 144–47, 154–60.  At a minimum, IBM has come forward with sufficient evidence to raise genuine disputes of fact with respect to its waiver, acquiescence, and unclean hands defenses.

  **(i)**  **Waiver**

"[W]aiver can result from silence or inaction if it occurs for so long that one could conclude the right holder intended to relinquish the right." *Mars, Inc. v. TruRx LLC*, No. 6:13-CV-526-RWS-KNM, 2016 WL 4034789, at *6 (E.D. Tex. Mar. 1, 2016), *report and recommendation adopted*, No. 6:13-CV-526-RWS-KNM, 2016 WL 4055676 (E.D. Tex. Apr. 29, 2016). As detailed in IBM's motions for summary judgment of non-infringement (Dkt. 240) and of no willful infringement (Dkt. 237), IBM's waiver defense arises from VirtaMove's prolonged silence and its affirmative encouragement of IBM's use of Docker container technology in the IBM cloud. *See, e.g.*, Dkt. 237; Dkt. 240; *supra* Sections III.D–E, V.A. From 2014 to 2023, VirtaMove engaged in business discussions and collaborations with IBM, including providing support and training to IBM and its customers on Docker-based migration. *See* Dkt. 227-12 at 7–11, 14–17, 69, 81–85, 98–102, 144–47, 154–60; *supra* Section III.D. VirtaMove also directly assisted IBM customers in migrating applications to IBM Cloud. Dkt. 227-12 at 8–10, 15–17, 82–84, 99–101, 144–46, 157–59; Section III.D.

Significantly, VirtaMove was aware of the accused IKS product as early as 2017—the year it was released—but raised no concerns regarding any alleged infringement. *See* Dkt. 227-12 at 9–

10, 16–17, 83–84, 100–01, 145–46, 158–59; Ex. 40 ¶ 11; *supra* Section III.D–E. It was not until January 2024—nearly twelve years after the parties began collaborating on cloud-based technologies and nearly seven years after IKS launched—that VirtaMove first alleged infringement. *See* Ex 22 (Falk Decl.) ¶ 12; *supra* Section III.D-E.

Courts routinely reject summary judgment of no waiver when a plaintiff delays in asserting its rights under comparable circumstances. *See, e.g.*, *Raytheon Co. v. Indigo Sys. Corp.*, No. 4:07-CV-109, 2009 WL 2744057, at *5 (E.D. Tex. Aug. 25, 2009) (denying summary judgment motion of no waiver where plaintiff waited "nearly ten years" from date of agreement and "over two years" after it disassembled the accused product to file suit); *Mars*, 2016 WL 4034789, at *6 (denying summary judgment where plaintiff "waited a substantial amount of time before filing suit, even after it learned of . . . sales of the accused products"); *Headwater Rsch. LLC v. AT&T Inc.*, No. 2:23-CV-397-JRG-RSP, Dkt. 242 at 5 (E.D. Tex. July 7, 2025) (denying summary judgment of no waiver where defendant alleged plaintiff "was on notice of the accused features[,]" but continued to pursue business opportunities for years before alleging infringement). *Cf. JumpSport, Inc. v. Acad., Ltd.*, No. 6:17-CV-414-RWS-JDL, 2018 WL 10124888, at *4 (E.D. Tex. Sept. 6, 2018) (denying motion to strike where defendant alleged delay in bringing suit after plaintiff was aware of sales of accused product).

**(ii)    Acquiescence**

To establish acquiescence, IBM must show that VirtaMove made "implicit or explicit assurances to [IBM] … [that] induce[d] reliance." *JumpSport*, 2018 WL 10124888, at *4 (citing *Conan Props., Inc. v. Conans Pizza, Inc.*, 752 F.2d 145, 153 (5th Cir. 1985)).

Here, there is evidence that VirtaMove engaged in conduct—including publicly dismissing Docker and Kubernetes-based solutions as noncompetitive—that reasonably conveyed the impression that it did not view IBM's Docker and Kubernetes-based products as infringing. *See*

Dkt. 227-12 at 8–10, 15–17, 82–84, 99–101, 144–46, 157–59; *supra* Section III.D-E.   IBM reasonably relied on that posture in continuing to develop and commercialize its container-based technologies, including through its release of and long-term investment in IKS.   *See* Dkt. 227-12 at 9–11, 16–17, 100–102, 146–47, 158–60; *supra* Sections III.D–E. Given the substantial investments and strategic commitments that IBM made in reliance on VirtaMove's silence, VirtaMove's delay has caused IBM substantial prejudice.   *See, e.g.*, *Pennzoil-Quaker State Co. v. Miller Oil & Gas Operations*, 779 F.3d 290, 297 (5th Cir. 2015) ("Equating undue prejudice with some form of 'business building' accords with the decisions of our sister circuits.").

At a minimum, given the evidence, there is a genuine dispute of fact regarding whether VirtaMove's conduct constituted an implicit assurance that IBM's use of containerization, container orchestration, and application technologies—including the accused IKS product—did not infringe the '814 Patent. *See, e.g.*, *Equistar Chems., LP v. Westlake Chem. Corp.*, No. 6:14-CV-68, 2016 WL 4373713, at *3 (E.D. Tex. Feb. 26, 2016) (denying summary judgment of no equitable estoppel, or acquiescence, because there were genuine disputes of material fact regarding "whether Plaintiffs delayed filing suit for an unreasonable and inexcusable length of time from the time they knew or reasonably should have known of their claim against [Defendant] and the delay prejudiced [Defendant]").

### (iii)    Unclean Hands

The doctrine of unclean hands applies when a party's misconduct "has immediate and necessary relation to equity that he seeks in respect of the matter in litigation"—*i.e.*, where the party's misconduct "in some measure affect[s] the equitable relations between the parties in respect of something brought before the court." *Gilead Scis., Inc. v. Merck & Co.*, 888 F.3d 1231, 1239 (Fed. Cir. 2018) (quoting *Keystone Driller Co. v. Gen. Excavator Co.*, 290 U.S. 240, 245 (1933)). The doctrine "necessarily gives wide range to the equity court's use of discretion in refusing to aid

the unclean litigant," and "closes the doors of a court of equity to one tainted with inequitableness or bad faith relative to the matter in which he seeks relief, however improper may have been the behavior of the defendant." *Precision Instrument Mfg. Co. v. Auto. Maint. Mach. Co.*, 324 U.S. 806, 814–15 (1945).

VirtaMove does not substantively rebut the evidence IBM has offered in support of its unclean hands defense. As explained above (*see supra* Section V.B), IBM has presented evidence that the '814 Patent's applicants committed inequitable conduct when obtaining the patent, by concealing contrary statements made to the European Patent Office and by failing to disclose material prior art to the USPTO— "affirmative acts of misconduct intended to deceive . . . the PTO." *Therasense, Inc. v. Becton, Dickinson & Co.*, 649 F.3d 1276, 1287 (Fed. Cir. 2011). That same misconduct also underlies IBM's unclean hands defense, and gives rise to a genuine dispute of material fact that precludes summary judgment. *See e.g., Consol. Aluminum Corp. v. Foseco Int'l, Ltd.*, 910 F.2d 804, 812 (Fed. Cir. 1990) (noting inequitable conduct "is no more than the unclean hands doctrine applied to particular conduct before the PTO"); *Sprint Commc'ns Co. L.P. v. Charter Commc'ns, Inc.*, No. CV 17-1734-RGA, 2021 WL 982726, at *11–12 (D. Del. Mar. 16, 2021) ("Defendants' unclean hands defense rests on the same evidence and arguments that supported their arguments against summary judgment on inequitable conduct. Therefore, the motions for summary judgment on inequitable conduct and summary judgment on the unclean hands defense will rise or fall together.").

### D.    VirtaMove's Challenge to IBM's Marking Defense Is Moot.

The Court should deny as moot VirtaMove's Motion regarding IBM's Seventh Affirmative Defense based on 35 U.S.C. § 287. IBM initially asserted this defense in response to VirtaMove's damages claims related to the '058 Patent. IBM relied on VirtaMove's failure to mark and offered both fact evidence and expert testimony in support. *See* Dkt. 227-12 at 153–54. However, given

the Court's finding that the term "functional replicas" in Independent Claim 1 of the '058 Patent is indefinite (*see* Dkt. 222), all asserted claims of the '058 Patent are now invalid and unenforceable, and thus cannot be infringed. *See Commil USA, LLC v. Cisco Sys., Inc.*, 575 U.S. 632, 637 (2015).

Accordingly, no live controversy remains for the Court to resolve on this issue, rendering VirtaMove's Motion moot. *See VirnetXInc. v. Apple Inc.*, 925 F. Supp. 2d 816, 849 (E.D. Tex. 2013), *aff'd in part, vacated in part, rev'd in part sub nom. on other grounds by Virnetx, Inc. v. Cisco Sys., Inc.*, 767 F.3d 1308 (Fed. Cir. 2014) ("The Court cannot and will not enter judgment upon claims and defenses that were not presented for consideration to the jury."). If it becomes necessary, IBM reserves the right to reassert this Defense at a later stage of the proceedings.

## VI.    CONCLUSION

For the reasons set forth above, IBM respectfully asks the Court to deny in full Plaintiff VirtaMove's Motion for Summary Judgment of Defendant IBM's Sixth, Seventh, Eighth and Eleventh Affirmative Defenses.

Dated: August 11, 2025

Respectfully submitted,

/s/ Todd M. Friedman
Todd M. Friedman (*pro hac vice*)
KIRKLAND & ELLIS LLP
601 Lexington Avenue
New York, NY 10022
Telephone:   (212) 446-4800
Facsimile:   (212) 446-4900
todd.friedman@kirkland.com

Brandon H. Brown
State Bar No. 266347
Kyle Calhoun (*pro hac vice*)
Nathaniel Ngerebara (*pro hac vice*)
KIRKLAND & ELLIS LLP
555 California Street
San Francisco, CA 94104
Telephone:   (415) 439-1400
Facsimile:   (415) 439-1500
brandon.brown@kirkland.com
kyle.calhoun@kirkland.com
nate.ngerebara@kirkland.com

Yimeng Dou
State Bar No. 285248
Andrew Morrill (*pro hac vice*)
KIRKLAND & ELLIS LLP
695 Town Center Dr.
Costa Mesa, CA 92626
Telephone:   (714) 982-8822
Facsimile:   (714) 982-8844
yimeng.dou@kirkland.com
drew.morrill@kirkland.com

*Of Counsel:*

Andrea L. Fair
Texas State Bar No. 24078488
MILLER FAIR HENRY PLLC
1507 Bill Owens Parkway
Longview, TX 75604
Telephone:   (903) 757-6400
Facsimile:   (903) 757-2323
andrea@millerfairhenry.com

*Attorneys for Defendant*
*International Business Machines Corp.*

## <u>CERTIFICATE OF SERVICE</u>

The undersigned hereby certifies that all counsel of record who are deemed to have

consented to electronic service are being served on August 11, 2025, with a copy of this

document via electronic mail.


*/s/ Todd M. Friedman*
Todd M. Friedman

## <u>CERTIFICATE OF AUTHORIZATION TO FILE UNDER SEAL</u>

I hereby certify that the foregoing document is authorized to be filed under seal pursuant to the Protective Order entered in this case.

*/s/ Todd M. Friedman*
Todd M. Friedman

**UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF TEXAS**
**MARSHALL DIVISION**

| | | |
|---|---|---|
| VIRTAMOVE, CORP., | § | Case No. 2:24-cv-00093-JRG |
| | § | (Lead Case) |
| Plaintiff, | § | |
| | § | |
| v. | § | **JURY TRIAL DEMANDED** |
| | § | |
| HEWLETT PACKARD ENTERPRISE | § | |
| COMPANY, | § | |
| | § | |
| Defendant. | § | |
| | § | |
| VIRTAMOVE, CORP., | § | Case No. 2:24-cv-00064-JRG |
| | § | (Member Case) |
| Plaintiff, | § | |
| | § | |
| v. | § | **JURY TRIAL DEMANDED** |
| | § | |
| INTERNATIONAL BUSINESS MACHINES | § | |
| CORP., | § | |
| | § | |
| Defendant. | § | |
| | § | |
| | § | |

**DECLARATION OF NATHANIEL NGEREBARA IN SUPPORT OF DEFENDANT**
**INTERNATIONAL BUSINESS MACHINES CORP.'S OPPOSITION TO PLAINTIFF**
**VIRTAMOVE'S MOTION FOR SUMMARY JUDGMENT OF DEFENDANT IBM'S**
**SIXTH, SEVENTH, EIGHTH AND ELEVENTH AFFIRMATIVE DEFENSES**

I, Nathaniel Ngerebara, hereby declare:

1.       I am a partner at Kirkland & Ellis LLP, counsel of record for Defendant International Business Machines Corp. ("IBM") in the above-captioned action. I make this declaration based on my personal knowledge and review of the documents referenced herein. If called to testify, I could and would testify competently to the matters set forth below.

2.       Attached as **Exhibit 1** is a true and correct copy of a production document from IBM, bearing beginning bates IBM_VM_000193145.

1

3.      Attached as **Exhibit 2** is a true and correct copy of a production document from IBM, bearing beginning bates IBM_VM_000193155.

4.      Attached as **Exhibit 3** is a true and correct copy of a production document from IBM, bearing beginning bates IBM_VM_000193149.

5.      Attached as **Exhibit 4** is a true and correct copy of a production document from VirtaMove, bearing beginning bates VM_IBM_0028702.

6.      Attached as **Exhibit 5** is a true and correct copy of a production document from VirtaMove, bearing beginning bates VM_IBM_0024666.

7.      Attached as **Exhibit 6** is a true and correct copy of a production document from VirtaMove, bearing beginning bates VM_IBM_0024807.

8.      Attached as **Exhibit 7** is a true and correct copy of a production document from VirtaMove, bearing beginning bates VM_IBM_0024814.

9.      Attached as **Exhibit 8** is a true and correct copy of a production document from VirtaMove, bearing beginning bates VM_IBM_0024816.

10.     Attached as **Exhibit 9** is a true and correct copy of a production document from VirtaMove, bearing beginning bates VM_IBM_0024866.

11.     Attached as **Exhibit 10** is a true and correct copy of a production document from VirtaMove, bearing beginning bates VM_IBM_0025914.

12.     Attached as **Exhibit 11** is a true and correct copy of a production document from VirtaMove, bearing beginning bates VM_PA_0000061.

13.     Attached as **Exhibit 12** is a true and correct copy of excerpts from the Donn Rochette Deposition Transcript, dated May 5, 2025.

2

14.      Attached as **Exhibit 13** is a true and correct copy of excerpts from the Paul O'Leary Deposition Transcript, dated May 15, 2025.

15.      Attached as **Exhibit 14** is a true and correct copy of excerpts from the Dean Huffman Deposition Transcript, dated May 23, 2025.

16.      Attached as **Exhibit 15** is a true and correct copy of a production document from VirtaMove, bearing beginning bates VM_IBM_0026745.

17.      Attached as **Exhibit 16** is a true and correct copy of a production document from VirtaMove, bearing beginning bates VM_IBM_0024635.

18.      Attached as **Exhibit 17** is a true and correct copy of a production document from VirtaMove, bearing beginning bates VM_IBM_0026132.

19.      Attached as **Exhibit 18** is a true and correct copy of a production document from VirtaMove, bearing beginning bates VM_IBM_0024810.

20.      Attached as **Exhibit 19** is a true and correct copy of a production document from VirtaMove, bearing beginning bates VM_IBM_0024840.

21.      Attached as **Exhibit 20** is a true and correct copy of a production document from VirtaMove, bearing beginning bates VM_IBM_0023062.

22.      Attached as **Exhibit 21** is a true and correct copy of excerpts from the Opening Expert Report of IBM's Expert, Mr. Robert Stoll, dated June 23, 2025.

23.      Attached as **Exhibit 22** is a true and correct copy of a production document from VirtaMove, bearing beginning bates VM_IBM_0001330.

24.      Attached as **Exhibit 23** is a true and correct copy of a production document from VirtaMove, bearing beginning bates VM_IBM_0036109.

25.     Attached as **Exhibit 24** is a true and correct copy of a production document from VirtaMove, bearing beginning bates VM_IBM_0036108.

26.     Attached as **Exhibit 25** is a true and correct copy of a production document from VirtaMove, bearing beginning bates VM_IBM_0036021.

27.     Attached as **Exhibit 26** is a true and correct copy of a production document from VirtaMove, bearing beginning bates VM_IBM_0036020.

28.     Attached as **Exhibit 27** is a true and correct copy of a production document from VirtaMove, bearing beginning bates VM_IBM_0036533.

29.     Attached as **Exhibit 28** is a true and correct copy of a production document from VirtaMove, bearing beginning bates VM_IBM_0029997.

30.     Attached as **Exhibit 29** is a true and correct copy of a production document from VirtaMove, bearing beginning bates VM_IBM_0029919.

31.     Attached as **Exhibit 30** is a true and correct copy of a production document from VirtaMove, bearing beginning bates VM_IBM_0029923.

32.     Attached as **Exhibit 31** is a true and correct copy of a production document from VirtaMove, bearing beginning bates VM_IBM_0030007.

33.     Attached as **Exhibit 32** is a true and correct copy of a production document from VirtaMove, bearing beginning bates VM_IBM_0000435.

34.     Attached as **Exhibit 33** is a true and correct copy of a production document from VirtaMove, bearing beginning bates IBM_VM_000092622.

35.     Attached as **Exhibit 34** is a true and correct copy of excerpts from the Greg O'Connor Deposition Transcript, dated May 15, 2025.

36.     Attached as **Exhibit 35** is a true and correct copy of excerpts from the Nigel Stokes Deposition Transcript, dated May 21, 2025.

37.     Attached as **Exhibit 36** is a true and correct copy of a production document from IBM, bearing beginning bates IBM_VM_000092769.

38.     Attached as **Exhibit 37** is a true and correct copy of a production document from IBM, bearing beginning bates IBM_VM_000092791.

39.     Attached as **Exhibit 38** is a true and correct copy of a production document from IBM, bearing beginning bates IBM_VM_000092794.

40.     Attached as **Exhibit 39** is a true and correct copy of a production document from IBM, bearing beginning bates IBM_VM_000094157.

41.     Attached as **Exhibit 40** is a true and correct copy of the Declaration of Walter Falk In Support Of IBM's Motion for Summary Judgment, dated July 25, 2025.

42.     Attached as **Exhibit 41** is a true and correct copy of excerpts from the Walter Falk Deposition Transcript, dated May 13, 2025.

43.     Attached as **Exhibit 42** is a true and correct copy of excerpts from the Michael Dorosh Deposition Transcript, dated May 27, 2025.

44.     Attached as **Exhibit 43** is a true and correct copy of an email correspondence from me to Daniel Kolko (counsel for VirtaMove) regarding 30(b)(6) Topic Designations for Andy Wojnicki, dated May 9, 2025.

45.     Attached as **Exhibit 44** is a true and correct copy of excerpts from the Paul O'Leary Deposition Transcript , dated May 14, 2025.

46.     Attached as **Exhibit 45** is a true and correct copy of excerpts from the Dean Huffman Deposition Transcript, dated May 21, 2025.

47.     Attached as **Exhibit 46** is a true and correct copy of VirtaMove's Objections and Responses to IBM's 2nd Set of Requests for Admissions (Nos. 36-40), dated May 29, 2025.

48.     Attached as **Exhibit 47** is a true and correct copy of excerpts from the Mac Devine Deposition Transcript, dated May 29, 2025.

49.     Attached as **Exhibit 48** is a true and correct copy of excerpts from the Opening Expert Report of Stephen B. Wicker Regarding U.S. Patent Nos. 7,519,814 and 7,784,058, dated June 23, 2025.

50.     Attached as **Exhibit 49** is a true and correct copy of a production document from VirtaMove, bearing beginning bates VM_IBM_001609.

51.     My firm has applied highlighting to Exhibits 1-7, 9-10, 12-13, 15, 17, 19, and 41-42 consistent with the guidance in Local Rule CV-7(b) and CV-56(d).


I declare under penalty of perjury that the foregoing is true and correct. Executed on August 11, 2025 in San Francisco, CA.


*/s/ Nathaniel Ngerebara*
Nathaniel Ngerebara

**CERTIFICATE OF SERVICE**

The undersigned hereby certifies that all counsel of record who are deemed to have consented to electronic service are being served with a copy of this document via the Court's CM/ECF system pursuant to Local Rule CV-5(a)(3) on August 11, 2025.


_/s/ Todd M. Friedman_____
Todd M. Friedman